1   Danielle Hultenius Moore (SBN 232480)
        E-Mail:  dmoore@fisherphillips.com
2   Miranda R. Watkins (SBN 279708)
        E-Mail:  mwatkins@fisherphillips.com
3   **FISHER & PHILLIPS LLP**
    4747 Executive Drive, Suite 1000
4   San Diego, California  92121
    Telephone:  (858)597-9600
5   Facsimile:  (858)597-9601

6   Attorneys for Defendant,
    Union Pacific Railroad Company

7

8               **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10  THOMAS DUNGER,                      Case No:  2:18-cv-06374-PA(SSx)

11              Plaintiff,              *[Los Angeles Superior Court Case
                                        No. BC73484 before the Honorable*
12      v.                              *Monica Bachner]*

13  UNION PACIFIC RAILROAD              **DECLARATION OF ANDREAS
    COMPANY, and DOES 1 through 20,     MADER IN SUPPORT OF
14  inclusive,                          DEFENDANT UNION PACIFIC
                                        RAILROAD COMPANY'S MOTION
15              Defendants.             FOR SUMMARY JUDGMENT OR,
                                        IN THE ALTERNATIVE, PARTIAL
16                                      SUMMARY JUDGMENT**

17                                      Date:    June 3, 2019
                                        Time:    1:30 p.m.
18                                      Ctrm:    9A
                                        State Complaint Filed:  April 23, 2018
19                                      Trial:  July 9, 2019

20

21      I, Andreas Mader, hereby declare and state as follows:

22      1.   I am an individual in the above-entitled action.   I make this

23  Declaration in support of Defendant Union Pacific Railroad Company's ("UP")

24  Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment.

25  I have personal knowledge of the facts set forth herein, and if called upon to testify

26  thereto, I could and would competently do so under oath.

27  / / /

28  / / /

                                    1            Case No. 2:18-cv-06374-PA(SSx)
FPDOCS 35213995.1

2.      I am a Manager Shop Operations at UP in Fort Worth, Texas overseeing roughly 400 UP employees. I have worked for UP since 2005. I never worked with Plaintiff or supervised Plaintiff during the time he was employed by UP.   Prior to working in Fort Worth, Texas, I worked at UP's headquarters in Omaha, Nebraska.   My job duties include ensuring compliance with company policies, overseeing attendance issues, overseeing disciplinary issues, handling regulatory compliance, processing billing payments, overseeing payroll, overseeing drug and alcohol testing, as well as serving as the initial officer of a first appeal for Union grievances and as a hearing officer for mechanical employees facing termination-level discipline. I have served as a Hearing Office for the past 10 years, and have served as the Hearing Officer for all UP mechanical employees since 2016.

3.      In order to serve as a Hearing Officer, UP requires you to attend a multi-day class taught by UP's Labor Relations Department. I attended this class. In the class, you are taught that it is important to remain fair, neutral, and impartial when acting as a Hearing Officer.  This is typically not an issue because, as a Hearing Officer, you do not normally have any information or involvement in the underlying employee issue. We are also taught to render fair, neutral, and impartial decisions based objectively on the evidence presented during the hearing.

4.      At some point in late 2017, I was contacted by Daniel Glenn. Mr. Glenn requested that I serve as the Hearing Officer on November 17, 2017, for Plaintiff. Since Plaintiff was a Machinist, and I was the Hearing Officer for all UP mechanical employees, I agreed.   At that time, I had no knowledge of or involvement in the underlying issue surrounding the need for Mr. Dunger's hearing or his medical condition necessitating his need for FMLA leave. In fact, I never worked with Mr. Dunger. The first time I met him was at the November 17, 2017 hearing.

/ / /

FPDOCS 35213995.1

5. On November 17, 2017, I served as the Hearing Officer at a disciplinary hearing regarding Plaintiff's dishonest misuse of FMLA leave. During the hearing, UP, Plaintiff, and Plaintiff's Union representative were allowed to call witnesses, introduce evidence, cross-examine witnesses called by others, and impeach evidence introduced by others. After the hearing concluded, I received a copy of the hearing transcript along with all exhibits that were attached during the hearing. A true and correct copy of a transcript of the November 17, 2017, hearing with exhibits marked during the hearing is attached hereto as **Exhibit A**.

6. I reviewed the evidence and testimony presented at the hearing pursuant to the hearing transcript. I determined that there was sufficient evidence to sustain the charge against Plaintiff. As a result, on November 27, 2017, I sent Plaintiff a letter explaining that I had determined, based on the evidence presented at the November 17, 2017, hearing, that the evidence more than substantially supported the charges against him. A true and correct copy of my November 27, 2017, letter to Plaintiff is attached hereto as **Exhibit B**.

7. On or around January 15, 2018, Kali Landmark, Manager for UP Labor Relations, contacted me regarding an appeal initiated by Plaintiff's Union regarding my decision to terminate Plaintiff for dishonest misuse of FMLA leave. As a result, I prepared and sent Ms. Landmark a letter dated January 15, 2018, explaining the investigation, my review of the evidence, and my decision. A true and correct copy of my January 15, 2018, letter to Ms. Landmark letter is attached hereto as **Exhibit C**.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1    I declare under penalty of perjury, under the laws of the United States of

2    America, that the foregoing is true and correct.

3    Executed this 3ᵉᵖ day of April, 2019, at 7:00 pm Chicago, IL.

4

5    _____

6    Andreas Mader

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Cover Page – Exhibit A

# In Re:

*In Re Investigation & Hearing of*
*THOMAS DUNGER*

---

*TRANSCRIPT OF PROCEEDINGS*
*November 17, 2017*

---

*ON THE RECORD*
*REPORTING SERVICES*
*(800)327-7274*

*SERVING CALIFORNIA SINCE 1985*

**Min-U-Script® with Word Index**

UNION PACIFIC RAILROAD COMPANY

IN RE INVESTIGATION OF:          )
                                 )
                                 )
                                 )
    TOMAS DUNGER                  )
    EMPLOYEE I.D. 0444911         )
    (IAM)                         )
                                 )
_____)

TRANSCRIPT OF FORMAL HEARING PROCEEDINGS

UNDER COLLECTIVE BARGAINING AGREEMENT

COMMERCE, CALIFORNIA

November 17, 2017

8:11 A.M.

REPORTED BY

RACHEL BROWN, HEARING REPORTER

UP_Dunger_000344

Exhibit A-6

1                    UNION PACIFIC RAILROAD COMPANY

2

3

4

5    IN RE INVESTIGATION OF:            )
                                        )
6                                       )
                                        )
7         THOMAS DUNGER                  )
          EMPLOYEE I.D. 0444911         )
8                                       )
                                        )
9    _____)

10

11

12

13   TRANSCRIPT OF FORMAL HEARING PROCEEDINGS UNDER THE COLLECTIVE

14     BARGAINING AGREEMENT taken on behalf of the Union Pacific

15   Railroad Company, on Friday, November 17, 2017, 8:11 A.M., at

16     Union Pacific Railroad, 4341 East Washington Boulevard,

17   Commerce, California, before RACHEL BROWN, Hearing Reporter.

18

19

20

21

22

23

24

25

UP_Dunger_000345

Exhibit A-7

```
 1                            APPEARANCES

 2

 3          For the Carrier, Union Pacific Railroad

 4               Hearing Officer:

 5               ANDREAS MADER
                 DIRECTOR OF PACIFIC RAILROAD
 6               UNION PACIFIC RAILROAD
                 1400 Douglas Street
 7               Omaha, Nebraska 68179
                 402-544-5000
 8               ajmader@up.com

 9

10               Charging Officer:

11               DANIEL K. GLENN
                 MGR. OF LOCO. MAINTENANCE, MECHANICAL DEPT.
12               UNION PACIFIC RAILROAD
                 200 South Sycamore Avenue
13               Bloomington, California 92316

14

15

16          For the Charged Employee:

17               JUAN ESTRADA, MACHINIST
                 PRESIDENT, LOCAL CHAIRMAN
18               IAM, LOS ANGELES
                 10363 Langdon Avenue
19               Mission Hills, California 91345

20

21          Offering Testimony:

22               Daniel Glenn
                 Brad Steffel
23               Zachary Padilla
                 Thomas Dunger
24

25
```

UP_Dunger_000346

Exhibit A-8

```
 1                          I N D E X

 2

 3

 4                         EXAMINATION

 5

 6   WITNESS:          BY:  HEARING OFFICER    ORGANIZATION

 7   D. GLENN                     19, 66            63

 8   B. STEFFEL                      69            73

 9   M. PADILLA                      75            77

10   T. DUNGER                       78            --

11

12

13

14   EXHIBIT           DESCRIPTION                 PAGE

15      1     Notice of Investigation              12

16      2     USPS Tracking                        16

17      3     Notice of Investigation              17

18      4     General Code of Operating Rules      21

19      5     Family & Medical Leave Policy        22

20      6     Use Family Medical Leave Appropriately  29

21      7     UPOnline Ethics Bulletin             29

22      8     Family Medical or Military Leave     35

23      9     Search Employee I.D.                 36

24     10     Employee's Status                    36

25                                            (Continued)
```

```
 1                    I N D E X           (Continued)

 2

 3

 4    EXHIBIT              DESCRIPTION              PAGE

 5      11   EDCS Calendar                          40

 6      12   MVS Reports                            42

 7      13   Not Admitted

 8      14   FMLA Absence Detail                    46

 9      15   Hard Drive                             48

10      16   Employee Information for Thomas Dunger,  80

11           Jassier Vargas, Harrison Scharf, and

12           John Lemus

13      17   Work or School Excuse                  80

14

15

16

17    CLOSING STATEMENT BY:                        PAGE

18    MR. DUNGER:                                   82

19    MR. ESTRADA:                                  83

20

21

22

23

24

25
```

Exhibit A-10

UP_Dunger_000348

```
 1                    COMMERCE, CALIFORNIA; NOVEMBER 17, 2017
 2                              8:11 A.M.
 3
 4
 5              (Safety Briefing conducted off the record by Michael
 6         Zachary Padilla.)
 7
 8         HEARING OFFICER:   It is 8:11 A.M. on November 17, 2017.
 9    Ladies and gentlemen, I am Andreas Mader, lead mic support
10    for the Union Pacific Railroad.  I am headquartered in Omaha,
11    Nebrasaka, and I will be conducting this formal investigation
12    being held to develop the facts and determine responsibility,
13    if any, concerning the charges that Mr. Thomas Dunger -- is
14    that correct?  Dunger?
15         THE CHARGED:  Yes.
16         HEARING OFFICER:   -- on 10/21/2017 at the location on
17    Commerce Diesel Facility at approximately 20:38 hours, while
18    employed as a machinist, you allegedly used FMLA, vacation,
19    in a manner that was not consistent with the serious medical
20    condition for which you received an FMLA entitlement from
21    UPRR heath services.
22              You were allegedly dishonest when you requested
23    FMLA, vacation, time from 10/20/2017 and/or 10/21/2017.  This
24    is a possible violation of the following rules and/or policy
25    1.6, conduct, dishonest.
```

```
 1          Personal recording of this investigation will be

 2   permitted, but all personal recorders must be in open view

 3   and personal recording will only be allowed when I announce

 4   that we are on the record.  If we stop recording for any

 5   reason, all personal recordings must also stop.

 6          Does anyone have a personal recorder today?

 7      THE CHARGED:  Are we able to use our cell phones?

 8      HEARING OFFICER:  You want to use it as a personal

 9   recorder?

10          I mean, that's if -- if you tell me that you're

11   going to record --

12      THE CHARGED:  Should I?

13      MR. ESTRADA:  I don't care.

14      THE CHARGED:  Yeah, I'll record it.

15      HEARING OFFICER:  Okay.  So when I tell you we are

16   stopping recording, then you must stop recording as well.

17   Since you are recording, I may request a copy of a transcript

18   from what you're recording.

19      THE CHARGED:  Okay.  I'll leave it off until you tell me

20   to.

21      HEARING OFFICER:  We're on the record now.

22      THE CHARGED:  Okay.

23      HEARING OFFICER:  Okay.  So we have one person that is

24   recording this, and that is Mr. Dunger.  And has stated --

25   since you are recording, I will probably ask you for a
```

UP_Dunger_000350

Exhibit A-12

```
 1   transcript of your recording.

 2           After I've completed the opening phase of this

 3   investigation by introducing those present and reading into

 4   the record the Notice of Investigation, the Charged and the

 5   representative will be given an opportunity to raise any

 6   objections they may have; therefore, please withhold any

 7   objections until that time.

 8           Regarding objections, this is the procedure I will

 9   follow:  Objections will be addressed as they are raised.  I

10   will first clarify the objection if necessary, and then make

11   a ruling on it.  If my judgement -- I see a reason to

12   withhold my ruling until a later time in the investigation, I

13   will do so.  If I cannot make a ruling on the objection

14   during the proceedings of the investigation -- meaning the

15   objection will be noted in the transcript and given

16   consideration upon review.

17           Excessive objections, interruptions, or outbursts

18   while witnesses are giving their statements will not be

19   tolerated.

20           All right.  Mr. Glenn, you are here as a Company

21   witness; correct, sir?

22      MR. GLENN:  Yes.

23      HEARING OFFICER:  Could you please state your full name,

24   spelling your last name.

25      MR. GLENN:  It's Daniel K. Glenn, G-L-E-N-N.
```

UP_Dunger_000351

Exhibit A-13

1     HEARING OFFICER:  Your employee I.D. number?

2     MR. GLENN:  0231018.

3     HEARING OFFICER:  Okay.  And what is your business

4  address of record?  And please spell your street's name.

5     MR. GLENN:  Okay.  It's 2001 South Sycamore, it's

6  S-Y-C-A-M-O-R-E, Avenue, Bloomington, California 92316.

7     HEARING OFFICER:  And this is your current US mailing

8  address?

9     MR. GLENN:  Yes.

10    HEARING OFFICER:  All right.  And what is your title,

11 sir?

12    MR. GLENN:  I'm manager of Locomotive ops -- shop ops.

13    HEARING OFFICER:  And your employment with the service,

14 sir?

15    MR. GLENN:  22 and a half years.

16    THE COURT:  Union Pacific?

17    MR. GLENN:  Yes.  Combined railroads Union Pacific and

18 Southern Pacific.

19    HEARING OFFICER:  All right.  And Mr. Dunger, you're the

20 employer under charge; is that correct, sir?

21    THE CHARGED:  Yes.

22    HEARING OFFICER:  All right.  Mr. Dunger, could you

23 please state your full name, spelling your last name.

24    THE CHARGED:  Thomas Edward Dunger, spelled D-U-N-G-E-R.

25    HEARING OFFICER:  All right, sir.  And what is your

UP_Dunger_000352

Exhibit A-14

1    employee I.D. number?

2       THE CHARGED:  0444911.

3       HEARING OFFICER:  All right.  Thank you.  And what is

4    your present address of record?  And please spell your

5    street's name.

6       THE CHARGED:  Uh, PO Box?

7          It's PO Box 129, Crestline, California 92325.

8       HEARING OFFICER:  All right.  And that is your current

9    mailing address, sir?

10      THE CHARGED:  Yes.

11      HEARING OFFICER:  All right.  And Mr. Dunger, what is

12    your occupation?

13      THE CHARGED:  I'm a mechanic -- diesel mechanic.

14      HEARING OFFICER:  All right.  And your employer?

15      THE CHARGED:  Union Pacific Railroad.

16      HEARING OFFICER:  And your length of service, sir?

17      THE CHARGED:  Six years.

18      HEARING OFFICER:  Okay.  And Mr. Dunger, do you desire to

19    have a representative present today?

20      THE CHARGED:  Yes.

21      HEARING OFFICER:  Okay.  And who is that representative?

22      THE CHARGED:  Juan Estrada.

23      HEARING OFFICER:  Okay.  And Mr. Estrada, could you

24    please state your full name, spelling your last name.

25      MR. ESTRADA:  Yes, sir.  My name is Juan Estrada, last

UP_Dunger_000353

Exhibit A-15

1    name E-S-T-R-A-D-A.

2        HEARING OFFICER:  And what is your present address of

3    record?  And please spell your street's name.

4        MR. ESTRADA:  10363 Langdon, L-A-N-G-D-O-N, Avenue,

5    Mission Hills, California 91345.

6        HEARING OFFICER:  And that is your current US mailing

7    address?

8        MR. ESTRADA:  Yes, sir.

9        HEARING OFFICER:  All right.  And Mr. Estrada, do you

10   desire to represent Mr. Dunger at this investigation?

11       MR. ESTRADA:  Yes, sir.

12       HEARING OFFICER:  Okay.  And I'm sorry?

13       MR. MORIKAWA:  Randy Morikawa.

14       HEARING OFFICER:  Randy, could you state your full name,

15   spelling your last name.

16       MR. MORIKAWA:  Randy Morikawa, last name M-O-R-I-K-A-W-A.

17       HEARING OFFICER:  Okay.  And what is your purpose at this

18   investigation?

19       MR. MORIKAWA:  Observing this investigation.

20       HEARING OFFICER:  All right.  Morikawa?

21       MR. MORIKAWA:  Morikawa.

22       HEARING OFFICER:  All right.  I apologize in advance for

23   mispronouncing your name.  As an observer, you're not an

24   active participant in this investigation.

25            Okay.  And we have Mr. Padilla here.

UP_Dunger_000354

Exhibit A-16

1          Mr. Padilla, could you please state your full name,
2     spelling your last name.
3          MR. PADILLA: Michael Zachary Padilla, P-A-D-I-L-L-A.
4          HEARING OFFICER:  Okay.  And Mr. Padilla, what's your
5     employee I.D. number?
6          MR. PADILLA:  0437546.
7          HEARING OFFICER:  Okay.  And your title, sir?
8          MR. PADILLA:  Supervisor, locomotive maintenance.
9          HEARING OFFICER:  Okay.  And Mr. Padilla, your employed
10    length of service?
11         MR. PADILLA:  Union Pacific Railroad, ten years.
12         HEARING OFFICER:  All right.  And for the record, we have
13    our court reporter, Ms. Rachel Brown, in the room here as
14    well.
15          Okay.  I have a Notice of Investigation.  It is a
16    one-page document.  I will mark this as ~~Exhibit Number 1.~~
17
18          (~~Exhibit Number 1~~ was marked for identification and
19      is attached hereto.)
20
21         HEARING OFFICER:  Does everyone have a -- Juan, you have
22    a copy?
23         MR. ESTRADA:  Yes, I do.
24         HEARING OFFICER:  It is dated 11/9/2017, addressed to
25    Thomas Dunger, employee I.D. 0444911, PO Box 129, Crestline,

UP_Dunger_000355

Exhibit A-17

1    California 92325.

2         "Subject:   Notice of investigation.

3    "Dear Thomas Dunger:   Please report to Commerce Diesel

4    Facility, 4341 East Washington Boulevard, Commerce,

5    California at 0800 hours on 11/17/2017 for the hearing

6    to develop the facts and determine your responsibility,

7    if any, in connection with the below charge.

8         "On 10/21/2017, at the location of Commerce Diesel

9    Facility, at approximately 2038 hours, while employed as

10   a Machinist, you allegedly used FMLA, vacation, in a

11   manner that was not consistent with the serious medical

12   condition for which you received an FMLA entitlement from

13   UPRR Health Services.   You were allegedly dishonest when

14   you requested FMLA-Vacation time from 10/20/2017 and/or

15   10/21/2017.   This is a possible violation of the

16   following rule(s) and/or policy:

17        "1.6, conduct - dishonest.

18        "Under the MAPS policy, this violation is a

19   dismissal event.   Based upon your current status, if you

20   are found to be in violation of this alleged charge,

21   dismissal may result.

22        "The investigation will be conducted in accordance

23   with applicable provisions of the collective bargaining

24   agreement between the Company and the organization

25   representing your craft or class.   You are entitled to

UP_Dunger_000356

Exhibit A-18

1    representation and to present witnesses at your own

2    expense in accordance with the agreement.  Any request

3    for postponement must be submitted in writing, including

4    reason therefore.  A copy of your written request for

5    postponement must be given to me.  I can be reached at

6    phone number 323)475-3831.

7        "The Rail Safety Improvement Act requires employees

8    obtain their mandatory rest before attending a hearing.

9    If you work an Hours of Service (HOS) covered position

10   and you have not obtained the mandatory rest prior to

11   commencement of the hearing, you cannot, consistent with

12   the requirements of the RSIA, be allowed to attend or

13   participate in the hearing and will be considered as

14   having elected not to attend the hearing

15       "Respectfully,

16       "Brad Steffel

17       "Senior Manager, System Locomotive Facility.

18       "cc:  Derrick Battle, Juan Estrada.

19       "Delivered to Machinist" -- this is handwritten on

20   here.

21       "Delivered to Machinist Union Rep John Lemus on

22       11/9/2017 at 11:30 P.M. PT."

23       And there's a signature.  Since there was no

24   postponement or anything, do you have any other opening

25   documents, Mr. Glenn?

UP_Dunger_000357

Exhibit A-19

 1    MR. ESTRADA:  I have an objection, Mr. Mader.

 2    HEARING OFFICER:  Your objection, sir?

 3    MR. ESTRADA:  Is Mr. Brad Steffel the charging officer in

 4 this investigation?

 5    HEARING OFFICER:  Mr. Glenn?

 6    MR. GLENN:  Yes, he is the charging officer of record.

 7 And he's not able to be here today, and I am representing the

 8 Company in his place.

 9    HEARING OFFICER:  All right.  And where is Mr. Steffel?

10    MR. GLENN:  He's on vacation --

11    HEARING OFFICER:  Okay.

12    MR. GLENN:  -- and it's out of this area.

13    HEARING OFFICER:  Okay.  Was a postponement requested by

14 the Organization?

15    MR. GLENN:  No.

16    HEARING OFFICER:  No?

17    MR. GLENN:  No postponement was requested.

18    HEARING OFFICER:  All right.  Mr. Glenn, are you ready to

19 proceed with this investigation as the charging officer?

20    MR. GLENN:  I believe I'm prepared to, yeah.

21    HEARING OFFICER:  Okay.

22    MR. ESTRADA:  Would that be considered hearsay, since

23 Mr. Steffel is not here?

24    HEARING OFFICER:  Is Mr. Steffel available by phone if I

25 need to question him?

UP_Dunger_000358

Exhibit A-20

1       MR. GLENN:  He would be available by phone.  He's

2   indicated to me that he could be reached by phone.

3       HEARING OFFICER:  Okay.

4       MR. GLENN:  May not be easy and immediate, but he is to

5   make himself available if we need him.  And as indicated,

6   that he would do what he could do.

7       HEARING OFFICER:  Okay.  Mr. Estrada, we'll go ahead and

8   note your objection for the record, and we'll go ahead and

9   proceed.  Mr. Glenn appears ready to proceed as the charging

10  officer in this case.

11      MR. ESTRADA:  Thank you.

12      HEARING OFFICER:  Do you have any opening documents?

13  Mailings?

14      MR. GLENN:  Well, yeah.  Just -- here is the tracking on

15  the Notice that was sent to -- to Tom.  Like you indicated,

16  the original notice was hand delivered the night of

17  November 9.

18      HEARING OFFICER:  All right.  So I'm showing that this

19  shows four pages, and we have two of them, pages 1 and 2.

20  And a UP -- USPS tracking card.

21          So we'll go ahead and mark this as 2.1 through 2.3.

22

23          (Exhibit Number 2.1 through 2.3 was marked for

24      identification and is attached hereto.)

25

UP_Dunger_000359

Exhibit A-21

```
 1        HEARING OFFICER:  All right.  This shows a tracking
 2   number ending in 2186.  I'm looking at -- Exhibit 2.1 shows
 3   that this was delivered on November 13, 2017, in Crestline,
 4   California.  And the tracking number on Exhibit 2.1 matches
 5   that on Exhibit 2.3, which shows it addressed to
 6   Thomas Dunger, PO Box 129, Crestline, California 92325.
 7           Is there any other opening document, Mr. Glenn?
 8        MR. GLENN:  I have just a -- this is a -- another copy --
 9   or version of the Notice of Investigation that was possibly
10   sent to Juan by E-mail.
11        MR. ESTRADA:  Yes.
12        MR. GLENN:  And it's slightly different than the first
13   one.  And if I can explain why?
14        HEARING OFFICER:  All right.  We'll go ahead and mark
15   this as Exhibit Number 3.
16
17           (Exhibit Number 3 was marked for identification and
18       is attached hereto.)
19
20        HEARING OFFICER:  And go ahead.  Give me your --
21        MR. GLENN:  Okay.  As we were preparing this, using the
22   Company's document system, APDS, it was actually after
23   midnight in Central Time where APDS resides.  Therefore, it
24   indicates this document was sent on 10- -- on 11/10, and we
25   wanted to make sure that it was delivered on November 9th
```

UP_Dunger_000360

Exhibit A-22

```
 1   at -- and that's why we had Mr. Lemus receive it on
 2   November 9th.
 3          So the charges and the -- and the text on this
 4   second -- on this other notice -- I'm not going to call this
 5   the second notice because it's really the same thing, it's
 6   just that APDS generates an automatic E-mail and sends it to
 7   Juan Estrada and Derrick Battle as the union representatives.
 8   And it sent automatically by the system with a time stamp --
 9   or a date stamp that is Central Time.
10       HEARING OFFICER:  Which accounts for Union Pacific
11   headquarters being in Omaha.
12       MR. GLENN:  Exactly.
13       HEARING OFFICER:  Okay.
14       MR. GLENN:  So --
15       HEARING OFFICER:  Is the caption of the charge the same,
16   sir?
17       MR. GLENN:  Exactly.
18       HEARING OFFICER:  Okay.  All right.  Do you have any
19   other opening statements?
20       MR. GLENN:  I have a copy of the rule --
21       HEARING OFFICER:  Okay.  That's -- that's not part of
22   opening.
23       MR. GLENN:  Okay.
24       HEARING OFFICER:  So no more Notice of Investigation,
25   postponements or mailings; right, sir?
```

UP_Dunger_000361

Exhibit A-23

1       MR. GLENN:  No.

2       HEARING OFFICER:  All right.  Mr. Dunger, Mr. Estrada, we

3   have completed the opening of this investigation.  If there

4   are any objections, we'll go ahead and address them now.

5       MR. ESTRADA:  Just the one that was brought up,

6   Mr. Mader.

7       HEARING OFFICER:  Okay.  Noted, sir.  Mr. Dunger.

8   Mr. Estrada.  Are you reedy to proceed with the

9   investigation?

10      MR. ESTRADA:  Yes, sir.

11      HEARING OFFICER:  Okay.  You understand you have the

12  right to cross-examine all witnesses and examine all

13  documents presented at this investigation?

14      MR. ESTRADA:  Yes, sir.

15      THE CHARGED:  Yes.

16      HEARING OFFICER:  Okay.  All right.  With that,

17  Mr. Padilla, you are excused.  Please remain in the area.  Do

18  not discuss your testimony with anyone.  And when I'm ready

19  for you, I will give you a call.

20      MR. PADILLA:  Thank you.

21

22

23

24

25

UP_Dunger_000362

Exhibit A-24

1                         EXAMINATION

2

3    BY HEARING OFFICER:

4        Q    All right.  Mr. Glenn, do you supervise Mr. Dunger?

5        A    Indirectly, yes.

6        Q    Okay.  And Mr. Glenn, did you make an inquiry into

7    this matter that we're investigating today?

8        A    Yes.

9        Q    And from that inquiry, what did you determine?  What

10   information have you discovered?

11       A    Well, what I'd like to present to -- first of all, I

12   would like to present the FMLA policy so that we understand

13   what the FMLA policy is.  It's a direct -- referred to in the

14   Notice of Investigation.  So therefore, I think it's

15   important that we understand the FMLA policy, understand the

16   Company's position with regard to the policy, and

17   Mr. Dunger's status with regard to FMLA.

18            And then, after that, I will get into the evidence

19   that indicates that Mr. Dunger was in violation of the

20   policy.

21       Q    All righty.  Sir?

22       A    Okay.  So first of all, do you want the copy of the

23   rule or --

24       Q    Is this --

25       A    -- did you already read the rule?

UP_Dunger_000363

Exhibit A-25

```
 1     Q    No, sir, I did not.  So you have the rule you would
 2  like to enter?
 3     A    Right.  That's the rule that's referenced in the
 4  Notice.
 5     Q    Okay.
 6     MR. GLENN:  And you should have a copy of that, Juan.
 7     MR. ESTRADA:  Yes.
 8     HEARING OFFICER:  Okay.  So I have a one-page document.
 9  I will mark this as Exhibit Number 4.
10
11          (Exhibit Number 4 was marked for identification and
12     is attached herto.)
13
14     Q    BY HEARING OFFICER:  And if you would, go ahead and
15  read your exhibit, sir.
16     A    Okay.  It's from the URPP General Code of Operating
17  Rules.  It's Rule 1.6, Conduct.  And the Notice only
18  references item 4.  So I've drawn a line through items 1, 2,
19  3, 5, 6, and 7 on the document that Mr. Mader has --
20     Q    Okay.
21     A    -- which I'm sure you'll be reviewing.
22     MR. ESTRADA:  Yes.
23     MR. GLENN:  It's Item 4, dishonest.
24          "Any acts of hostility, misconduct, or willful
25     discharge or negligence affecting the interest of the
```

UP_Dunger_000364

Exhibit A-26

1    company or its employees is cause for dismissal and must

2    be reported.  Indifference to duty or to the performance

3    of duty will not be tolerated.

4              "Rule update date:  April 7, 2010."

5         And then there's a link here to the UPRR rule book

6    online.

7    Q    BY HEARING OFFICER:  All righty, sir.

8    A    Okay.  The next document I have is the Family

9    Medical Leave Policy of the railroad.  And you should have a

10   copy of this, too.  I've got parts of this highlighted that I

11   think are pertinent to the investigation.  I'll -- if -- I'll

12   leave it up to you.  If you think we ought to read the whole

13   policy into the investigation or just try and focus on some

14   of the items that I've highlighted.

15        I will leave that up to you.

16   Q    No.  We can go ahead and go with the portions that

17   you feel are relevant to your case, but first let me mark

18   this.

19   HEARING OFFICER:  It's a six-page document.  We'll go

20   ahead as 5.1 through 5.6.  And give me a moment to mark my

21   exhibit.

22

23        (Exhibit Number 5.1 through 5.6 was marked for

24        identification and is attached hereto.)

25

UP_Dunger_000365

Exhibit A-27

1    Q    BY HEARING OFFICER:  All right.  Mr. Glenn, if you

2  would, go ahead with your ~~Exhibit Number 5?~~

3    A    So you're okay with me just reading the items that I

4  feel pertain --

5    Q    Yeah.

6    A    -- to --

7    Q    Whatever, yeah.  Whatever you think you need to use

8  to substantiate your case, go ahead.

9    A    Okay.  This is a copy of the policy.  Like I said, I

10 want to first establish what the policy is and the Company's

11 position with regard to the policy and alleged violations on

12 it.  The purpose of this policy -- I'm reading under

13 "purpose":

14          "This policy outlines conditions and procedures

15      under which eligible employees may take limited periods

16      of time off, without pay, for certain qualifying medical,

17      family-related, and family-military related reasons.

18      This policy is intended to cover eligibility for unpaid

19      leave, including unpaid leave authorized in the Family

20      and Medical Leave Act and the Family Military Leave Act,

21      including Military Caregiver Leave.

22          "This policy is separate and apart from the Military

23      Leave Policy, which applies to an employee's own active

24      or reserve military leave.

25          Under "Scope and Eligibility:

UP_Dunger_000366

Exhibit A-28

1    "The provisions of this policy apply to all eligible

2    Union Pacific Railroad employees subject to collective

3    bargaining agreements and to all absences as

4    FMLA-related.

5    "Item 1.1:  An employee is eligible for FMLA leave

6    if he or she:

7    "(a) has been employed for at least 12 months; and

8    "(b) has at least 1,250 hours of service during the

9    12-month period immediately preceding the start of leave.

10   "The 12 months of employment do not need to be

11   consecutive.  If an employee is maintained on the payroll

12   for any part of a week, the week will count as a week of

13   employment.  For purposes of determining whether

14   intermittent employment qualifies for meeting the

15   12-month period, 52 weeks is deemed equal to 12 months.

16   "If an employee has accrued vacation or personal

17   leave, he or she may elect, but will not be required, to

18   substitute such paid time or all or any part of unpaid

19   FMLA leave subject to the terms of any applicable

20   collective bargaining agreement.  Accordingly, the

21   employee will receive pay pursuant to Union Pacific's

22   applicable paid leave policies and any governing

23   collective bargaining agreement provisions during the

24   period of otherwise unpaid FMLA leave.  Therefore, any

25   conditions or procedural requirements governing use of

UP_Dunger_000367

Exhibit A-29

1    that accrued paid leave must be met in order for an

2    employee to receive pay for FMLA leave.

3        "An employee may choose (or may be required,

4    depending on the employee's craft) to use paid leave

5    concurrent with FMLA leave.  In order to use paid leave

6    for FMLA leave, the employees must comply with Union

7    Pacific's normal paid leave policies and follow your

8    department's procedures for requesting such paid leave.

9        Under "Item 2:  Types of FMLA Leave and Duration" --

10       I'm -- let's see.

11       Under "Item 2.1, Basic and Active Duty Family

12   Military Leave," it says:

13       "FMLA leave of absence taken for family and/or

14   medical reasons, including a qualifying family military

15   event, is defined as an approved, unpaid absence

16   available to eligible employees, not to exceed 12 work

17   weeks in a rolling calendar year.  Leave may be taken for

18   the following reasons:

19       "Upon the birth of employee's child;

20       "Upon the placement of a child with employee for

21   adoption or foster care;

22       "When an employee is needed to care for his or her

23   child, spouse, or parent who has a serious health

24   condition;

25       "When the employee is unable to perform the

UP_Dunger_000368

Exhibit A-30

1    essential functions of his or her position because of a

2    serious health condition."

3        And then it -- or -- says "or" and it goes into some

4    military leave items that really are not applicable at this

5    time.

6        So I want to drop down to item 3, where it talks

7    about "Definitions of Serious Health Conditions" and

8    qualifying exigency.

9        "As used in Section 2, serious health conditions

10    which relates to basic FMLA leave and qualifying

11    exigencies, which relates to active duty family medical

12    leave are defined as:

13    "3.1, a Serious Health Condition:

14    "A 'serious health condition' means an illness,

15    injury, impairment, or physical or mental condition that

16    involves:

17    "(a) Inpatient care in a hospital, hospice, or

18    residential care facility; or

19    "(b) Continuing treatment by a healthcare provider

20    involving:

21    "Item (i) A period of incapacity of more than three

22    consecutive calendar days, and any subsequent treatment

23    or period of incapacity, relating to the same condition

24    that also involves:

25    "Treatment of two or more times by a healthcare

UP_Dunger_000369

Exhibit A-31

1           provided within 30 days of the start of the

2   incapacity;    or

3           "Treatment by a health care provider on at least one

4       occasion within 7 days of the start of the incapacity

5       that results in a regimen of continuing treatment under

6       the supervision of a health care provider."

7           It continues to talk about incapacitation due to

8   pregnancy, which is not applicable here.

9           "Any period of incapacitation or treatment due to

10      chronic serious health conditions that requires periodic

11      visits of at least twice per year for treatment by a

12      health care provider.  This includes conditions that may

13      cause -- cause episodic, rather than continuing,

14      incapacitation.

15          "A period of incapacitation that is permanent or

16      long-term due to a condition for which the treatment may

17      not be effecting -- effective during which the employee

18      must be under the continuing supervision of, but not

19      need -- not need be receiving active treatment by, a

20      health care provider.  And any period of absence is to

21      receive multiple treatments by a health care provider."

22          The rest of that Section 3 is defining the serious

23  health condition applies to military leave.  So we'll skip

24  down to item 4, where it talks about other considerations.

25  Item 4.1 says:

UP_Dunger_000370

Exhibit A-32

```
 1              "Leave may be taken intermittently or on a reduced
 2         leave schedule when it is medically necessary, and the
 3         employee is required to care for a family member with
 4         a serious health condition or the employee is taking FMLA
 5         leave for his or her own serious health condition.  When
 6         it is physically impossible for the employee to return to
 7         work during a work assignment, after the taking of the
 8         intermittent leave, the entire amount of the work missed
 9         will be counted against the employee's FMLA leave
10         entitlement."
11              From there, I would like to drop down to item 5, the
12    first caption under "FMLA Notice Requirements":
13              "The employee should provide maximum advanced notice
14         of their FMLA leave to allow for time necessary to
15         reassign duties and otherwise fill assignments."
16              From there I would like to step down to item 5.4,
17    talking about intermittent leave, which is the type of leave
18    that Mr. Dunger qualifies for.  Item 5.4:
19              "In the case of intermittent or reduced leave
20         schedule, the employee must provide the reasons why
21         taking of the intermittent or reduced schedule leave is
22         necessary and provide the schedule for treatment to allow
23         an opportunity to reassign duties and otherwise fill the
24         assignment."
25              And I believe that's the items that I felt were
```

UP_Dunger_000371

**Exhibit A-33**

1   directly applicable to this case.

2      Q    All righty, sir.

3      A    And you have the entire version of the policy;

4   correct?

5      Q    Yes.

6      A    Okay.  The next thing I wanted to do, and I've got

7   two documents -- two separate documents.  The first is a --

8   and I enter these documents because I want to establish the

9   Company's position with regard to FMLA and alleged abuse of

10  FMLA.

11         Okay?

12     Q    Do you have a copy?

13     A    Yes, I do.  Here is a copy of the -- there's two

14  documents, and I'll read both of them into the record.

15     A    Okay.  Hang on.  Let me look at this real quick.

16     HEARING OFFICER:  All right.  We'll go ahead and mark

17  them separately.  The first one, it says page 1 of 1.  We'll

18  go ahead and mark that as Exhibit Number 6.  And the one that

19  says page 1 of 2, we'll mark as Exhibit 7.

20

21         (Exhibits Numbers 6 and 7 were marked for

22     identification and attached hereto.)

23

24     MR. GLENN:  Okay.  And just to identify what these are,

25  these are both ethics bulletins that the company periodically

UP_Dunger_000372

Exhibit A-34

1    issues.

2         This first one is -- was issued in April of 2016.

3    And it reads:

4         "Use of family medical leave appropriately.  The

5    family medical" --

6         And I read these, again, to establish the Company's

7    position to FMLA and alleged abuse of it.

8         "The Family Medical Leave Act is designed to protect

9    all eligible employees so that they can focus on

10   qualifying personal or family serious medical situations

11   when necessary.  Consider the following scenario:

12        "An employee has an approved FMLA case for a serious

13   health condition.  She had a planned 4th of July holiday

14   vacation beginning June 28th, but had difficult --

15   difficulty finding coverage for two scheduled shifts.

16   The  employee took a personal day on July 2nd, but

17   subsequently requested two days of FMLA leave on July 3rd

18   and 4th instead of returning to work.

19        "The employee was terminated for improperly taking

20   FMLA to cover scheduled work.  Consequences:  The

21   employee sued her employer contending the company

22   interfered with her right to use FMLA and discriminated

23   against her for use of -- for using FMLA.  The court

24   stated that the employee's assumption to use FMLA

25   whenever she wanted due to the approved case was wrong.

UP_Dunger_000373

Exhibit A-35

1   The employee's -- the employee conveniently overlooked

2   that her use of leave on each occasion had to be the

3   result of a serious health condition rendering her unable

4   to perform one or more essential job functions.  The

5   employee had no proof of her July 3rd or 4th FMLA leave,

6   work, or serious health conditions.

7       "The policy:  Employees should only use leave for

8   its intended purpose.  FMLA may provide up to 12 unpaid

9   work weeks during a rolling 12-month period, and it is

10  not a means to take additional time off when work -- from

11  work when not otherwise allowed under the company

12  policies and collective bargaining agreements.  Please

13  review Union Pacific's FMLA policy.

14      "Employees are reminded of their responsibility when

15  using FMLA leave.

16      "FMLA leave may only be used for its lawful purpose;

17  intentional misuse and FMLA fraud are grounds or

18  termination.

19      "An employee needing intermittent FMLA leave for a

20  chronic condition must comply with Union Pacific's

21  advanced call-in procedures unless unusual circumstances

22  prevent the employee from doing so, in which case the

23  employee must provide notice as soon as he or she is

24  able.

25      "Federal registrations clearly state that, if an

UP_Dunger_000374

Exhibit A-36

1    employee fails to provide timely notice, he or she may

2    have the FMLA leave delayed or denied and be subject to

3    discipline as set forth in UP's attendance policy.

4        "FMLA regulations permit UP to request

5    recertification if an employee's FMLA use is excessive

6    frequency and duration identified by a health care

7    provider, or if the employee has patterns of taking leave

8    in conjunction with rest days, weekends, or holidays.

9        "More information:  Employees should report

10    violations of UP's Ethics and Business Policy to the

11    manager -- to a manager or the UP value line

12    (800) 998-2000.  Employees uncertain about FMLA policy or

13    with questions can contact HR Service at (877) 275-8747

14    from 9:00 A.M. to 5:00 P.M., Central Time.

15        "Questions regarding collective bargaining,

16    including labor contractors and negotiations, should be

17    submitted to LR or Labor Relations."

18        So that's one scenario that helps establish the

19    Company's position with regard to abuse.  The second one is a

20    similar ethics bulletin that came out April 21st of 2017, and

21    it reads -- a lot of this is similar to the other bulletin.

22    I'll probably -- is it okay if I highlight a few things and

23    don't repeat the exact thing that was on the other bulletin?

24    HEARING OFFICER:  I'm fine with that.

25    MR. GLENN:  Is everybody in agreement with that?

UP_Dunger_000375

Exhibit A-37

1      MR. ESTRADA:  Yes.

2      MR. GLENN:  Okay.  But I will touch on a few points that

3  I think are relevant.

4          "The Family Medical Leave Act is designated to

5      protect eligible employee's jobs, to permit employees to

6      focus on their own or a family member's qualifying

7      serious medical condition.  The below situation

8      summarizes a recent FMLA court case not relating to Union

9      Pacific.

10         "Situation:  Employee had an approved intermittent

11     FMLA case for a reoccurring medical condition causing

12     arthritis and painful flare-ups requiring bed rest.  One

13     day, after legitimate FMLA use, the employee drove to a

14     pub, became intoxicated, and was arrested driving home.

15     The employee was released from jail the next day, but

16     used FMLA to layoff.  Subsequently, the employee used

17     additional FMLA time on days corresponding to court days

18     for the DUI case.

19         "Eventually, the employee's manager was made aware

20     of the arrest or conviction, searched court records, and

21     concluded the employee was falsely using FMLA to cover

22     absences connected to the arrest.  Employee responded

23     that the absences were legitimate.  The employee denied

24     being in jail or court at the times of the FMLA, but was

25     unable to provide evidence substantiating the denial.

UP_Dunger_000376

Exhibit A-38

1          "Employee was terminated on the manager's good faith

2     belief that the employee had falsely claimed FMLA leave

3     to cover absences connected with the arrest for driving

4     while intoxicated."

5          I believe the next paragraph, consequences, was read

6     on the first one, and policy are probably fairly close to

7     what I already read.

8          You want me to read them?

9     HEARING OFFICER:  I'm okay with entering as read.

10    MR. GLENN:  I would just like to --

11    HEARING OFFICER:  Mr. Estrada?

12    MR. ESTRADA:  That's fine.

13    Q     BY HEARING OFFICER:  Okay.

14    A     I would just like to point out, you know -- jump

15    down to where it says "policy":

16         "Employee should always use the FMLA for its

17    intended purpose.  FMLA may provide up to 12 unpaid

18    workweeks during a rolling 12-month period, but it is not

19    a means to take additional time off from work for

20    unrelated reasons not otherwise allowed under the company

21    policy or collective bargaining agreement.

22         "Employees are reminded of their responsibility when

23    using FMLA.

24         "FMLA leave may only be used for its lawful purpose.

25    Intended misuse of FMLA fraud are grounds for

UP_Dunger_000377

Exhibit A-39

1    termination."

2         And I think the rest of it is fairly identical to

3    the other ethics bulletin.

4    Q   Where are these posted?

5    A   They're posted on the Company's website

6    periodically, on UP online, where employes are able to see

7    it.

8    Q   All right.

9    A   And of course the FMLA policy is available on the

10    employee website, also.

11    Q   All right.  Mr. Glenn?

12    A   Okay.  So the next thing I wanted to establish, and

13    I have some documents to support the fact, is that Mr. Dunger

14    does have FMLA and did qualify for FMLA leave.

15    Q   Let's see what you have there, sir.

16    HEARING OFFICER:  All right.  The letter, which is a

17    two-page document --

18    MR. GLENN:  Front and back.

19    HEARING OFFICER:  -- front and back.  I'll go ahead and

20    mark that as Exhibit 8.1 and 8.2.

21

22    (Exhibit Number 8.1 and 8.2 were marked for

23    identification and attached hereto.)

24

25    HEARING OFFICER:  And then the one that has a -- appears

UP_Dunger_000378

Exhibit A-40

 1   to be a search box, I'm assuming.

 2        MR. GLENN:  Yeah.  This is just a snapshot of the -- out

 3   of our RE Health Safe System, which is the system that the UP

 4   has to store information relating to health -- health related

 5   situations, either medical leaves or FMLA.  In this case I

 6   did a search on Mr. Dunger, and then the next page --

 7        HEARING OFFICER:  So the one with that search employee

 8   I.D. one, I'm going to mark as Exhibit Number 9.

 9

10            (Exhibit Number 9 was marked for identification and

11        it attached hereto.)

12            ʼ

13        MR. GLENN:  Okay.

14        HEARING OFFICER:  And the I just want to mark the

15   exhibits before you start to talk about them.

16            And then the last page, which shows employee's

17   status, I will mark as Exhibit Number 10.

18

19            (Exhibit Number 10 was marked for identification and

20        is attached hereto.)

21

22        MR. GLENN:  Okay.

23        Q    BY HEARING OFFICER:  And you can go ahead.

24        A    And the reason I have both pages is because you'll

25   probably note on the second page it shows a -- that someone

UP_Dunger_000379

Exhibit A-41

1  has an intermittent leave -- intermittent leave conditionally

2  approved for two days and that may occur three times a month,

3  but it doesn't have Mr. Dunger's name.  So I wanted to

4  establish that I did search first before I pulled that

5  document up.

6      Q    Oh, I see what you mean.

7      A    And we could reproduce that if we had, you know, to

8  go look at that again, but just looking at that second page,

9  it doesn't identify Mr. Dunger anywhere on that page, so I

10 needed to establish where that came from.

11     Q    So page -- or ~~Exhibit 9~~ is the search and ~~Exhibit 10~~

12 is the result?

13     A    Yeah.

14     Q    Okay.  All right.  That makes sense.  Thank you.

15     A    And ~~Exhibit 8~~ is the actual letter that Mr. Dunger

16 received from health services indicating that he is

17 qualifying for an intermittent leave for his own health

18 condition.

19         And I can read this entire letter if you think we

20 need to.

21     HEARING OFFICER:  Mr. Estrada, enter as read?

22     MR. ESTRADA:  What was that?

23     HEARING OFFICER:  Enter as read?

24     MR. ESTRADA:  Yes, please.

25     HEARING OFFICER:  Okay.  Exhibit 8.1 and 8.2 are entered

UP_Dunger_000380

Exhibit A-42

```
 1   as read.

 2       MR. GLENN:  Okay.  Again, the things that I wanted to

 3   point out from this letter is that he was granted initial

 4   eligibility for Federal FMLA leave for himself or a health

 5   condition of his own.

 6          Okay.  So I've tried to identify the policy,

 7   identify the Company's position with regard to the policy,

 8   and the fact that Mr. Dunger does have a qualifying FMLA

 9   situation for his own health condition.

10          The next thing I would like to do -- can we take a

11   short break so I can get a drdink of water or two?

12       HEARING OFFICER:  Yeah, that's fine.

13       MR. GLENN:  I'm getting kind of parched.

14       HEARING OFFICER:  Mr. Estrada, are you okay with that?

15       MR. ESTRADA:  Yes.

16       HEARING OFFICER:  All right.  8:57 A.M., we'll take a

17   short recess.

18

19          (Off the record.)

20

21       HEARING OFFICER:  It is 9:08, and we are back on.

22       Q    BY HEARING OFFICER:  All right.

23       A    Okay.  The next thing I'm going to do is I'm going

24   to start through a timeline of events that lead up to the

25   alleged violation that's noted in the caption in the Notice
```

UP_Dunger_000381

Exhibit A-43

1   of Investigation.   The first item I would like to submit

2   is -- is an EPE exercise that was conducted with Mr. Dunger

3   on October 14th.

4        Q    Can I see that, please?

5        A    Oh.  No.  It was on October 19th.  It says --

6        Q    Let me see this.

7        A    And this is not related to the event, but it -- we

8   feel that it -- that it is pertinent to indicate -- it may

9   have led up to the event.

10       MR. ESTRADA:  Objection, Mr. Hearing Officer.  This has

11  nothing to do with the charges that he's charged with today.

12       MR. GLENN:  I'll also note that this --

13       HEARING OFFICER:  How is this relevant to the case right

14  now, today, sir?

15       MR. GLENN:  Well, it -- this conference occurred the day

16  before -- the day before Mr. Dunger laid off for FMLA

17  reasons.  I believe this kind of establishes, if you can --

18  if you read the comments and the coaching, it establishes his

19  kind of sentiments at the time, and I believe it's relevant.

20  If you don't, then, of course, it's not.

21       HEARING OFFICER:  Yeah.  I'm not going to allow this one

22  in.  I don't see how it's relevant to the issue of FMLA and

23  the time period in question.  I understand what you're

24  establishing, but I think that's a little bit of a -- to try

25  to make that connection, it just doesn't -- I'm going to go

UP_Dunger_000382

Exhibit A-44

1  ahead and exclude that one.

2        I'm sure you have no objection to that, Mr. Estrada?

3      MR. ESTRADA:  No objection.

4      Q    BY HEARING OFFICER:  All right.

5      A    Okay.  The next items that I would want to establish

6  are that Mr. Dunger did layoff FMLA -- for FMLA -- his bona

7  fide FMLA reason on the work night -- since he worked nights

8  on October 19th, 20th, and 21st, and I'll submit a copy of

9  his EDCS calendar, which EDCS is our timekeeping system which

10 also collects the pay information and so forth.

11       And then --

12     Q    Okay.  Hold on.  What is FMLA, no pay FMLA, vacation

13 paid?  What's --

14     A    Well, as I read in the policy, it allows the

15 employee to -- to take an FMLA day.  He may choose to be paid

16 for that day if he has eligible vacation, which, in this

17 case, apparently he did, and so he would have optioned --

18 elected to be paid for that day.

19     Q    So it's not a vacation day, it's an FMLA day?

20     A    It's an FMLA day that he chose to use a vacation

21 day.

22     HEARING OFFICER:  Okay.  All right.  A one-page document,

23 we'll go ahead and mark this as Exhibit Number 11.

24

25

UP_Dunger_000383

Exhibit A-45

```
 1          (Exhibit Number 11 was marked for identification and
 2     attached hereto.)
 3
 4     MR. GLENN:  And while you're marking that, I'll -- I'll
 5  kind of explain a little more about that vacation.
 6          The company only allows a certain number of people
 7  off on a given day for production reasons and to, you know,
 8  fill the jobs.  And so -- however, if a person has a bona
 9  fide FMLA entitlement, they can choose to use that vacation
10  according to the FMLA leave policy that we read, regardless
11  of whether we have the allowed number off or not.
12          So he chose to take FMLA, no pay, on the 19th.
13  FMLA, paid vacation, on the 20th and the 21st.
14     Q     BY HEARING OFFICER:  Okay.
15     A     And he accomplished this by using the Company's
16  layoff line, which the the established --
17     Q     Okay.  One second.  I want to go back to this.
18          Were the vacation days full on these two days?
19     A     I was -- I was going to get to that in a few
20  minutes.
21     Q     All right.  You're getting to that?
22     A     Yeah.  I can --
23     Q     Okay.
24     A     I can jump to that now if you would rather do that?
25     Q     Yeah.  You brought it up, and I'm now -- I'm
```

UP_Dunger_000384

Exhibit A-46

```
 1   curious.
 2       A    Okay.  Well, I can easily -- now the -- from our EDC
 3   system for the craft --
 4       MR. ESTRADA:  Not on the 20th.
 5       MR. GLENN:  Pardon me?
 6       MR. ESTRADA:  The 20th isn't full, Mr. Hearing Officer.
 7   The 21st is.
 8       Q    BY HEARING OFFICER:  All right.
 9       A    Right.  The 19th -- the 19th was not full.  The 20th
10   was not full.  The 21st was.
11       Q    Okay.  So the 21st was full?  The other two days
12   were not?
13       A    Yes.
14       Q    All right.  Do you have something --
15       A    That indicates that?
16       Q    Yeah.
17       A    The days in green are the --
18       Q    Okay.  January.  June.  October.  Days in green are
19   not full days and red are full?
20       A    Right.
21       Q    Okay.  And there is the number allowed, I'm
22   assuming, because I see 21 -- 21st had six and six.  So I'm
23   assuming four is the number, like, on the 20th.  I see four
24   with six in parentheses?
25            Six was the number allowed off?
```

UP_Dunger_000385

Exhibit A-47

```
 1     A     Correct.
 2     HEARING OFFICER:  Okay.  All right.  I'm going to mark
 3   this one was Exhibit Number 12.
 4
 5          (Exhibit Number 12 was marked for identification and
 6      attached hereto.)
 7
 8     HEARING OFFICER:  All right.
 9     MR. GLENN:  So we've established that he phoned in -- or
10   FMLA -- or I was about to established that he used our layoff
11   line to accomplish that, and that's identified on this next
12   page, Juan.
13     MR. ESTRADA:  Yes, I have it.
14     Q     BY HEARING OFFICER:  What is a layoff line?
15     A     The layoff line is the mechanism that the Department
16   uses -- or allows for people to call-in when they're not able
17   to come to work.  And it's a -- a touch tone type system that
18   says, like, "If you're sick, type 1.  If   you're" -- and I
19   don't know if that's the actual language, but if you type it
20   in -- the indication of why you're missing and one of the
21   indications is FMLA, and one of them is FMLA, vacation or
22   FMLA, paid.
23          And you can see from this -- this is a report out of
24   that system.  I searched Mr. Dunger and his I.D. number.  It
25   would indicate his layoff reasons for those days.  And it
```

UP_Dunger_000386

Exhibit A-48

1    also indicates the time -- the times that he laid off, which

2    will be Central Time.

3        Q    All right.  So the call date and time column is

4    Central Time?

5        A    Yes.

6        Q    Okay.  Let me just ask this:  Is there something

7    that prevents another employee or another person calling in

8    for somebody else?

9        A    No.

10       Q    There's no passwords or anything?

11       A    I believe there is a password, which is typically

12   the last four of their social and the last two of their user

13   I.D., but you can seemingly give that to somebody else to

14   phone-in.

15       Q    Okay.  All right.

16       A    And in the case of medical situations, I believe the

17   policy actually allows for somebody else -- a family member

18   to phone in for you if it's for an FMLA, but --

19       Q    So there's a security passcode that you have to

20   enter?

21       A    Yes, there is.

22       Q    Okay?

23   MR. ESTRADA:  Objection, Mr. Hearing Officer.

24   HEARING OFFICER:  Your objection?

25   MR. ESTRADA:  Is there any paperwork regarding that?

UP_Dunger_000387

Exhibit A-49

```
 1      HEARING OFFICER:  Regarding what?

 2      MR. ESTRADA:  The procedure in question.

 3      MR. GLENN:  I certainly don't have it with me.

 4      HEARING OFFICER:  Is that something you can produce?

 5      MR. GLENN:  There's some instructions somewhere on how to

 6   use it.  I mean --

 7      MR. ESTRADA:  As it were, we're bringing up the issues of

 8   somebody else making that phone call, I don't believe

 9   somebody else can make their phone call unless you go online.

10      MR. GLENN:  Well --

11      HEARING OFFICER:  Have you used the system, sir?

12      MR. ESTRADA:  Yes, sir.

13      HEARING OFFICER:  Is there a pass code or something

14   that --

15      MR. ESTRADA:  It used to be a phone line, but it

16   recently -- maybe in the last month -- got modified to an

17   online system.

18      MR. GLENN:  The phone is still available, too, but you

19   can --

20      MR. ESTRADA:  Log in.

21      HEARING OFFICER:  So you have to log in with your --

22      MR. ESTRADA:  Your employee I.D. and password.

23      HEARING OFFICER:  Okay.  So it's protected.

24      MR. ESTRADA:  Yes.

25      HEARING OFFICER:  Okay.  All right.  That's all I was
```

UP_Dunger_000388

Exhibit A-50

1   really trying to see, if there was a possibility for someone

2   else that -- to just go in and say, "Hey.  Tom's laying off

3   today," as a joke type thing or something.

4        MR. ESTRADA:  Oh, okay.

5        HEARING OFFICER:  I just wanted to see if that was

6   feasible or possible.

7        MR. GLENN:  And I'm not really implying that somebody

8   else did it -- did phone-in for him.

9        HEARING OFFICER:  Okay.

10       MR. GLENN:  I'm not going to imply that.  I have no way

11   to know that.

12       HEARING OFFICER:  All right.

13       MR. GLENN:  I'm just indicating that he did use the

14   system and probably used it the way it's intended to be used,

15   to designate an FMLA day.

16       Q    BY HEARING OFFICER:  All right.  All right.  Go

17   ahead, Mr. Glenn.

18       A    Okay.  The next item I want to enter is just a --

19   and I want to enter this just to establish that Mr. Dunger is

20   familiar with the process.  Okay.  And it's a list of his

21   FMLA usage the last several -- the last couple years.

22            And again, I submit this to just establish that

23   he's -- that he's not new to this --

24       HEARING OFFICER:  All right.  I can mark this as 14.1 and

25   14.2.

UP_Dunger_000389

Exhibit A-51

```
 1              (Exhibit Number 14.1 and 14.2 were marked for
 2         identification and attached hereto.)

 3

 4      BY THE HEARING OFFICER:
 5      Q    Go on.
 6      A    Okay.  So just to kind of summarize where we're at
 7   now.
 8           On 10/19 Mr. Dunger laid off FMLA using the layoff
 9   system at 2042, Central Time.  He indicated layoff reason
10   FMLA.  On 10/20, at about the same time, 2056 Central Time,
11   he indicated an FMLA, paid vacation time, and on the 21st, at
12   about the same time, 20:38, he again indicated an FMLA
13   situation for which he requested pay.
14           From here, I want to kind of shift gears a little
15   bit and go to what I have -- and I don't know exactly how you
16   want to present this.  I have -- I -- well, let's back up.
17           So we established the policies.  We established the
18   Company's position for the policy.  We established that
19   Mr. Dunger is entitled to FMLA for some sort of serious
20   health condition that I don't think we have or that we're
21   privy to at this time.  And that he laid off on these days.
22           Hence forward, I've obtained a video, which would
23   indicate that that -- that he was off these days and for some
24   other reason, other than his -- his FMLA entitlement.
25      Q    Okay.
```

UP_Dunger_000390

Exhibit A-52

```
 1     A    Okay.  So I've got a video on this -- on this drive,
 2  this storage device.  We can show it on my computer?  Your
 3  computer?
 4          How do you want to do it?
 5     Q    Is there a way to -- I don't know --
 6     A    I don't know if there is.
 7     Q    -- what you have available here?
 8     A    I don't know how to -- how they use this, but I can
 9  try -- if you want to take a short break, I can try to get it
10  ready to work, or we can look at it on my computer.
11     Q    That drive, you're going to give that to me;
12  correct?
13     A    Yes, this is evidence.
14     Q    All right.  Yeah.  How am I going to do it?
15     A    If you want to take a short break, we can get the AV
16  going here and --
17     Q    I'll tell you what --
18     A    -- show it here or show it on my laptop.
19     HEARING OFFICER:  Yeah.  However you want to show it,
20  I'm -- this isn't my room.  I don't know what resources you
21  have here, but first, I want to mark this as Exhibit Number
22  15.
23
24          (Exhibit Number 15 was marked for identification and
25      attached hereto.)
```

UP_Dunger_000391

Exhibit A-53

```
 1        MR. GLENN:  Well, if we're going to --
 2        HEARING OFFICER:  And I have to figure out how I'm going
 3   to --
 4        MR. GLENN:  Randy, do you know how to load it?
 5        HEARING OFFICER:  I may just retain possession of this so
 6   we have it available.
 7             All right.  Mr. Glenn, here is Exhibit Number 15.
 8        MR. GLENN:  Okay.  Then why don't we get a short break,
 9   and I'll see if I can get Mr. Padilla's help.
10        HEARING OFFICER:  Okay.  9:25 A.M., we'll take a short
11   recess.
12
13             (Off the record.)
14
15        HEARING OFFICER:  All right.  It is 9:38 A.M., we are
16   back.
17             Mr. Glenn, you have what's been marked as
18   Exhibit 15, which is a drive.  I'll go ahead and retain
19   possession of that exhibit.
20        MR. GLENN:  Okay.
21        HEARING OFFICER:  So --
22        MR. GLENN:  And this -- this stick actually has three --
23   three separate documents on it.
24        HEARING OFFICER:  Okay.
25        MR. GLENN:  And we'll look at all three of them.
```

UP_Dunger_000392

Exhibit A-54

```
 1     Q    BY HEARING OFFICER:  All right.  Now, what are we
 2  looking at?
 3     A    We're looking at a video and a still photograph of
 4  something -- of a stream that was posted on Facebook --
 5     Q    Okay.
 6     A    -- and was obtained by Brad Steffel.
 7     Q    And is there audio associated with it?
 8     A    There is audio associated with this, yes.
 9     Q    Are you going to narrate anything?
10     A    I'm going to try, yeah.  I'm going to try and -- but
11  before I -- but before I do, I kind of wanted to present the
12  pictures of the people that I'm able to recognize in the
13  video.
14     Q    Okay.
15     A    I've got -- and these are pictures out of our -- out
16  of our EDCS system.
17     Q    All right.
18     A    So they're pictures that these -- these individuals
19  have on file.  These are not the only people in the video,
20  but they're the ones that I'm able to recognize.
21     Q    All right.  Let me see what I'm looking at here.
22     A    And I input these simply so we're able to make a
23  relationship between the two.
24     Q    All right.
25     A    And only one of these individuals is here today, but
```

1    the others --

2        Q    But the others --

3        A    -- I was able to recollect, so I think it's

4    pertinent to include them.

5        HEARING OFFICER:  All right.  I've got one, two, three,

6    four.

7             I'll mark this as Exhibit 15.1 through 15.4.

8

9             (Exhibit Number 15.1 through 15.4 were marked for

10            identification and attached hereto.)

11

12       HEARING OFFICER:  Give me a second.

13       MR. GLENN:  And -- and I'll wait until you're done

14   marking.

15       Q    BY HEARING OFFICER:  Yeah.  And I see some writing

16   on one of the back of these, but we're just looking --

17       A    We're just looking at the front.  If you want to

18   draw a line through that, that just got printed on the back

19   side of something.  It's not relevant to this at all.

20       Q    All right.

21       A    I intended to only print the first page, but that

22   one got -- snuck in there.

23            Okay.  So I wanted to point out that the date --

24   the -- or the indication in the two still photos is that this

25   occurred on the 21st at 2:00 P.M., and I also wanted to point

UP_Dunger_000394

Exhibit A-56

 1   out that Brad Steffel received this on the 25th of October.

 2           So it occurred on 10/21 at approximately

 3   2:00 A.M. -- 2:00 P.M., and Brad Steffel received it on

 4   10/25.

 5       Q    All right.

 6       A    Okay.  So I'm going to go to this item on my

 7   computer, this D drive.  And here are the three files I told

 8   you about.

 9           Okay.  The first is an image that shows this was

10   from John Lemus, who happens to be one of the people in the

11   video that I recognize, and that it occurred Saturday at

12   2:00 P.M.

13           Okay.  Item 1.

14       MR. ESTRADA:  What date was that?

15       MR. GLENN:  The 21st is a Saturday.

16       MR. ESTRADA  so --

17       MR. GLENN:  Okay.  The next item is just a different look

18   at that same picture, I believe, indicating -- I don't think

19   I can rotate this.  Oh, maybe I can.  There we go.

20           So same thing, 2:00 P.M., Saturday.  This was posted

21   live by John Lemus.  Posted live on Facebook or some other

22   social media.

23       Q    BY HEARING OFFICER:  Okay.  Okay.

24       A    Now, the third item is -- I didn't need to save that

25   again, did I?   I'm just going to delete that because I

UP_Dunger_000395

Exhibit A-57

1    didn't really need to save that twice.  Okay.

2          Okay.  And the next item is a video, which I'm

3    just going to play it through once, and then see if you can

4    turn that --

5

6          (Video playing in background.)

7

8    Q    Okay.  I can't hear the audio and you talking at the

9    same time.

10   A    Okay.  Well, I'll play it again, but I want to try

11   and turn it.  It won't allow me to turn it.

12   Q    Okay.

13   A    So let me stop and go back, and we'll play it again.

14   Q    All right.  Let me watch this without any narration.

15   A    And let me get the volume turned up as high as it

16   will go here.

17   Q    If you can transcribe what you can hear on the

18   audio?  I don't know what -- it's hard for me to hear.

19   A    Can you maybe turn out this front light or turn it

20   down?  I think they have a mechanism to dim them.  It might

21   make it a little easier to see.

22         That window is kind of bad.

23

24         (Video playing)

25

UP_Dunger_000396

Exhibit A-58

```
 1          "UNIDENTIFIED INDIVIDUAL:  There.  Live feed.
 2          "UNIDENTIFIED INDIVIDUAL:  What's up?
 3          "UNIDENTIFIED INDIVIDUAL:  There it is.
 4          "UNIDENTIFIED INDIVIDUAL:  I can see.
 5          "UNIDENTIFIED INDIVIDUAL:  Absolutely.
 6          "UNIDENTIFIED INDIVIDUAL:  Is this for Facebook or
 7      Instagram?
 8          "UNIDENTIFIED INDIVIDUAL:  Facebook.
 9          "UNIDENTIFIED INDIVIDUAL:  I'm not out here.
10          "UNIDENTIFIED INDIVIDUAL:  What?
11          "UNIDENTIFIED INDIVIDUAL:  I'm not out here.
12          "UNIDENTIFIED INDIVIDUAL:  Oh, sick.
13          "UNIDENTIFIED INDIVIDUAL:  Yeah this is --
14          "UNIDENTIFIED INDIVIDUAL:  There he is.
15          "UNIDENTIFIED INDIVIDUAL:  What's up, homie?
16          "UNIDENTIFIED INDIVIDUAL:  Okay.  Man."
17
18          (Video stopped playing.)
19
20      MR. GLENN:  Okay.  That's the end of the video.
21          I'm going to see if we can block this window with
22      some paper --
23      Q     BY HEARING OFFICER:  Yeah, that's what I was looking
24      for, some paper, something to block that window up.
25      A     You want to take a break?
```

UP_Dunger_000397

Exhibit A-59

```
 1      Q    I just need something to see if I can do that.

 2           Why don't you give me two minutes?

 3      A    We'll fix that.

 4      Q    Yeah.  Why don't you block that window out.

 5      A    We're off the record?

 6      HEARING OFFICER:  Yeah.  I need to get back to my phone.

 7           All right.  9:47, take a short recess to see if we

 8    can -- see if we can block that window out a little bit

 9    better.

10

11           (Off the record.)

12

13      HEARING OFFICER:  All right.  9:50 A.M. we are back.

14           I kind of sealed the light out here.

15           Mr. Glenn, if you would just play this video again

16    without any narration, sir?  Thank you.

17

18           (Video playing.)

19

20           "UNIDENTIFIED INDIVIDUAL:  There you are.

21           "UNIDENTIFIED INDIVIDUAL:  Your live feed.

22           "UNIDENTIFIED INDIVIDUAL:  Oh no.

23           "UNIDENTIFIED INDIVIDUAL:  Yeah.

24           "UNIDENTIFIED INDIVIDUAL:  There it is.

25           "UNIDENTIFIED INDIVIDUAL:  Everybody is here.
```

UP_Dunger_000398

Exhibit A-60

```
 1          "UNIDENTIFIED INDIVIDUAL:  Is this Facebook or
 2     Instagram?
 3          "UNIDENTIFIED INDIVIDUAL:  Facebook.
 4          "UNIDENTIFIED INDIVIDUAL:  I'm not out here.
 5          "UNIDENTIFIED INDIVIDUAL:  What's that?
 6          "UNIDENTIFIED INDIVIDUAL:  I'm not out here.
 7          "UNIDENTIFIED INDIVIDUAL:  What's up, man?
 8          "UNIDENTIFIED INDIVIDUAL:  Damn.
 9          "UNIDENTIFIED INDIVIDUAL:  There he is.
10          "UNIDENTIFIED INDIVIDUAL:  What's up, homie?
11          "UNIDENTIFIED INDIVIDUAL:  Damn man.
12          "UNIDENTIFIED INDIVIDUAL:  Okay.  Man."
13
14          (Video stopped playing.)
15
16     HEARING OFFICER:  All right.  One more time, if you
17     would?
18
19          (Video playing.)
20
21          "UNIDENTIFIED INDIVIDUAL:  There you are.
22          "UNIDENTIFIED INDIVIDUAL:  Your live feed.
23          "UNIDENTIFIED INDIVIDUAL:  Oh no.
24          "UNIDENTIFIED INDIVIDUAL:  Yeah.
25          "UNIDENTIFIED INDIVIDUAL:  There it is.
```

```
 1          "UNIDENTIFIED INDIVIDUAL:  Everybody is here.

 2          "UNIDENTIFIED INDIVIDUAL:  Is this Facebook or

 3    Instagram?

 4          "UNIDENTIFIED INDIVIDUAL:  Facebook.

 5          "UNIDENTIFIED INDIVIDUAL:  I'm not out here.

 6          "UNIDENTIFIED INDIVIDUAL:  What's that?

 7          "UNIDENTIFIED INDIVIDUAL:  I'm not out here.

 8          "UNIDENTIFIED INDIVIDUAL:  What's up, man?

 9          "UNIDENTIFIED INDIVIDUAL:  Damn.

10          "UNIDENTIFIED INDIVIDUAL:  There he is.

11          "UNIDENTIFIED INDIVIDUAL:  What's up, homie?

12          "UNIDENTIFIED INDIVIDUAL:  Damn man.

13          "UNIDENTIFIED INDIVIDUAL:  Okay.  Man."

14

15          (Video stopped playing.)

16

17    HEARING OFFICER:  All right.

18    MR. GLENN:  So now do you want me to --

19    HEARING OFFICER:  Were you able --

20    MR. GLENN:  -- narrate what I see?

21    HEARING OFFICER:  Were you able to get any of the audio

22    from that?

23    THE REPORTER:  A little.

24    MR. GLENN:  Want to try it again?  Play it one more time?

25    HEARING OFFICER:  Where's the speaker for this?
```

UP_Dunger_000400

Exhibit A-62

```
 1      MR. ESTRADA:  I believe it's --

 2

 3          (Video playing.)

 4

 5          "UNIDENTIFIED INDIVIDUAL:  There you are.

 6          "UNIDENTIFIED INDIVIDUAL:  Your live feed.

 7          "UNIDENTIFIED INDIVIDUAL:  Oh no.

 8          "UNIDENTIFIED INDIVIDUAL:  Yeah.

 9          "UNIDENTIFIED INDIVIDUAL:  There it is.

10          "UNIDENTIFIED INDIVIDUAL:  Everybody is here.

11          "UNIDENTIFIED INDIVIDUAL:  Is this Facebook or

12      Instagram?

13          "UNIDENTIFIED INDIVIDUAL:  Facebook.

14          "UNIDENTIFIED INDIVIDUAL:  I'm not out here.

15          "UNIDENTIFIED INDIVIDUAL:  What's that?

16          "UNIDENTIFIED INDIVIDUAL:  I'm not out here.

17          "UNIDENTIFIED INDIVIDUAL:  What's up, man?

18          "UNIDENTIFIED INDIVIDUAL:  Damn.

19          "UNIDENTIFIED INDIVIDUAL:  There he is.

20          "UNIDENTIFIED INDIVIDUAL:  What's up, homie?

21          "UNIDENTIFIED INDIVIDUAL:  Damn man.

22          "UNIDENTIFIED INDIVIDUAL:  Okay.  Man."

23

24          (Video stopped playing.)

25
```

UP_Dunger_000401

Exhibit A-63

```
 1      Q      BY HEARING OFFICER:  All right.

 2      A      Okay.  Now, I'm going to -- if you're ready, I'll

 3   play it, and I'll stop it in a few places and identify what I

 4   see in the video.

 5      Q      Okay.

 6

 7             (Video playing.)

 8

 9      A      Okay.  That's Mr. Dunger down there.

10      Q      Okay.

11      A      I'll go back a little.

12             That is Mr. Dunger.

13      Q      All right.

14      A      That is the other person that I'm able to identify

15   on this boat, Jassier Vargas.  And that is Harrison Scharf.

16      Q      Okay.

17      A      Okay.  You heard, just now in the background, "I'm

18   not out here."  That's Mr. Dunger talking.

19      Q      Okay.

20      A      And that's the only other person I'm able to

21   identify talking in the video.

22             Let me go back a little bit here.

23             Same subject.

24      Q      Say again?

25      A      Same subject right there.
```

UP_Dunger_000402

Exhibit A-64

```
 1      Q    Same subject?

 2      A    Mr. Dunger.

 3      Q    Oh, okay.

 4      A    Another brief glimpse, I believe.

 5           After that point, he's gone someplace else because I

 6      believe he knew he was somewhere he shouldn't be, and so he's

 7      no longer in the picture.

 8      MR. ESTRADA:  Objection, Mr. Hearing Officer.  This is

 9      all hearsay.  We have no one there who is a witness to that

10      video.  We don't even have a date for that video.  It has a

11      time of Saturday of 2:00 o'clock, but there is no date.  We

12      don't even know when that video was taken, what date.

13      HEARING OFFICER:  How do I know when that video was

14      taken?

15      MR. GLENN:  What's that?

16      Q    BY HEARING OFFICER:  How do I know when that video

17      was taken?

18      A    Just based on the date we received it.  And it says

19      it's live on Saturday.  All those people in that video were

20      not at work that day, Saturday the 21st.

21      MR. ESTRADA:  It's hearsay.

22      MR. GLENN:  And the company -- we believe the -- that it

23      was Saturday the 21st.

24      HEARING OFFICER:  All right.

25      MR. GLENN:  And Brad Steffel received this video on
```

UP_Dunger_000403

Exhibit A-65

1   October 25th from a supervisor here on the property who had

2   received it live.

3       HEARING OFFICER:   Okay.

4       MR. ESTRADA:   Objection, Mr. Hearing Officer.

5       HEARING OFFICER:   Your objection will be noted in the

6   record.

7       Q    BY HEARING OFFICER:   All right.

8       A    May I summarize a little?

9       Q    Yeah.

10      A    Okay.   So the company believes that, of course,

11  Mr. Dunger is on that boat on that day when he had identified

12  it as a day that he had an FMLA or a condition that he had an

13  FMLA entitlement.   And that that is misuse of the FMLA policy

14  and, hence, dishonest as identified by the caption of the

15  Notice.   Brad Steffel received this video on the 25th.

16          There was a period of time from the 25th to

17  November 2nd when it was evaluated and gathering up evidence

18  and gathering up some of the facts to establish that, first

19  of all, Mr. Dunger has a FMLA accomodation and, at that

20  point, was determined that, yes, we would proceed with the

21  case.   <u>And the final go ahead was given on November 7th, and</u>

22  <u>we proceeded and generated a charge letter on November 9th.</u>

23      Q    All right.

24      A    And --

25      MR. ESTRADA:   Mr. Hearing Officer, I would like to object

UP_Dunger_000404

Exhibit A-66

```
 1   to this statement.

 2        HEARING OFFICER:  Your objection, sir?

 3        MR. ESTRADA:  It's all hearsay.  Mr. Glenn was not

 4   present at the time of the video was handed over to

 5   Mr. Brad Steffel.  Mr. Brad Steffel is not here to be the

 6   witness, since he's the charging officer and the witness at

 7   that point.

 8             I would ask for this video, you know, noted as not

 9   being -- having any bearing in this case.  There is no date

10   on that video to say it was the 21st, the 20th, or the 19th.

11             So at this point, it has no bearing on this case.

12        HEARING OFFICER:  Your objection will be noted for the

13   record, but I'm going to allow it right now.

14        Q    BY HEARING OFFICER:  Mr. Steffel is available by

15   phone; correct?

16        A    He's -- he should be able to be contacted, yes.

17        Q    Okay.

18        A    And as -- and Zack Padilla, who you sworn in here

19   earlier -- or qualified him earlier, he can also identify the

20   people in this video.

21        Q    Okay.

22        A    It's the reason that he's here, too.

23        Q    All right.  Do you have any other evidence right now

24   to present, sir?

25        A    I believe that's the end of my -- what I have at
```

UP_Dunger_000405

Exhibit A-67

1   this time.

2       HEARING OFFICER:  All right.  I'll tell you what, let's

3   go ahead -- it's 10:00 o'clock.  Let's take a short recess.

4           Before we go off, Mr. Glenn, you are excused right

5   now.

6       MR. GLENN:  Okay.  Would you like for me to try and --

7       HEARING OFFICER:  Correct that.  Correct that.

8           Do you need a moment to prepare some questions for

9   Mr. Glenn?

10      MR. ESTRADA:  Yes, sir.

11      HEARING OFFICER:  Okay.  Then you are not excused right

12  now, Mr. Glenn.

13          It is 10:01, we'll take a short recess.  And when we

14  come back, we'll have the Organization's cross.

15

16          (Off the record.)

17

18      HEARING OFFICER:  All right.  It is 10:08 A.M., we are

19  back.

20          Mr. Glenn, you had no further evidence or testimony

21  to provide; correct?

22      MR. GLENN:  I don't think so.

23      HEARING OFFICER:  All right.

24          Mr. Estrada, do you have any questions for

25  Mr. Glenn?

UP_Dunger_000406

Exhibit A-68

1          MR. ESTRADA:  Yes, I do.

2

3                         EXAMINATION

4

5    BY MR. ESTRADA:

6       Q    Mr. Glenn, you have -- you have put up the video and

7    have actually gone step-by-step on who and what was said in

8    that video.

9            You have said that's Dunger on that video saying

10   that, "I'm not here," or something like that?

11      A    Uh-huh.

12      Q    There's nothing that shows that video -- you know,

13   him saying that.  I mean, it's a background noise, but

14   there's nothing in that video that proves Mr. Dunger saying

15   anything -- any sort -- or anybody saying Mr. -- you know,

16   Mr. Lemus is the one who took that video, but it doesn't show

17   anybody else on there saying anything.

18           Why would you bring that up to this case?

19      A    Because I recognize his voice.  It's him.  It's him

20   in the picture, and it's his voice.

21      Q    You said you work directly with Mr. Dunger?

22      A    I don't work directly with him, but I have

23   interacted with Mr. Dunger on recent occasion.

24           I hired Mr. Dunger, what?  Seven years ago, I think.

25      Q    So --

UP_Dunger_000407

Exhibit A-69

```
1      A    So I have interacted with him over the years, and I
2   recognize his voice.  That's him.
3      Q    And the date on that video, what exact date is on
4   that video because there's no --
5      A    The date is Saturday the 21st.
6      Q    And that's --
7      A    October 21st.
8      Q    And whose -- is there a time stamp on the video?
9      A    It says Saturday at 2:00 P.M., and it is Saturday
10  the 21st.
11     Q    It does not say 21st?
12     A    It does not say that in the video, but it is the
13  21st.
14     Q    So we're supposed to go -- are we supposed to go
15  with the video that says Saturday, 2:00 P.M., and assume it's
16  the 21st or it could be the 19th, it could the 20th, or it
17  could be the 1st.
18     HEARING OFFICER:  And your question, sir?
19     Q    BY MR. ESTRADA:  My question is:  Why are we
20  allowing the video -- why are we bringing a video into this
21  investigation that has no date?  It has no date on it.
22     HEARING OFFICER:  Well, we can cross-examine Mr. Steffel
23  and get some information regarding him -- regarding the dates
24  of the video.
25     MR. GLENN:  I believe it was the 21st.
```

UP_Dunger_000408

Exhibit A-70

```
 1        MR. ESTRADA:  That's all I have.

 2        MR. GLENN:  All indications I have are the 21st.

 3        HEARING OFFICER:  Okay.  That's all the questions?

 4        MR. ESTRADA:  Yes, sir.

 5        HEARING OFFICER:  Okay.  Mr. Dunger, questions for

 6   Mr. Glenn?

 7        THE CHARGED:  No.

 8

 9

10                    FURTHER EXAMINATION

11

12   BY HEARING OFFICER:

13        Q    All right.  Mr. Glenn, do you have a definition of

14   what it means to be dishonest?

15        A    Yes.  I have the railroad's definition of being

16   dishonest as it is contained in the MAPS policy.

17        Q    Can I see that?

18        A    If you want a copy of that one, I'll have to go make

19   a copy.

20        HEARING OFFICER:  Yeah.  You don't want a copy?

21        MR. ESTRADA:  Yeah, I'm okay.  Thank you.

22        Q    BY HEARING OFFICER:  Okay.  Where is this from?

23        A    It's from the MAPS policy.

24        Q    All right.  And what is MAPS?

25        A    MAPS stands for "Managing Agreement Professionals
```

UP_Dunger_000409

Exhibit A-71

1   for Success."  It's the rules compliance mechanism.

2          If you're -- if that's going to be submitted, I

3   would maybe recommend it be submitted as a -- you know, a

4   sub-document to the rule since that's -- you know, if the

5   rule was ~~Exhibit 8,~~ then make that 8.1.  I don't know.

6          HEARING OFFICER:  Yeah.  I'll go ahead and renumber that.

7          Since this goes part in part with ~~Exhibit 4,~~

8   ~~Exhibit 4~~ will now be marked as Exhibit 4.1, and I will mark

9   this as Exhibit 4.2.

10

11         (Exhibit Number 4.2 was marked for identification

12         and attached hereto.)

13

14      MR. GLENN:  And it has a definition of dishonesty.  I can

15   read it if you want, or you can.

16      Q    HEARING OFFICER:  Nope.  You can read that.

17      A    It has a whole bunch of other definitions on here,

18   but the only one we're interested in is the one in the middle

19   of the page, "dishonest."

20         "When an employees actions or statements constitute

21   lying, cheating, theft or deception."

22      HEARING OFFICER:  All right.  What number do you have for

23   Mr. Steffle?

24      MR. GLENN:  I'll have to look it up.  (562) 631-1993.

25      HEARING OFFICER:  All right.  All right.  Mr. Estrada,

UP_Dunger_000410

Exhibit A-72

1   questions?

2        MR. ESTRADA:  Yes, I just have a question.  I have

3   something I want to submit into the record, when would you

4   like me to do that?

5        HEARING OFFICER:  Let me see it.

6            Okay.  You can do that when you question Mr. Dunger.

7        MR. ESTRADA:  Sounds good.  Thank you.

8        HEARING OFFICER:  All right.  Any other questions for

9   Mr. Glenn?

10       MR. ESTRADA:  No, Mr. Hearing Officer.

11       HEARING OFFICER:  Mr. Dunger, any questions for

12  Mr. Glenn?

13       THE CHARGED:  No.

14       HEARING OFFICER:  Mr. Glenn, you are excused.  Please

15  remain in the area.  You are subject to recall, and do not

16  discuss your testimony with anyone.

17       MR. GLENN:  Okay.  And would you like me to leave my

18  computer setup?

19       HEARING OFFICER:  Yes, I believe --

20       MR. GLENN:  If it times out -- it's plugged in so it

21  shouldn't, and it should still be at that site.

22       HEARING OFFICER:  Does this thing work?

23       MR. GLENN:  I think so.  Oh, probably not.  Unless it's

24  Bluetooth.

25       HEARING OFFICER:  It is.

UP_Dunger_000411

Exhibit A-73

```
 1              (Mr. Glenn exited the proceeding at this time.)

 2

 3                   (Whereupon, the Hearing Officer dialed Mr. Steffel's

 4        number at this time.)

 5

 6        MR. STEFFEL:  Hello?

 7        HEARING OFFICER:  Mr. Steffel?

 8        MR. STEFFEL:  Yeah.

 9        HEARING OFFICER:  Yeah, this is Andy Mader.  How are you

10   doing today, sir?

11        MR. STEFFEL:  Okay.  How are you?

12        HEARING OFFICER:  I'm good.  Do you have a couple of

13   minutes to talk, sir?

14        MR. STEFFEL:  Yeah.  I'm in a museum, but I'm back in a

15   corner, so I'm sure I can talk for a few minutes.

16

17

18                        EXAMINATION

19   BY HEARING OFFICER:

20        Q    All righty, sir.  Before we start, if you would,

21   sir, give me your full name, spelling your last name.

22        A    Brad A. Steffel, S-T-E-F-F-E-L.

23        Q    And your employee I.D. number, sir?

24        A    0000186.

25        Q    And what is your title?
```

UP_Dunger_000412

Exhibit A-74

1      A     I'm the senior manager of the Commerce locomotive

2   facility.

3      Q     And your employer and length of service, sir?

4      A     Union Pacific for 19 years.

5      Q     All righty.  Thank you, sir.  So I'm here in an

6   investigation.  We have Mr. Dunger, Mr. Estrada, and -- help

7   me with your last name again?

8      MR. MORIKAWA:  Morikawa.

9      Q     BY HEARING OFFICER:  Morikawa.  Okay.  I apologize

10  again for mispronouncing your last name.  Here in the

11  investigation, you are listed as the charging officer on this

12  case against Mr. Dunger, and Mr. Glenn presented on your

13  behalf.  So I had some questions for you.

14         First of all, sir, when did you receive this

15  information, the video?

16     A     The initial video -- it's on the timeline that I

17  help put together for Dan.  And I don't recall the date

18  because it's not right here in front of me right now.  It was

19  a Wednesday on that sheet with the timeline.  I don't know if

20  you have it there in front of you?

21     Q     No.  No timeline was submitted?

22     A     No timeline was submitted.

23     Q     So -- but it was a Wednesday?

24         Who did you receive it from?

25     A     I received it from Vic Prado.  He showed me on his

UP_Dunger_000413

Exhibit A-75

1  cell phone, and then I took a video of it on my cellphone at

2  that time.

3      Q     All right.  And what date was this video

4  published -- taken -- I don't know what else to call it.

5      A     The video itself took place on the Saturday that

6  Mr. Dunger laid off FMLA -- laid off FMLA on Friday and then

7  on Saturday, both of those FMLA, vacation.  And this video

8  took place at 2:00 P.M., right between the first shift that

9  he laid off for FMLA, vacation, and before he laid for his

10  second day of FMLA, vacation.

11      Q     All righty.  And you're certain of that date, sir?

12      A     Yes, I am.

13      MR. ESTRADA:  Objection, Mr. Hearing Officer.

14      HEARING OFFICER:  You'll be able to cross.

15      MR. ESTRADA:  Thank you.

16      Q     BY HEARING OFFICER:  And you've seen the video

17  that's been in question; correct, sir?

18      A     I'm sorry?  Can you say that again?

19      Q     You've seen the video that's --

20      A     Yes.

21      Q     Okay.  That you were going to present?

22      A     Yes, I have seen the video.

23      Q     All righty, sir.  Who is in the video?

24      A     I -- in that video, there is John Lemus, who is the

25  third shift machinist union rep.  There is Jassier Vargas,

UP_Dunger_000414

Exhibit A-76

```
 1   who is an electrician at Commerce.  There's Harrison Scharf,
 2   who's an electrician at Commerce.  And then there's also
 3   Thomas Dunger, who is the employee being charged.
 4         And on those -- on that day there, that that video
 5   took place, everyone except for Thomas Dunger either had that
 6   as a rest day before or previously scheduled vacation before
 7   that video took place.
 8   Q    And --
 9   A    And then --
10   Q    Go ahead, sir.
11   A    I was going to say, and then Thomas ended up
12   circumventing the vacation approval process by laying off
13   FMLA, vacation, for both of those days.
14   Q    All right.  Have you interacted with Mr. Dunger
15   previously, sir?
16   A    Yes, I have interacted with him several times.
17   Q    Is that his voice in the video?
18   A    It's my belief that that is his voice, yes.  And
19   then, after he states in that video that, you know, he's not
20   there, you know, you can see Thomas hiding behind John Lemus,
21   towards the end of the video there, as John's moving the
22   camera around, you see a little bit of Dunger's clothes
23   behind John Lemus there.  So --
24   HEARING OFFICER:  All righty.  I have no questions for
25   you right now, sir.
```

UP_Dunger_000415

Exhibit A-77

```
 1           Mr. Estrada, questions for Mr. Steffel?
 2      MR. ESTRADA:  Yes, Mr. Hearing Officer.
 3      HEARING OFFICER:  Go ahead, sir.
 4           Can you hear him okay?
 5      MR. STEFFEL:  Yeah.  It's kind of quiet, but I can hear.
 6
 7
 8                         EXAMINATION
 9
10  BY MR. ESTRADA:
11      Q    Now, Mr. Steffel, I just have a couple questions for
12  you.  The first one would be:  What was the exact date this
13  video was taken?
14      A    I'm sorry?  I can't really hear now.  Can you come
15  closer to the speaker?
16      Q    What was the exact date this video was taken?
17      A    The exact date the video was taken?
18      Q    Yes, sir.
19      A    I don't have a calendar in front of me right now.
20  The -- here.  Let me pull up the calendar on my phone.  Give
21  me a second.
22           Okay.  I believe the days that Thomas Dunger laid
23  off was the 20th and the 21st for FMLA, vacation, and the
24  video is taken at 2:00 P.M., I'm assuming Pacific Time, on
25  the 21st according to the Facebook Live post.
```

UP_Dunger_000416

Exhibit A-78

1          There was a screenshot that I took on my phone

2     showing the actual date and time stamp of that Facebook live

3     post.  So that would have been 8 hours after Dunger should be

4     at work, and 8 hours before Dunger should have returned to

5     work.

6          Q    Now, the video that we have seen or information does

7     not have a time stamp, Mr. Brad Steffel, so do you have any

8     witnesses that shows the transaction between you and

9     Mr. Prado regarding the video?

10         A    So on that day I got that video and -- is Vic Prado

11    there?  Did he testify to --

12         HEARING OFFICER:  No, we don't have Mr. Prado.

13         MR. STEFFEL:  -- that video was provided.

14         HEARING OFFICER:  No, we don't --

15         MR. STEFFEL:  He's not there?

16         HEARING OFFICER:  Mr. Prado is not here.

17         MR. STEFFEL:  Well, I sent Dan Glenn an E-mail with a

18    screen shot showing the time of the video, and it's on my

19    phone.  If you need it, I can always forward it in an E-mail

20    to the Hearing Officer or to Dan Glenn to show the date and

21    time that that video actually took place.

22         HEARING OFFICER:  Okay.

23         MR. ESTRADA:  That's all I have, Mr. Hearing Officer.

24         HEARING OFFICER:  Mr. Dunger, do you have any questions

25    for Mr. Steffel?

UP_Dunger_000417

Exhibit A-79

1    THE CHARGED:  No.

2    HEARING OFFICER:  All right.  Mr. Steffel, I don't have

3  any further questions for you right now.  If I do, I'll give

4  you a call back.  Hopefully you're available to talk at that

5  time, if we need to.

6    MR. STEFFEL:  Okay.  I'll do my best to stay available.

7    HEARING OFFICER:  All right.  And I'll give you a call

8  when we're done, just so you know you don't have to worry

9  about it anymore.

10    MR. STEFFEL:  Okay.  Thank you.

11    HEARING OFFICER:  Thank you.  Bye.

12        All right.  We can bring in -- what's his name --

13  Mr. Padilla.

14    MR. MORIKAWA:  Want me to grab him?

15    HEARING OFFICER:  Yeah, would you, please?

16    MR. ESTRADA:  We can go ahead.  That's fine.

17    HEARING OFFICER:  Okay.  He's just observing.  All right.

18

19

20

21                  EXAMINATION

22

23  BY HEARING OFFICER:

24    Q    First of all, could you please state your name for

25  the record?

UP_Dunger_000418

Exhibit A-80

```
1       A    Michael Zachary Padilla.

2       Q    And what is your title, sir?

3       A    Supervisor, locomotive maintenance.

4       Q    Where?

5       A    Commerce, California.

6       Q    All right.  Do you work or interact with the

7  employees here in Commerce?

8       A    I do.

9       Q    All right, sir.  So you have interacted with

10 Mr. Dunger previously?

11      A    I have.

12      Q    I'm going to show you a video.  I will play the

13 video, and after I play the video, I'd like you to tell me

14 whom you see in this video.  Okay?

15      THE REPORTER:  Would you like me to take the video down?

16      HEARING OFFICER:  The audio?  No.

17

18           (Video playing.)

19

20      Q    BY HEARING OFFICER:  All right.  Hold on.

21           Do you recognize anybody in this?

22      A    Yes.

23      Q    Who is that?

24      A    Mr. Dunger.

25      Q    Who is that, sir?
```

UP_Dunger_000419

Exhibit A-81

```
 1      A     Jassier Vargas.

 2      Q     And that?

 3      A     Harrison Scharf.

 4            I do not recognize that person.

 5            John Lemus.

 6      Q     Okay.  I want you to listen to this portion here.

 7            You recognize that voice?

 8      A     Yes.

 9      Q     Who's voice is that?

10      A     Thomas Dunger.

11      Q     Thank you.

12      HEARING OFFICER:  Mr. Estrada, do you have a question for

13  Mr. Padilla?

14      MR. ESTRADA:  Yes, Mr. Mader.

15

16

17                          Examination

18

19  BY MR. ESTRADA:

20      Q     Mr. Padilla, can you tell me when that video was

21  recorded?

22      A     I do not know.

23      Q     So you can't tell me -- by looking at the video, you

24  can't tell me what date that video was recorded?

25      A     From looking at the video, no.  Unless there's any
```

UP_Dunger_000420

Exhibit A-82

```
 1   date stamp, I do not know.
 2        MR. ESTRADA:  That's all I have.
 3        HEARING OFFICER:  Mr. Dunger, any questions for
 4   Mr. Padilla?
 5        THE CHARGED:  No questions.
 6        HEARING OFFICER:  All right.  Mr. Padilla, I don't have
 7   any other questions for you right now.  Please remain in the
 8   area.  You are subject to recall, and do not discuss your
 9   testimony with anyone.
10        MR. PADILLA:  Thank you.
11
12
13                         EXAMINATION
14   BY HEARING OFFICER:
15        Q    All right.  Mr. Dunger.
16        A    Yes?
17        Q    Would you please state your name and your I.D.
18   number?
19        A    Thomas Dunger, 0444911.
20        Q    All right.  And Mr. Dunger, what is your occupation?
21        A    I'm a diesel mechanic at Commerce Pacific Union,
22   locomotive.
23        Q    All right.  Mr. Dunger, first, did you receive a
24   copy of this Notice of Investigation, sir?
25        A    I did.
```

UP_Dunger_000421

Exhibit A-83

```
 1      Q    All right.  I forgot to ask that earlier.

 2           Did you apply for FMLA, Mr. Dunger?

 3      A    I did.

 4      Q    For yourself, sir?

 5      A    Yes.

 6      Q    Did you layoff FMLA on the 20th and the 21st, sir?

 7      A    I laid off the FMLA on the 19th, 20th, and 21st.

 8      Q    All right.  Mr. Dunger, is that you in the video?

 9      A    I don't recall.

10      Q    You don't recall if you were out --

11      A    I don't remember.  I was --

12      Q    So you recall laying off FMLA, you just don't recall

13   whether you were out fishing that day?

14      A    I don't remember.

15      Q    Okay.

16      A    But I did layoff FMLA.

17      Q    I'm sorry?

18      A    I did layoff FMLA.

19      Q    All right.  No other recollection from that day?

20      A    No.  I remember that I was in pain.

21           Can I submit this as --

22      Q    Yeah.  What do you got there?

23           Okay.  So you have --

24      A    I have -- I went to the urgent care that 19th, in

25   the morning, after I preformed duty from the 18th night to
```

UP_Dunger_000422

Exhibit A-84

1  the 19th morning.

2      Q   Uh-huh.

3      A   I went to the urgent care because I was in severe

4  pain for the same reasons that I have FMLA.  And after

5  speaking with a person on duty at that facility, they advised

6  me to stay out of work for the remaining of my week.  And

7  return to work on the 22nd, I believe, which is my rest day.

8      HEARING OFFICER:  Okay.  Cleanup note.  I marked two

9  exhibits as 15.  The hard drive is Exhibit 15 and the 15.1

10  through 15.4 which were marked, which were the EDCS records

11  showing the pictures, I'm going to renumber those as

12  Exhibits 16.1 through 16.4.

13

14          (Exhibit Number 16.1 through 16.4 were marked for

15       identification and attached hereto.)

16

17      HEARING OFFICER:  I forgot it was in the computer.

18          All right.  And then I will mark this note that

19  Mr. Dunger has submitted as Exhibit Number 17.

20

21          (Exhibit Number 17 was marked for identification and

22       attached hereto.)

23

24      THE CHARGED:  Would you like me to read it?

25      Q   BY HEARING OFFICER:  Yeah, go ahead.

UP_Dunger_000423

Exhibit A-85

```
1      A    "This is a work or school excuse.

2           "Patient Dunger, Thomas, MRM:  2215332.

3           "FIN:  4316196.  Age:  28 years.  Sex:  Male.

4           "DOB:  11/23/1988.  Associated diagnoses:  None.

5           "Author McNutt, Carrolyn.

6           "Today's date:  10/19/2017.

7           "To whom it may concern,

8           "This patient was seen in my office on 10/19/2017.

9  Please excuse him or her from work today, for the next two

10 days.  He or she may return to work on 10/22/2017.  Please

11 contact me if you have any questions or concerns.

12          "Sincerely,.

13          "Lizotte, Scott FNP.

14          "(909) 948-8100."

15          Want me to go over the rest of it at the bottom?

16     Q    BY HEARING OFFICER:  No, that's okay.

17          When did you go on the trip with your coworkers?

18     A    I don't remember.  I don't recall.  It was over a

19 month ago.

20     Q    You don't recall at all when you did that?

21     A    I don't recall.

22     HEARING OFFICER:  Mr. Estrada?

23     MR. ESTRADA:  No questions, Mr. Mader.

24     HEARING OFFICER:  Okay.  Let's go ahead and take a short

25 recess.  It is 10:43 A.M.
```

UP_Dunger_000424

Exhibit A-86

1          (Whereupon, a brief recess was taken at this time.)

2

3

4      HEARING OFFICER:  All right.  It is 10:58 A.M.

5          Mr. Estrada, do we have any questions we need to

6  bring anybody in for?

7      MR. ESTRADA:  No, sir.

8      HEARING OFFICER:  No?  Mr. Dunger?

9      THE CHARGED:  No.

10     HEARING OFFICER:  No?

11         Mr. Dunger, have you been present throughout the

12 hearing?

13     THE CHARGED:  Yes.

14     HEARING OFFICER:  And you've heard all the testimony

15 given?

16     THE CHARGED:  Yes.

17     HEARING OFFICER:  You've had an opportunity to examine

18 all documents entered into this investigation?

19     THE CHARGED:  Yes.

20     HEARING OFFICER:  Mr. Dunger, do you desire to make a

21 statement on your behalf?

22

23

24

25

UP_Dunger_000425

Exhibit A-87

```
 1                    CLOSING ARGUMENT

 2

 3     THE CHARGED:  I mean, I followed all the Union Pacific

 4  procedures and policies that we have in place.  I took my

 5  FMLA just the way I supposed to.  I did see an urgent care

 6  doctor and had him give me a note to validate that I was on

 7  FMLA.  So I don't see where I have an issue with anything.  I

 8  followed all the UP procedures.

 9          That's it.

10     HEARING OFFICER:  Okay.  Mr. Estrada, do you desire to

11  make a closing statement on behalf of Mr. Dunger, whom you

12  represented here today?

13     MR. ESTRADA:  Yes, Mr. Mader.

14     HEARING OFFICER:  Go ahead.

15

16

17                    CLOSING ARGUMENT

18

19     MR. ESTRADA:  We have -- we have reviewed all the

20  exhibits here in this investigation, which are not clear, nor

21  have exact dates, which is what we're looking for.  It is a

22  careless burden to supply witnesses and exhibits, you know,

23  in order to prove these charges.

24          At this point, we would just like to request

25  Mr. Dunger back to service and any loss of wages and time.
```

1          That's all I have, Mr. Mader.

2       HEARING OFFICER:  All right.  Admin note, I will give the

3    original exhibits to our court reporter, Ms. Rachel Brown.  I

4    will retain Exhibit Number 15, which is the hard drive.

5          This investigation and hearing is now closed.  The

6    evidence will be transcribed and carefully considered and

7    after a discussion has been reached, you'll be notified of

8    that discussion in due course.

9          The time is 11:00 o'clock on November 17, 2017.

10   Thank you.

11

12         (The foregoing proceedings were adjourned at

13   11:00 A.M.)

14

15

16

17

18

19

20

21

22

23

24

25

UP_Dunger_000427

Exhibit A-89

---

## A

**able (15)**
7:7;15:7;31:24;
35:6;43:16;50:12,20,
22;51:3;57:19,21;
59:14,20;62:16;
71:14

**Absence (4)**
5:8;25:13,15;27:20

**absences (7)**
24:3;33:22,23;34:3

**Absolutely (1)**
54:5

**abuse (3)**
29:9;30:7;32:19

**accomodation (1)**
61:19

**accomplish (1)**
43:11

**accomplished (1)**
41:15

**accordance (2)**
13:22;14:2

**according (2)**
41:10;73:25

**Accordingly (1)**
24:20

**accounts (1)**
18:10

**accrued (2)**
24:16;25:1

**Act (5)**
14:7;23:20,20;
30:8;33:4

**actions (1)**
67:20

**active (5)**
11:24;23:23;25:11;
26:11;27:19

**acts (1)**
21:24

**actual (3)**
37:15;43:19;74:2

**actually (5)**
17:22;44:17;49:22;
64:7;74:21

**additional (3)**
31:10;33:17;34:19

**address (7)**
9:4,8;10:4,9;11:2,
7;19:4

**addressed (3)**
8:9;12:24;17:5

**adjourned (1)**
84:12

**Admin (1)**
84:2

**Admitted (1)**
5:7

**adoption (1)**
25:21

**advance (1)**
11:22

**advanced (2)**
28:13;31:21

**advised (1)**
80:5

**affecting (1)**
21:25

**again (14)**
30:6;37:8;38:2;
46:22;47:12;52:25;
53:10,13;55:15;
57:24;59:24;70:7,10;
71:18

**against (3)**
28:9;30:23;70:12

**Age (1)**
81:3

**ago (2)**
64:24;81:19

**agreement (7)**
13:24;14:2;24:20,
23;32:25;34:21;
66:25

**agreements (2)**
24:3;31:12

**ahead (28)**
16:7,8,21;17:14,
20;19:4;21:14;22:16,
20;23:2,8;29:16,18;
35:19;36:23;40:1,23;
46:17;49:18;61:21;
63:3;67:6;72:10;
73:3;75:16;80:25;
81:24;83:14

**alleged (5)**
13:20;23:11;29:9;
30:7;38:25

**allegedly (4)**
6:18,22;13:10,13

**allow (5)**
28:14,22;39:21;
53:11;62:13

**allowed (7)**
7:3;14:12;31:11;
34:20;41:11;42:21,
25

**allowing (1)**
65:20

**allows (4)**
40:14;41:6;43:16;
44:17

**always (2)**
34:16;74:19

**amount (1)**
28:8

**and/or (5)**
6:23,24;13:14,16;
25:13

**Andreas (1)**
6:9

**Andy (1)**
69:9

**announce (1)**
7:3

**anymore (1)**
75:9

**apart (1)**
23:22

**APDS (3)**
17:22,23;18:6

**apologize (2)**
11:22;70:9

**apparently (1)**
40:17

**appears (2)**
16:9;35:25

**applicable (6)**
13:23;24:19,22;
26:4;27:8;29:1

**applies (2)**
23:23;27:23

**apply (2)**
24:1;79:2

**appropriately (1)**
30:4

**approval (1)**
72:12

**approved (5)**
25:15;30:12,25;
33:10;37:2

**approximately (3)**
6:17;13:9;52:2

**April (3)**
22:4;30:2;32:20

**area (4)**
15:12;19:17;68:15;
78:8

**ARGUMENT (2)**
83:1,17

**around (1)**
72:22

**arrest (3)**
33:20,22;34:3

**arrested (1)**
33:14

**arthritis (1)**
33:12

**assignment (2)**
28:7,24

**assignments (1)**
28:15

**associated (3)**
50:7,8;81:4

**assume (1)**
65:15

**assuming (4)**
36:1;42:22,23;
73:24

**assumption (1)**
30:24

**attached (17)**
12:19;16:24;17:18;
21:12;22:24;29:22;
35:23;36:11,20;41:2;
43:6;47:2;48:25;

**announce (1)**
51:10;67:12;80:15,
22

**attend (2)**
14:12,14

**attendance (1)**
32:3

**attending (1)**
14:8

**audio (6)**
50:7,8;53:8,18;
57:21;76:16

**Author (1)**
81:5

**authorized (1)**
23:19

**automatic (1)**
18:6

**automatically (1)**
18:8

**AV (1)**
48:15

**available (11)**
15:24;16:1,5;
25:16;35:9;45:18;
48:7;49:6;62:14;
75:4,6

**Avenue (2)**
9:6;11:4

**aware (1)**
33:19

---

## B

**back (18)**
35:18,19;38:21;
41:17;47:16;49:16;
51:16,18;53:13;55:6,
13;59:11,22;63:14,
19;69:14;75:4;83:25

**background (3)**
53:6;59:17;64:13

**bad (1)**
53:22

**bargaining (7)**
13:23;24:3,20,23;
31:12;32:15;34:21

**Based (2)**
13:19;60:18

**Basic (2)**
25:11;26:10

**Battle (2)**
14:18;18:7

**bearing (2)**
62:9,11

**became (1)**
33:14

**bed (1)**
33:12

**beginning (1)**
30:14

**behalf (3)**
70:13;82:21;83:11

**behind (2)**

**72:20,23**

**belief (2)**
34:2;72:18

**believes (1)**
61:10

**below (2)**
13:7;33:7

**best (1)**
75:6

**better (1)**
55:9

**birth (1)**
25:19

**bit (1)**
39:24;47:15;55:8;
59:22;72:22

**block (4)**
54:21,24;55:4,8

**Bloomington (1)**
9:6

**Bluetooth (1)**
68:24

**boat (2)**
59:15;61:11

**bona (2)**
40:6;41:8

**book (1)**
22:5

**both (5)**
29:14,25;36:24;
71:7;72:13

**bottom (1)**
81:15

**Boulevard (1)**
13:4

**Box (5)**
10:6,7;12:25;17:6;
36:1

**Brad (11)**
14:16;15:3;50:6;
52:1,3;60:25;61:15;
62:5,5;69:22;74:7

**break (5)**
38:11;48:9,15;
49:8;54:25

**brief (2)**
60:4;82:1

**Briefing (1)**
6:5

**bring (3)**
64:18;75:12;82:6

**bringing (2)**
45:7;65:20

**brought (2)**
19:5;41:25

**Brown (2)**
12:13;84:3

**bulletin (4)**
32:20,21,23;35:3

**bulletins (1)**
29:25

**bunch (1)**
67:17

---

UP_Dunger_000428

**burden (1)**
83:22
**business (2)**
9:3;32:10
**Bye (1)**
75:11

**C**

**Calendar (6)**
5:5;25:17;26:22;
40:9;73:19,20
**CALIFORNIA (9)**
6:1;9:6;10:7;11:5;
13:1,5;17:4,6;76:5
**call (8)**
18:4;19:19;44:3;
45:8,9;71:4;75:4,7
**call-in (2)**
31:21;43:16
**calling (1)**
44:7
**came (2)**
32:20;37:10
**camera (1)**
72:22
**can (56)**
14:5;17:13;22:16;
30:9;32:13;36:23;
37:19;38:10,11;39:4,
17;41:9,22,24;42:2;
43:23;44:13;45:4,9,
19;46:24;48:2,8,9,10,
15;49:9;52:19,19;
53:3,17,17,19;54:4,
21;55:1,8,8;62:19;
65:22;66:17;67:14,
15,16;68:6;69:15;
71:18;72:20;73:4,5,
14;74:19;75:12,16;
77:20;79:21
**caption (4)**
18:15;28:12;38:25;
61:14
**card (1)**
16:20
**care (15)**
7:13;25:21,22;
26:17,18;27:3,6,12,
20,21;28:3;32:6;
79:24;80:3;83:5
**carefully (1)**
84:6
**Caregiver (1)**
23:21
**careless (1)**
83:22
**Carrolyn (1)**
81:5
**case (20)**
16:10;22:17;23:8;
28:19;29:1;30:12,25;
31:22;33:8,11,18;

36:5;39:13;40:17;
44:16;61:21;62:9,11;
64:18;70:12
**cause (3)**
22:1;27:13,13
**causing (1)**
33:11
**cc (1)**
14:18
**cell (2)**
7:7;71:1
**cellphone (1)**
71:1
**Central (7)**
17:23;18:9;32:14;
44:2,4;47:9,10
**certain (3)**
23:16;41:6;71:11
**certainly (1)**
45:3
**charge (5)**
9:20;13:7,20;
18:15;61:22
**CHARGED (30)**
6:15;7:7,12,14,19,
22;8:4;9:21,24;10:2,
6,10,13,15,17,20,22;
19:15;39:11;66:7;
68:13;72:3;75:1;
78:5;80:24;82:9,13,
16,19;83:3
**charges (4)**
6:13;18:3;39:11;
83:23
**charging (6)**
15:3,6,19;16:9;
62:6;70:11
**cheating (1)**
67:21
**child (3)**
25:19,20,23
**choose (1)**
25:3;40:15;41:9
**chose (2)**
40:20;41:12
**chronic (2)**
27:10;31:20
**circumstances (1)**
31:21
**circumventing (1)**
72:12
**claimed (1)**
34:2
**clarify (1)**
8:10
**class (1)**
13:25
**Cleanup (1)**
80:8
**clear (1)**
83:20
**clearly (1)**
31:25

**close (1)**
34:6
**closed (1)**
84:5
**closer (1)**
73:15
**CLOSING (4)**
5:17;83:1,11,17
**clothes (1)**
72:22
**coaching (1)**
39:18
**Code (2)**
21:16;45:13
**collective (7)**
13:23;24:2,20,23;
31:12;32:15;34:21
**collects (1)**
40:10
**column (1)**
44:3
**Combined (1)**
9:17
**commencement (1)**
14:11
**comments (1)**
39:18
**COMMERCE (11)**
6:1,17;13:3,4,8;
70:1;72:1,2;76:5,7;
78:21
**Company (11)**
8:20;13:24;15:8;
22:1;29:25;30:21;
31:11;34:20;41:6;
60:22;61:10
**Company's (10)**
17:22;20:16;23:10;
29:9;30:6;32:19;
35:5;38:7;41:15;
47:18
**completed (2)**
8:2;19:3
**compliance (1)**
67:1
**comply (2)**
25:6;31:20
**computer (6)**
48:2,3,10;52:7;
68:18;80:17
**concern (1)**
81:7
**concerning (1)**
6:13
**concerns (1)**
81:11
**concluded (1)**
33:21
**concurrent (1)**
25:5
**condition (21)**
6:20;13:12;25:24;
26:2,13,15,23;27:16,

23;28:4,5;30:13;
31:3,20;33:7,11;
37:18;38:5,9;47:20;
61:12
**condition' (1)**
26:14
**conditionally (1)**
37:1
**conditions (7)**
23:14;24:25;26:7,
9;27:10,12;31:6
**conduct (3)**
6:25;13:17;21:17
**conducted (3)**
6:5;13:22;39:2
**conducting (1)**
6:11
**conference (1)**
39:15
**conjunction (1)**
32:8
**connected (2)**
33:22;34:3
**connection (2)**
13:7;39:25
**consecutive (2)**
24:11;26:22
**Consequences (2)**
30:20;34:5
**Consider (1)**
30:11
**consideration (1)**
8:16
**considerations (1)**
27:24
**considered (3)**
14:13;15:22;84:6
**consistent (3)**
6:19;13:11;14:11
**constitute (1)**
67:20
**contact (2)**
32:13;81:11
**contacted (1)**
62:16
**contained (1)**
66:16
**contending (1)**
30:21
**Continued (1)**
5:1
**continues (1)**
27:7
**Continuing (4)**
26:19;27:5,13,18
**contractors (1)**
32:16
**conveniently (1)**
31:1
**conviction (1)**
33:20
**copy (16)**
7:17;12:22;14:4;

17:8;18:20;20:22;
21:6;22:10;23:9;
29:12,13;40:8;66:18,
19,20;78:24
**corner (1)**
69:15
**corresponding (1)**
33:17
**count (1)**
24:12
**counted (1)**
28:9
**couple (3)**
46:21;69:12;73:11
**course (4)**
35:9;39:20;61:10;
84:8
**COURT (8)**
9:16;12:13;30:23;
33:8,17,20,24;84:3
**cover (4)**
23:18;30:20;33:21;
34:3
**coverage (1)**
30:15
**covered (1)**
14:9
**coworkers (1)**
81:17
**craft (3)**
13:25;25:4;42:3
**Crestline (4)**
10:7;12:25;17:3,6
**cross (2)**
63:14;71:14
**cross-examine (2)**
19:12;65:22
**curious (1)**
42:1
**current (4)**
9:7;10:8;11:6;
13:19

**D**

**Damn (6)**
56:8,11;57:9,12;
58:18,21
**Dan (3)**
70:17;74:17,20
**Daniel (1)**
8:25
**date (26)**
18:9;22:4;44:3;
51:23;52:14;60:10,
11,12,18;62:9;65:3,3,
5,21,21;70:17;71:3,
11;73:12,16,17;74:2,
20;77:24;78:1;81:6
**dated (1)**
12:24
**dates (2)**
65:23;83:21

**day (24)**
30:16;33:13,15;
39:15,16;40:15,16,
18,19,19,20,21;41:7;
46:15;60:20;61:11,
12;71:10;72:4,6;
74:10;79:13,19;80:7

**days (20)**
26:22;27:1,4;
30:17;32:8;33:17,17;
37:2;41:18,18;42:11,
17,18,19;43:25;
47:21,23;72:13;
73:22;81:10

**Dear (1)**
13:3

**deception (1)**
67:21

**deemed (1)**
24:15

**defined (2)**
25:15;26:12

**defining (1)**
27:22

**definition (3)**
66:13,15;67:14

**Definitions (2)**
26:7;67:17

**delayed (1)**
32:2

**delete (1)**
52:25

**Delivered (5)**
14:19,21;16:16;
17:3,25

**denial (1)**
33:25

**denied (2)**
32:2;33:23

**Department (1)**
43:15

**department's (1)**
25:8

**depending (1)**
25:4

**Derrick (2)**
14:18;18:7

**DESCRIPTION (1)**
5:4

**designate (1)**
46:15

**designated (1)**
33:4

**designed (1)**
30:8

**desire (4)**
10:18;11:10;82:20;
83:10

**Detail (1)**
5:8

**determine (3)**
6:12;13:6;20:9

**determined (1)**

**61:20**

**determining (1)**
24:13

**develop (2)**
6:12;13:6

**device (1)**
48:2

**diagnoses (1)**
81:4

**dialed (1)**
69:3

**Diesel (5)**
6:17;10:13;13:3,8;
78:21

**different (2)**
17:12;52:17

**difficult (1)**
30:14

**difficulty (1)**
30:15

**dim (1)**
53:20

**direct (1)**
20:13

**directly (3)**
29:1;64:21,22

**discharge (1)**
21:25

**discipline (1)**
32:3

**discovered (1)**
20:10

**discriminated (1)**
30:22

**discuss (3)**
19:18;68:16;78:8

**discussion (2)**
84:7,8

**dishonest (9)**
6:22,25;13:13,17;
21:23;61:14;66:14,
16;67:19

**dishonesty (1)**
67:14

**dismissal (3)**
13:19,21;22:1

**DOB (1)**
81:4

**doctor (1)**
83:6

**document (11)**
12:16;17:7,22,24;
21:8,19;22:8,19;
35:17;37:5;40:22

**documents (10)**
14:25;16:12;19:13;
29:7,7,8,14;35:13;
49:23;82:18

**done (2)**
51:13;75:8

**down (8)**
26:6;27:24;28:11,
16;34:15;53:20;59:9;

**76:15**

**draw (1)**
51:18

**drawn (1)**
21:18

**drdink (1)**
38:11

**Drive (7)**
5:9;48:1,11;49:18;
52:7;80:9;84:4

**driving (2)**
33:14;34:3

**drop (2)**
26:6;28:11

**drove (1)**
33:13

**due (5)**
27:7,9,16;30:25;
84:8

**DUI (1)**
33:18

**Dunger (72)**
5:10,18;6:13,14;
7:24;9:19,22,24;
10:11,18;11:10;
12:25;13:3;17:6;
19:2,7;20:4,19;
28:18;35:13;36:6;
37:9,15;38:8;39:2,
16;40:6;43:24;46:19;
47:8,19;59:9,12,18;
60:2;61:11,19;64:9,
14,21,23,24;66:5;
68:6,11;70:6,12;
71:6;72:3,5,14;
73:22;74:3,4,24;
76:10,24;77:10;78:3,
15,19,20,23;79:2,8;
80:19;81:2;82:8,11,
20;83:11,25

**D-U-N-G-E-R (1)**
9:24

**Dunger's (3)**
20:17;37:3;72:22

**Duration (2)**
25:9;32:6

**during (7)**
8:14;24:8,23;
27:17;28:7;31:9;
34:18

**duties (2)**
28:15,23

**duty (6)**
22:2,3;25:11;
26:11;79:25;80:5

**E**

**earlier (1)**
62:19,19;79:1

**easier (1)**
53:21

**easily (1)**

**42:2**

**East (1)**
13:4

**easy (1)**
16:4

**EDC (1)**
42:2

**EDCS (5)**
5:5;40:9,9;50:16;
80:10

**Edward (1)**
9:24

**effecting (1)**
27:17

**effective (1)**
27:17

**either (2)**
36:5;72:5

**elect (1)**
24:17

**elected (2)**
14:14;40:18

**electrician (2)**
72:1,2

**eligibility (3)**
23:18,25;38:4

**eligible (7)**
23:15;24:1,5;
25:16;30:9;33:5;
40:16

**else (10)**
44:8,13,17;45:8,9;
46:2,8;60:5;64:17;
71:4

**E-mail (4)**
17:10;18:6;74:17,
19

**employed (4)**
6:18;12:9;13:9;
24:7

**Employee (48)**
5:10;9:1;10:1;12:5,
25;24:5,11,16,21;
25:2,3,20,22,25;
27:17;28:3,4,6,13,20;
30:12,16,19,21;31:1,
5,19,22,23;32:1,7;
33:10,13,15,16,21,22,
23;34:1,2,16;35:10;
36:7;40:15;44:7;
45:22;69:23;72:3

**employees (15)**
14:7;22:1;23:15;
24:2;25:6,16;30:9;
31:7,14;32:9,12;
33:5;34:22;67:20;
76:7

**employee's (10)**
23:23;25:4,19;
28:9;30:24;31:1;
32:5;33:5,19;36:16

**employer (4)**
9:20;10:14;30:21;

**70:3**

**employes (1)**
35:6

**employment (4)**
9:13;24:10,13,14

**end (3)**
54:20;62:25;72:21

**ended (1)**
72:11

**ending (1)**
17:2

**enter (7)**
21:2;29:8;37:21,
23;44:20;46:18,19

**entered (2)**
37:25;82:18

**entering (1)**
34:9

**entire (3)**
28:8;29:3;37:19

**entitled (2)**
13:25;47:19

**entitlement (6)**
6:20;13:12;28:10;
41:9;47:24;61:13

**EPE (1)**
39:2

**episodic (1)**
27:13

**equal (1)**
24:15

**essential (2)**
26:1;31:4

**establish (11)**
23:10;29:8;30:6;
32:18;35:12;37:4,10;
40:5;46:19,22;61:18

**established (6)**
41:16;43:9,10;
47:17,17,18

**establishes (2)**
39:17,18

**establishing (1)**
39:24

**ESTRADA (89)**
5:19;7:13;10:22,
23,25,25;11:4,8,9,11;
12:23;14:18;15:1,3,
22;16:7,11;17:11;
18:7;19:2,5,8,10,14;
21:7,22;33:1;34:11,
12;37:21,22,24;
38:14,15;39:10;40:2,
3;42:4,6;43:13;
44:23,25;45:2,7,12,
15,20,22,24;46:4;
52:14,16;58:1;69:8,
21;61:4,25;62:3;
63:10,24;64:1,5;
65:19;66:1,4,21;
67:25;68:2,7,10;
70:6;71:13,15;73:1,2,
10;74:23;75:16;

77:12,14,19;78:2;
81:22,23;82:5,7;
83:10,13,19
**E-S-T-R-A-D-A (1)**
11:1
**ethics (4)**
29:25;32:10,20;
35:3
**evaluated (1)**
61:17
**even (2)**
60:10,12
**event (4)**
13:19;25:15;39:7,9
**events (1)**
38:24
**Eventually (1)**
33:19
**everybody (4)**
32:25;55:25;57:1;
58:10
**everyone (2)**
12:21;72:5
**evidence (7)**
20:18;33:25;48:13;
61:17;62:23;63:20;
84:6
**exact (6)**
32:23;65:3;73:12,
16,17;83:21
**Exactly (3)**
18:12,17;47:15
**EXAMINATION (8)**
20:1;64:3;66:10;
69:18;73:8;75:21;
77:17;78:13
**examine (2)**
19:12;82:17
**exceed (1)**
25:16
**except (1)**
72:5
**Excessive (2)**
8:17;32:5
**exclude (1)**
40:1
**Excuse (3)**
5:13;81:1,9
**excused (4)**
19:17;63:4,11;
68:14
**exercise (1)**
39:2
**EXHIBIT (50)**
5:4;12:16,18;
16:23;17:2,4,5,15,17;
21:9,11,15;22:21,23;
23:2;29:18,19;35:20,
22;36:8,10,17,19;
37:11,11,15,25;
40:23;41:1;43:3,5;
47:1;48:21,24;49:7,
18,19;51:7,9;67:5,7,

8,8,9,11;80:9,14,19,
21;84:4
**Exhibits (7)**
29:21;36:15;80:9,
12;83:20,22;84:3
**exigencies (1)**
26:11
**exigency (1)**
26:8
**exited (1)**
69:1
**expense (1)**
14:2
**explain (2)**
17:13;41:5

## F

**Facebook (12)**
50:4;52:21;54:6,8;
56:1,3;57:2,4;58:11,
13;73:25;74:2
**Facility (7)**
6:17;13:4,9;14:17;
26:18;70:2;80:5
**fact (2)**
35:13;38:8
**facts (3)**
6:12;13:6;61:18
**fails (1)**
32:1
**fairly (2)**
34:6;35:2
**faith (1)**
34:1
**falsely (2)**
33:21;34:2
**familiar (1)**
46:20
**Family (15)**
22:8;23:19,20;
25:11,13,14;26:11;
28:3;30:4,5,8,10;
33:4,6;44:17
**family-military (1)**
23:17
**family-related (1)**
23:17
**feasible (1)**
46:6
**Federal (2)**
31:25;38:4
**feed (4)**
54:1;55:21;56:22;
58:6
**feel (3)**
22:17;23:4;39:8
**felt (1)**
28:25
**few (5)**
32:22;33:2;41:19;
59:3;69:15
**fide (2)**

40:7;41:9
**figure (1)**
49:2
**file (1)**
50:19
**files (1)**
52:7
**fill (3)**
28:15,23;41:8
**FIN (1)**
81:3
**final (1)**
61:21
**finding (1)**
30:15
**fine (4)**
32:24;34:12;38:12;
75:16
**first (22)**
8:10;17:12;20:11,
22;22:17;23:10;
28:12;29:7,17;30:2;
34:6;37:4;39:1;
48:21;51:21;52:9;
61:18;70:14;71:8;
73:12;75:24;78:23
**fishing (1)**
79:13
**fix (1)**
55:3
**flare-ups (1)**
33:12
**FMLA (109)**
5:8;6:18,20,23;
13:10,12;20:12,13,
15,17;24:5,19,24;
25:2,5,6,9,13;26:10;
28:4,9,12,14;29:9,10;
30:7,12,17,20,22,23,
24;31:5,8,13,15,16,
17,19;32:2,4,5,12;
33:8,11,13,16,17,21,
24;34:2,16,17,23,24,
25;35:9,14,14;36:5;
38:4,8;39:16,22;40:6,
6,7,12,12,15,19,20;
41:9,10,12,13;43:10,
21,21,22;44:18;
46:15,21;47:8,10,11,
12,19,24;61:12,13,
13,19;71:6,6,7,9,10;
72:13;73:23;79:2,6,7,
12,16,18;80:4;83:5,7
**FMLA-related (1)**
24:4
**FMLA-Vacation (1)**
13:14
**FNP (1)**
81:13
**focus (3)**
22:13;30:9;33:6
**follow (2)**
8:9;25:7

**followed (2)**
83:3,8
**following (4)**
6:24;13:16;25:18;
30:11
**foregoing (1)**
84:12
**forgot (2)**
79:1;80:17
**formal (1)**
6:11
**forth (2)**
32:3;40:10
**forward (2)**
47:22;74:19
**foster (1)**
25:21
**found (1)**
13:20
**four (5)**
16:19;42:23,23;
44:12;51:6
**fraud (2)**
31:17;34:25
**frequency (1)**
32:6
**Friday (1)**
71:6
**Front (7)**
35:18,19;51:17;
53:19;70:18,20;
73:19
**full (13)**
8:23;9:23;10:24;
11:14;12:1;41:18;
42:6,9,10,11,19,19;
69:21
**functions (2)**
26:1;31:4
**further (3)**
63:20;66:10;75:3

## G

**gathering (2)**
61:17,18
**gears (1)**
47:14
**General (1)**
21:16
**generated (1)**
61:22
**generates (1)**
18:6
**gentlemen (1)**
6:9
**given (6)**
8:5,15;14:5;41:7;
61:21;82:15
**giving (1)**
8:18
**Glenn (106)**
8:20,22,25,25;9:2,

5,9,12,15,17;14:25;
15:5,6,10,12,15,17,
18,20;16:1,4,9,14;
17:7,8,12,21;18:12,
14,17,20,23;19:1;
20:4,6;21:6,23;23:1;
29:24;32:25;33:2;
34:10;35:11,18;36:2,
13,22;38:2,13;39:12,
15;41:4;42:5;43:9;
45:3,5,10,18;46:7,10,
13,17;49:1,4,7,8,17,
20,22,25;51:13;
52:15,17;54:20;
55:15;57:18,20,24;
60:15,22,25;62:3;
63:4,6,9,12,20,22,25;
64:6;65:25;66:2,6,
13;67:14,24;68:9,12,
14,17,20,23;69:1;
70:12;74:17,20
**G-L-E-N-N (1)**
8:25
**glimpse (1)**
60:4
**goes (2)**
26:3;67:7
**good (3)**
34:1;68:7;69:12
**governing (2)**
24:22,25
**grab (1)**
75:14
**granted (1)**
38:3
**green (2)**
42:17,18
**grounds (2)**
31:17;34:25

## H

**half (1)**
9:15
**hand (1)**
16:16
**handed (1)**
62:4
**handwritten (1)**
14:19
**Hang (1)**
29:15
**happens (1)**
52:10
**Hard (4)**
5:9;53:18;80:9;
84:4
**Harrison (4)**
5:11;59:15;72:1;
77:3
**headquartered (1)**
6:10
**headquarters (1)**

ON THE RECORD 800-327-7274
onthehrecord@roadrunner.com

Exhibit A-93

UP_Dunger_000431

18:11
**Health (28)**
13:13;25:23;26:2,
7,9,13,14;27:3,6,10,
12,20,21,23;28:4,5;
30:13;31:3,6;32:6;
36:3,4,4;37:16,17;
38:4,9;47:20
**healthcare (2)**
26:19,25
**hear (6)**
53:8,17,18;73:4,5,
14
**heard (2)**
59:17;82:14
**HEARING (224)**
6:8,16;7:8,15,21,
23;8:23;9:1,3,7,10,
13,19,22,25;10:3,8,
11,14,16,18,21,23;
11:2,6,9,12,14,17,20,
22;12:4,7,9,12,21,24;
13:5;14:8,11,13,14;
15:2,5,9,11,13,16,18,
21,24;16:3,7,12,18;
17:1,14,20;18:10,13,
15,18,21,24;19:2,7,
11,16;20:3;21:8,14;
22:7,19;23:1;29:16;
32:24;34:9,11,13;
35:16,19,25;36:7,14,
23;37:21,23,25;
38:12,14,16,21,22;
39:10,13,21;40:4,22;
41:14;42:6,8;43:2,8,
14;44:23,24;45:1,4,
11,13,21,23,25;46:5,
9,12,16,24;47:4;
48:19;49:2,5,10,15,
21,24;50:1;51:5,12,
15;52:23;54:23;55:6,
13;56:16;57:17,19,
21,25;59:1;60:8,13,
16,24;61:3,4,5,7,25;
62:2,12,14;63:2,7,11,
18,23;65:18,22;66:3,
5,12,20,22;67:6,16,
22,25;68:5,8,10,11,
14,19,22,25;69:3,7,9,
12,19;70:9;71:13,14,
16;72:24;73:2,3;
74:12,14,16,20,22,23,
24;75:2,7,11,15,17,
23;76:16,20;77:12;
78:3,6,14;80:8,17,25;
81:16,22,24;82:4,8,
10,12,14,17,20;
83:10,14;84:2,5
**hearsay (4)**
15:22;60:9,21;62:3
**heath (1)**
6:21
**held (1)**

6:12
**Hello (1)**
69:6
**help (3)**
49:9;70:6,17
**helps (1)**
32:18
**Hence (1)**
47:22;61:14
**hereto (16)**
12:19;16:24;17:18;
22:24;29:22;35:23;
36:11,20;41:2;43:6;
47:2;48:25;51:10;
67:12;80:15,22
**herto (1)**
21:12
**Hey (1)**
46:2
**hiding (1)**
72:20
**high (1)**
53:15
**highlight (1)**
32:22
**highlighted (2)**
22:10,14
**Hills (1)**
11:5
**himself (2)**
16:5;38:4
**hired (1)**
64:24
**Hold (2)**
40:12;76:20
**holiday (1)**
30:13
**holidays (1)**
32:8
**home (1)**
33:14
**homie (4)**
54:15;56:10;57:11;
58:20
**Hopefully (1)**
75:4
**HOS (1)**
14:9
**hospice (1)**
26:17
**hospital (1)**
26:17
**hostility (1)**
21:24
**hours (7)**
6:17;13:5,9;14:9;
24:8;74:3,4
**HR (1)**
32:13

**I**

**ID (10)**

9:1;10:1;12:5,25;
36:8;43:24;44:13;
45:22;69:23;78:17
**identical (1)**
35:2
**identification (17)**
12:18;16:24;17:17;
21:11;22:24;29:22;
35:23;36:10,19;41:1;
43:5;47:2;48:24;
51:10;67:11;80:15,
21
**identified (4)**
32:6;43:11;61:11,
14
**identify (8)**
29:24;37:9;38:6,7;
59:3,14,21;62:19
**illness (1)**
26:14
**image (1)**
52:9
**immediate (1)**
16:4
**immediately (1)**
24:9
**impairment (1)**
26:15
**imply (1)**
46:10
**implying (1)**
46:7
**important (1)**
20:15
**impossible (1)**
28:6
**improperly (1)**
30:19
**Improvement (1)**
14:7
**incapacitation (4)**
27:7,9,14,15
**incapacity (4)**
26:21,23;27:2,4
**include (1)**
51:4
**includes (1)**
27:12
**including (5)**
14:3;23:19,21;
25:14;32:16
**indicate (3)**
39:8;43:25;47:23
**indicated (6)**
16:2,5,15;47:9,11,
12
**indicates (4)**
17:24;20:19;42:15;
44:1
**indicating (3)**
37:16;46:13;52:18
**indication (2)**
43:20;51:24

**indications (2)**
43:21;66:2
**Indifference (1)**
22:2
**Indirectly (1)**
20:5
**INDIVIDUAL (66)**
54:1,2,3,4,5,6,8,9,
10,11,12,13,14,15,16;
55:20,21,22,23,24,
25;56:1,3,4,5,6,7,8,9,
10,11,12,21,22,23,24,
25;57:1,2,4,5,6,7,8,9,
10,11,12,13;58:5,6,7,
8,9,10,11,13,14,15,
16,17,18,19,20,21,22
**individuals (2)**
50:18,25
**Information (6)**
5:10;20:10;32:9;
36:4;40:10;65:23;
70:15;74:6
**initial (2)**
38:3;70:16
**injury (1)**
26:15
**Inpatient (1)**
26:17
**input (1)**
50:22
**inquiry (2)**
20:6,9
**Instagram (4)**
54:7;56:2;57:3;
58:12
**instead (1)**
30:18
**instructions (1)**
45:5
**intended (6)**
23:18;31:8;34:17,
25;46:14;51:21
**intentional (1)**
31:17
**interact (1)**
76:6
**interacted (5)**
64:23;65:1;72:14,
16;76:9
**interest (1)**
21:25
**interested (1)**
67:18
**interfered (1)**
30:22
**intermittent (10)**
24:14;28:8,17,19,
21;31:19;33:10;37:1,
1,17
**intermittently (1)**
28:1
**interruptions (1)**
8:17

into (9)
8:3;20:6,18;22:13;
26:3;29:14;65:20;
68:3;82:18
**intoxicated (2)**
33:14;34:4
**introducing (1)**
8:3
**investigating (1)**
20:7
**investigation (31)**
6:11;7:1;8:3,4,12,
14;11:10,18,19,24;
12:15;13:2,22;15:4,
19;17:9;18:24;19:3,
9,13;20:14;22:11,13;
39:1;65:21;70:6,11;
78:24;82:18;83:20;
84:5
**involves (2)**
26:16,24
**involving (1)**
26:20
**issue (2)**
39:22;83:7
**issued (1)**
30:2
**issues (2)**
30:1;45:7
**item (19)**
21:18,23;24:5;
25:9,11;26:6,21;
27:24,25;28:11,16,
18;39:1;46:18;52:6,
13,17,24;53:2
**items (6)**
21:18;22:14;23:3;
26:4;28:25;40:5

**J**

**jail (2)**
33:15,24
**January (1)**
42:18
**Jassier (4)**
5:11;59:15;71:25;
77:1
**job (1)**
31:4
**jobs (2)**
33:5;41:8
**John (8)**
5:12;14:21;52:10,
21;71:24;72:20,23;
77:5
**John's (1)**
72:21
**joke (1)**
46:3
**Juan (8)**
10:22,25;12:21;
14:18;17:10;18:7;

Min-U-Script®

ON THE RECORD 800-327-7274
ontherecord@roadrunner.com
Exhibit A-94

(5) Health - Juan

UP_Dunger_000432

21:6;43:12
**judgement (1)**
    8:11
**July (4)**
    30:13,16,17;31:5
**jump (2)**
    34:14;41:24
**June (2)**
    30:14;42:18

## K

**kind (10)**
    38:13;39:17,19;
    41:5;47:6,14;50:11;
    53:22;55:14;73:5
**knew (1)**
    60:6

## L

**labor (2)**
    32:16,17
**Ladies (1)**
    6:9
**laid (10)**
    39:16;44:1;47:8,
    21;71:6,6,9,9;73:22;
    79:7
**Langdon (1)**
    11:4
**L-A-N-G-D-O-N (1)**
    11:4
**language (1)**
    43:19
**laptop (1)**
    48:18
**last (16)**
    8:24;9:23;10:24,
    25;11:15,16;12:2;
    36:16;44:12,12;
    45:16;46:21,21;
    69:21;70:7,10
**later (1)**
    8:12
**lawful (2)**
    31:16;34:24
**laying (3)**
    46:2;72:12;79:12
**layoff (12)**
    33:16;40:6;41:16;
    43:10,14,15;25;47:8,
    9;79:6,16,18
**lead (2)**
    6:9;38:24
**least (4)**
    24:7,8;27:3,11
**leave (64)**
    7:19;22:9,12,15;
    23:19,19,20,20,21,23,
    24;24:5,9,17,19,22,
    24;25:1,2,4,5,5,6,7,8,
    9,12,13,17;26:4,10,

12;27:23;28:1,2,5,8,
9,14,17,17,19,21;
30:4,8,17;31:2,5,7,
15,16,19;32:2,7;33:4;
34:2,24;35:14;37:1,1,
17;38:4;41:10;68:17
**leaves (1)**
    36:5
**led (1)**
    39:9
**legitimate (2)**
    33:13,23
**Lemus (10)**
    5:12;14:21;18:1;
    52:10,21;64:16;
    71:24;72:20,23;77:5
**length (3)**
    10:16;12:10;70:3
**letter (3)**
    35:16;37:15,19;
    38:3;61:22
**light (2)**
    53:19;55:14
**limited (1)**
    23:15
**line (8)**
    21:18;32:11;41:16;
    43:11,14,15;45:15;
    51:18
**link (1)**
    22:5
**list (1)**
    46:20
**listed (1)**
    70:11
**listen (1)**
    77:6
**little (10)**
    39:24;41:5;47:14;
    53:21;55:8;57:23;
    59:11,22;61:8;72:22
**live (10)**
    52:21,21;54:1;
    55:21;56:22;58:6;
    60:19;61:2;73:25;
    74:2
**Lizotte (1)**
    81:13
**load (1)**
    49:4
**location (2)**
    6:16;13:8
**Locomotive (6)**
    9:12;12:8;14:17;
    70:1;76:3;78:22
**Log (2)**
    45:20,21
**longer (1)**
    60:7
**long-term (1)**
    27:16
**look (6)**
    29:15;37:8;48:10;

49:25;52:17;67:24
**looking (11)**
    17:2;37:8;50:2,3,
    21;51:16,17;54:23;
    77:23,25;83:21
**loss (1)**
    83:25
**lot (1)**
    32:21
**LR (1)**
    32:17
**lying (1)**
    67:21

## M

**machinist (5)**
    6:18;13:10;14:19,
    21;71:25
**Mader (9)**
    6:9;15:1;19:6;
    21:19;69:9;77:14;
    81:23;83:13;84:1
**mailing (1)**
    9:7;10:9;11:6
**Mailings (2)**
    16:13;18:25
**maintained (1)**
    24:11
**maintenance (2)**
    12:8;76:3
**makes (1)**
    37:14
**making (1)**
    45:8
**Male (1)**
    81:3
**Man (10)**
    54:16;56:7,11,12;
    57:8,12,13;58:17,21,
    22
**manager (6)**
    9:12;14:17;32:11,
    11;33:19;70:1
**manager's (1)**
    34:1
**Managing (1)**
    66:25
**mandatory (2)**
    14:8,10
**manner (2)**
    6:19;13:11
**MAPS (5)**
    13:18;66:16,23,24,
    25
**mark (20)**
    12:16;16:21;17:14;
    21:9;22:17,20;29:16,
    18,19;35:20;36:8,14,
    17;40:23;43:2;46:24;
    48:21;51:7;67:8;
    80:18
**marked (21)**

12:18;16:23;17:17;
21:11;22:23;29:21;
35:22;36:10,19;41:1;
43:5;47:1;48:24;
49:17;51:9;67:8,11;
80:8,10,14,21
**marking (2)**
    41:4;51:14
**matches (1)**
    17:4
**matter (1)**
    20:7
**maximum (1)**
    28:13
**may (24)**
    7:17;8:6;13:21;
    16:4;23:15;24:17;
    25:3,3,17;27:12,16;
    28:1;31:8,16;32:1;
    34:17,24;37:2;39:8;
    40:15;49:5;61:8;
    81:7,10
**maybe (4)**
    45:16;52:19;53:19;
    67:3
**McNutt (1)**
    81:5
**mean (5)**
    7:10;37:6;45:6;
    64:13;83:3
**meaning (1)**
    8:14
**means (4)**
    26:14;31:10;34:19;
    66:14
**mechanic (3)**
    10:13,13;78:21
**mechanism (3)**
    43:15;53:20;67:1
**media (1)**
    52:22
**medical (16)**
    6:19;13:11;22:9;
    23:16,20;25:14;
    26:11;30:4,5,8,10;
    33:4,7,11;36:5;44:16
**medically (1)**
    28:2
**meeting (1)**
    24:14
**member (2)**
    28:3;44:17
**member's (1)**
    33:6
**mental (1)**
    26:15
**met (1)**
    25:1
**mic (1)**
    6:9
**Michael (3)**
    6:5;12:3;76:1
**middle (1)**

67:18
**midnight (1)**
    17:23
**might (1)**
    53:20
**Military (8)**
    23:20,21,22,24;
    25:12,14;26:4;27:23
**minutes (4)**
    41:20;55:2;69:13,
    15
**misconduct (1)**
    21:24
**mispronouncing (2)**
    11:23;70:10
**missed (1)**
    28:8
**missing (1)**
    43:20
**Mission (1)**
    11:5
**misuse (3)**
    31:17;34:25;61:13
**modified (1)**
    45:16
**moment (1)**
    22:20;63:8
**month (3)**
    37:2;45:16;81:19
**months (3)**
    24:7,10,15
**more (8)**
    18:24;26:21,25;
    31:4;32:9;41:5;
    56:16;57:24
**Morikawa (12)**
    11:13,13,16,16,19,
    20,21,21;70:8,8,9;
    75:14
**M-O-R-I-K-A-W-A (1)**
    11:16
**morning (2)**
    79:25;80:1
**moving (1)**
    72:21
**MRM (1)**
    81:2
**multiple (1)**
    27:21
**museum (1)**
    69:14
**must (12)**
    7:2,5,16;14:3,5;
    22:1;25:1,6;27:18;
    28:20;31:20,23
**MVS (1)**
    5:6

## N

**name (25)**
    8:23,24;9:4,23,23;
    10:5,24,24,25;11:1,3,

14,15,16,23;12:1,2;
37:3;69:21,21;70:7,
10;75:12,24;78:17

**narrate (2)**
50:9;57:20
**narration (2)**
53:14;55:16
**Nebrasaka (1)**
6:11
**necessary (5)**
8:10;28:2,14,22;
30:11
**need (15)**
15:25;16:5;23:7;
24:10;27:19,19;
37:20;52:24;53:1;
55:1,6;63:8;74:19;
75:5;82:5
**needed (2)**
25:22;37:10
**needing (1)**
31:19
**negligence (1)**
21:25
**negotiations (1)**
32:16
**new (1)**
46:23
**next (14)**
22:8;29:6;33:15;
34:5;35:12;36:6;
38:10,23;40:5;43:11;
46:18;52:17;53:2;
81:9
**night (3)**
16:16;40:7;79:25
**nights (1)**
40:7
**noise (1)**
64:13
**None (1)**
81:4
**Nope (1)**
67:16
**nor (1)**
83:20
**normal (1)**
25:7
**note (7)**
16:8;36:25;39:12;
80:8,18;83:6;84:2
**noted (6)**
8:15;19:7;38:25;
61:5;62:8,12
**Notice (19)**
8:4;12:15;13:2;
16:15,16;17:9;18:4,5,
24;20:14;21:4,17;
28:12,13;31:23;32:1;
38:25;61:15;78:24
**notified (1)**
84:7
**NOVEMBER (10)**

6:1,8;16:17;17:3,
25;18:2;61:17,21,22;
84:9
**number (45)**
9:1;10:1;12:5,16,
18;14:6;16:23;17:2,
4,15,17;21:9,11;
22:23;23:2;29:18;
35:22;36:8,10,17,19;
40:23;41:1,6,11;
42:21,23,25;43:3,5,
24;47:1;48:21,24;
49:7;51:9;67:11,22;
69:4,23;78:18;80:14,
19,21;84:4
**Numbers (1)**
29:21

---

## O

**object (1)**
61:25
**objection (17)**
8:10,13,15;15:1,2;
16:8;39:10;40:2,3;
44:23,24;60:8;61:4,
5;62:2,12;71:13
**objections (6)**
8:6,7,8,9,17;19:4
**observer (1)**
11:23
**Observing (2)**
11:19;75:17
**obtain (1)**
14:8
**obtained (3)**
14:10;47:22;50:6
**occasion (3)**
27:4;31:2;64:23
**occupation (2)**
10:12;78:20
**occur (1)**
37:2
**occurred (4)**
39:15;51:25;52:2,
11
**o'clock (3)**
60:11;63:3;84:9
**October (7)**
39:3,5;40:8;42:18;
52:1;61:1;65:7
**off (27)**
6:5;7:19;23:16;
31:10;34:19;38:19;
39:16;41:7,11;42:25;
44:1;46:2;47:8,21,
23;49:13;55:5,11;
63:4,16;71:6,6,9;
72:12;73:23;79:7,12
**office (1)**
81:8
**OFFICER (223)**
6:8,16;7:8,15,21,

23;8:23;9:1,3,7,10,
13,19,22,25;10:3,8,
11,14,16,18,21,23;
11:2,6,9,12,14,17,20,
22;12:4,7,9,12,21,24;
15:2,3,5,6,9,11,13,16,
18,19,21,24;16:5,7,
10,12,18;17:1,14,20;
18:10,13,15,18,21,
24;19:2,7,11,16;20:3;
21:8,14;22:7,19;
23:1;29:16;32:24;
34:9,11,13;35:16,19,
25;36:7,14,23;37:21,
23,25;38:12,14,16,
21,22;39:10,13,21;
40:4,22;41:14;42:6,
8;43:2,8,14;44:23,24;
45:1,4,11,13,21,23,
25;46:5,9,12,16,24;
47:4;48:19;49:2,5,10,
15,21,24;50:1;51:5,
12,15;52:23;54:23;
55:6,13;56:16;57:17,
19,21,25;59:1;60:8,
13,16,24;61:3,4,5,7,
25;62:2,6,12,14;63:2,
7,11,18,23;65:8,8,10,
11,14,19,22,25;69:3,
7,9,12,19;70:9,11;
71:13,14,16;72:24;
73:2,3;74:12,14,16,
20,22,23,24;75:2,7,
11,15,17,23;76:16,
20;77:12;78:3,6,14;
80:8,17,25;81:16,22,
24;82:4,8,10,14,17,
20;83:10,14;84:2
**Omaha (2)**
6:10;18:11
**once (1)**
53:3
**one (34)**
7:23;17:13;19:5;
27:3;29:17,18;30:2;
31:4;32:18,19;33:12;
34:6;35:25;36:7,8;
39:21;40:1;41:17;
43:3,20,21;50:25;
51:5,16,22;52:10;
56:16;57:24;60:9;
64:16;66:18;67:18,
18;73:12
**one-page (3)**
12:16;21:8;40:22
**ones (1)**
50:20
**online (4)**
22:6;35:6;45:9,17
**only (11)**
7:3;21:17;31:7,16;

34:24;41:6;50:19,25;
51:21;59:20;67:18
**open (1)**
7:2
**opening (7)**
8:2;14:24;16:12;
17:7;18:19,22;19:3
**Operating (1)**
21:16
**opportunity (3)**
8:5;28:23;82:17
**ops (2)**
9:12,12
**optioned (1)**
40:17
**order (3)**
25:1,5;83:23
**organization (2)**
13:24;15:14
**Organization's (1)**
63:14
**original (2)**
16:16;84:3
**others (2)**
51:1,2
**otherwise (3)**
24:24;28:15,23;
31:11;34:20
**ought (1)**
22:12
**out (28)**
15:12;32:20;34:14;
36:2;38:3;43:23;
49:2;50:15,15;51:23;
52:1;53:19;54:9,11;
55:4,8,14;56:4,6;
57:5,7;58:14,16;
59:18;68:20;79:10,
13;80:6
**outbursts (1)**
8:17
**outlines (1)**
23:14
**over (4)**
62:4;65:1;81:15,18
**overlooked (1)**
31:1
**own (7)**
14:1;23:23;28:5;
33:6;37:17;38:5,9

---

## P

**Pacific (13)**
6:10;9:16,17,18;
10:15;12:11;18:10;
24:2;33:9;70:4;
73:24;78:21;83:3
**Pacific's (4)**
24:21;25:7;31:13,
20
**Padilla (20)**
6:6;11:25;12:1,3,3,

34:24;41:6;50:19,25;
51:21;59:20;67:18
**P-A-D-I-L-L-A (1)**
12:3
**Padilla's (1)**
49:9
**PAGE (13)**
5:4,17;29:17,19;
36:6,16,25;37:8,9,11;
43:12;51:21;67:19
**pages (2)**
16:19,19;36:24
**paid (5)**
24:18,22;25:1,4,5,
7,8;40:13,15,18;
41:13;43:22;47:11
**pain (2)**
79:20;80:4
**painful (1)**
33:12
**paper (2)**
54:22,24
**paperwork (1)**
44:25
**paragraph (1)**
34:5
**parched (1)**
38:13
**Pardon (1)**
42:5
**parent (1)**
25:23
**parentheses (1)**
42:24
**part (5)**
18:21;24:12,18;
67:7,7
**participant (1)**
11:24
**participate (1)**
14:13
**parts (1)**
22:10
**pass (1)**
45:13
**passcode (1)**
44:19
**password (2)**
44:11;45:22
**passwords (1)**
44:10
**Patient (2)**
81:2,8
**patterns (1)**
32:7
**pay (5)**
23:16;24:21;25:2;
40:10,12;41:12;
47:13
**payroll (1)**
24:11
**people (7)**

Min-U-Script®                ON THE RECORD 800-327-7274                (7) narrate - people
ontherecord@roadrunner.com
Exhibit A-96
UP_Dunger_000434

41:6;43:16;50:12,
19;52:10;60:19;
62:20
**per (1)**
27:11
**perform (2)**
25:25;31:4
**performance (1)**
22:2
**period (12)**
24:9,15,24;26:21,
23;27:9,15,20;31:9;
34:18;39:23;61:16
**periodic (1)**
27:10
**periodically (2)**
29:25;35:6
**periods (1)**
23:15
**permanent (1)**
27:15
**permit (2)**
32:4;33:5
**permitted (1)**
7:2
**person (7)**
7:23;41:8;44:7;
59:14,20;77:4;80:5
**Personal (9)**
7:1,2,3,5,6,8;24:16;
30:10,16
**pertain (1)**
23:4
**pertinent (3)**
22:11;39:8;51:4
**phase (1)**
8:2
**phone (15)**
14:6;15:24;16:1,2;
44:18;45:8,9,15,18;
55:6;62:15;71:1;
73:20;74:1,19
**phoned (1)**
43:9
**phone-in (2)**
44:14;46:8
**phones (1)**
7:7
**photograph (1)**
50:3
**photos (1)**
51:24
**physical (1)**
26:15
**physically (1)**
28:6
**picture (3)**
52:18;60:7;64:20
**pictures (4)**
50:12,15,18;80:11
**place (7)**
15:8;71:5,8;72:5,7;
74:21;83:4

**placement (1)**
25:20
**places (1)**
59:3
**planned (1)**
30:13
**play (8)**
53:3,10,13;55:15;
57:24;59:3;76:12,13
**playing (11)**
53:6,24;54:18;
55:18;56:14,19;
57:15;58:3,24;59:7;
76:18
**please (20)**
8:6,23;9:4,23;10:4,
24;11:3;12:1;13:3;
19:17;31:12;37:24;
39:4;68:14;75:15,24;
78:7,17;81:9,10
**plugged (1)**
68:20
**PM (10)**
14:22;32:14;51:25;
52:3,12,20;65:9,15;
71:8;73:24
**PO (4)**
10:6,7;12:25;17:6
**point (9)**
34:14;38:3;51:23,
25;60:5;61:20;62:7,
11;83:24
**points (1)**
33:2
**policies (5)**
24:22;25:7;31:12;
47:17;83:4
**policy (38)**
6:24;13:16,18;
20:12,13,15,16,20;
22:9,13;23:9,10,11,
12,14,18,22,23;24:1;
29:3;31:7,13;32:3,10,
12;34:6,15,21;35:9;
38:6,7;40:14;41:10;
44:17;47:18;61:13;
66:16,23
**portion (1)**
77:6
**portions (1)**
22:16
**position (9)**
14:9;20:16;23:11;
26:1;29:9;30:7;
32:19;38:7;47:18
**possession (2)**
49:5,19
**possibility (1)**
46:1
**possible (3)**
6:24;13:15;46:6
**possibly (1)**
17:9

**post (2)**
73:25;74:3
**posted (5)**
35:4,5;50:4;52:20,
21
**postponement (5)**
14:3,5,24;15:13,17
**postponements (1)**
18:25
**Prado (5)**
70:25;74:9,10,12,
16
**preceding (1)**
24:9
**preformed (1)**
79:25
**pregnancy (1)**
27:8
**prepare (1)**
63:8
**prepared (1)**
15:20
**preparing (1)**
17:21
**present (13)**
8:3;10:4,19;11:2;
14:1;20:11,12;47:16;
50:11;62:4,24;71:21;
82:11
**presented (2)**
19:13;70:12
**prevent (1)**
31:22
**prevents (1)**
44:7
**previously (3)**
72:6,15;76:10
**print (1)**
51:21
**printed (1)**
51:18
**prior (1)**
14:10
**privy (1)**
47:21
**probably (6)**
7:25;32:22;34:6;
36:25;46:14;68:23
**procedural (1)**
24:25
**procedure (2)**
8:8;45:2
**procedures (5)**
23:14;25:8;31:21;
83:4,8
**proceed (5)**
15:19;16:9,9;19:8;
61:20
**proceeded (1)**
61:22
**proceeding (1)**
69:1
**proceedings (2)**

8:14;84:12
**process (2)**
46:20;72:12
**produce (1)**
45:4
**production (1)**
41:7
**Professionals (1)**
66:25
**proof (1)**
31:5
**property (1)**
61:1
**protect (2)**
30:8;33:5
**protected (1)**
45:23
**prove (1)**
83:23
**proves (1)**
64:14
**provide (9)**
28:13,20,22;31:8,
23;32:1;33:25;34:17;
63:21
**provided (2)**
27:1;74:13
**provider (7)**
26:19;27:3,6,12,20,
21;32:7
**provisions (3)**
13:23;24:1,23
**PT (1)**
14:22
**pub (1)**
33:14
**published (1)**
71:4
**pull (1)**
73:20
**pulled (1)**
37:4
**purpose (7)**
11:17;23:12,13;
31:8,16;34:17,24
**purposes (1)**
24:13
**pursuant (1)**
24:21
**put (2)**
64:6;70:17

**Q**

**qualified (1)**
62:19
**qualifies (2)**
24:14;28:18
**qualify (1)**
35:14
**qualifying (8)**
23:16;25:14;26:8,
10;30:10;33:6;37:17;

38:8
**quick (1)**
29:15
**quiet (1)**
73:5

**R**

**Rachel (2)**
12:13;84:3
**Rail (1)**
14:7
**Railroad (5)**
6:10;10:15;12:11;
22:9;24:2
**railroads (1)**
9:17
**railroad's (1)**
66:15
**raise (1)**
8:5
**raised (1)**
8:9
**Randy (4)**
11:13,14,16;49:4
**rather (2)**
27:13;41:24
**RE (1)**
36:3
**reached (3)**
14:5;16:2;84:7
**read (19)**
20:25;21:15;22:12;
29:14;30:6;34:5,7,8,
9;37:19,21,23;38:1;
39:18;40:14;41:10;
67:15,16;80:24
**reading (1)**
8:3;23:3,12
**reads (2)**
30:3;32:21
**ready (5)**
15:18;16:9;19:18;
48:10;59:2
**real (1)**
29:15
**really (6)**
18:5;26:4;46:1,7;
53:1;73:14
**reason (8)**
7:5;8:11;14:4;
36:24;40:7;47:9,24;
62:22
**reasons (9)**
23:17;25:14,18;
28:20;34:20;39:17;
41:7;43:25;80:4
**reassign (1)**
28:15,23
**recall (10)**
68:15;70:17;78:8;
79:9,10,12,12;81:18,
20,21

Min-U-Script®

ON THE RECORD 800-327-7274
ontherecord@roadrunner.com
Exhibit A-97

(8) per - recall

UP_Dunger_000435

**receive (7)**
18:1;24:21;25:2;
27:21;70:14,24;
78:23
**received (10)**
6:20;13:12;37:16;
52:1,3;60:18,25;61:2,
15;70:25
**receiving (1)**
27:19
**recent (2)**
33:8;64:23
**recently (1)**
45:16
**recertification (1)**
32:5
**recess (7)**
38:17;49:11;55:7;
63:3,13;81:25;82:1
**recognize (8)**
50:12,20;52:11;
64:19;65:2;76:21;
77:4,7
**recollect (1)**
51:3
**recollection (1)**
79:19
**recommend (1)**
67:3
**record (22)**
6:5;7:4,11,14,21;
8:4;9:4;10:4;11:3;
12:12;15:6;16:8;
29:14;38:19;49:13;
55:5,11;61:6;62:13;
63:16;68:3;75:25
**recorded (2)**
77:21,24
**recorder (2)**
7:6,9
**recorders (1)**
7:2
**recording (10)**
7:1,3,4,16,16,17,
18,24,25;8:1
**recordings (1)**
7:5
**records (2)**
33:20;80:10
**red (1)**
42:19
**reduced (3)**
28:1,19,21
**reedy (1)**
19:8
**referenced (1)**
21:3
**references (1)**
21:18
**referred (1)**
20:13
**regard (6)**
20:16,17;23:11;

29:9;32:19;38:7
**Regarding (7)**
8:8;32:15;44:25;
45:1;65:23,23;74:9
**regardless (1)**
41:10
**regimen (1)**
27:5
**registrations (1)**
31:25
**regulations (1)**
32:4
**related (3)**
23:17;36:4;39:7
**relates (2)**
26:10,11
**relating (3)**
26:23;33:8;36:4
**Relations (1)**
32:17
**relationship (1)**
50:23
**released (1)**
33:15
**relevant (6)**
22:17;33:3;39:13,
19,22;51:19
**remain (3)**
19:17;68:15;78:7
**remaining (1)**
80:6
**remember (4)**
79:11,14,20;81:18
**reminded (2)**
31:14;34:22
**rendering (1)**
31:3
**renumber (2)**
67:6;80:11
**reoccurring (1)**
33:11
**Rep (2)**
14:21;71:25
**repeat (1)**
32:23
**report (3)**
13:3;32:9;43:23
**reported (1)**
22:2
**reporter (4)**
12:13;57:23;76:15;
84:3
**Reports (1)**
5:6
**represent (1)**
11:10
**representation (1)**
14:1
**representative (3)**
8:5;10:19,21
**representatives (1)**
18:7
**represented (1)**

83:12
**representing (2)**
13:25;15:7
**reproduce (1)**
37:7
**request (5)**
7:17;14:2,4;32:4;
83:24
**requested (6)**
6:22;13:14;15:13,
17;30:17;47:13
**requesting (1)**
25:8
**required (3)**
24:17;25:3;28:3
**requirements (3)**
14:12;24:25;28:12
**requires (2)**
14:7;27:10
**requiring (1)**
33:12
**reserve (1)**
23:24
**residential (1)**
26:18
**resides (1)**
17:23
**resources (1)**
48:20
**Respectfully (1)**
14:15
**responded (1)**
33:22
**responsibility (4)**
6:12;13:6;31:14;
34:22
**rest (9)**
14:8,10;27:22;
32:8;33:12;35:2;
72:6;80:7;81:15
**result (3)**
13:21;31:3;37:12
**results (1)**
27:5
**retain (3)**
49:5,18;84:4
**return (3)**
28:6;80:7;81:10
**returned (1)**
74:4
**returning (1)**
30:18
**review (2)**
8:16;31:13
**reviewed (1)**
83:19
**reviewing (1)**
21:21
**right (112)**
8:20;9:10,19,22,
25;10:3,8,11,14;11:9,
20,22;12:12;15:9,18;
16:18;17:1,14;18:18,

25;19:2,12,16;20:4;
21:3;23:1;29:16;
30:22;35:8,11,16;
37:14;38:16,22;
39:13;40:4,22;41:21;
42:8,9,14,20;43:2,8;
44:3,15;45:25;46:12,
16,16,24;48:14;49:7,
15;50:1,17,21,24;
51:5,20;52:5;53:14;
55:7,13;56:16;57:17;
59:1,13,25;60:24;
61:7,23;62:13,23,23;
63:2,4,11,18,23;
66:13,24;67:22,25,
25;68:8;70:18,18;
71:3,8;72:14,25;
73:19;75:2,3,7,12,17;
76:6,9,20;78:6,7,15,
20,23;79:1,8,19;
80:18;82:4;84:2
**righty (8)**
20:21;22:7;29:2;
69:20;70:5;71:11,23;
72:24
**rolling (3)**
25:17;31:9;34:18
**room (2)**
12:13;48:20
**rotate (1)**
52:19
**RSIA (1)**
14:12
**rule (10)**
18:20;20:23,25;
21:1,3,17;22:4,5;
67:4,5
**rules (4)**
6:24;13:16;21:17;
67:1
**ruling (3)**
8:11,12,13

**S**

**Safe (1)**
36:3
**Safety (2)**
6:5;14:7
**same (12)**
18:5,15;26:23;
47:10,12;52:18,20;
53:9;59:23,25;60:1;
80:4
**Saturday (13)**
52:11,15,20;60:11,
19,20,23;65:5,9,9,15;
71:5,7
**save (2)**
52:24;53:1
**saying (5)**
64:9,13,14,15,17
**scenario (2)**

30:11;32:18
**Scharf (4)**
5:11;59:15;72:1;
77:3
**schedule (1)**
28:2,20,21,22
**scheduled (3)**
30:15,20;72:6
**School (2)**
5:13;81:1
**Scope (1)**
23:25
**Scott (1)**
81:13
**screen (1)**
74:18
**screenshot (1)**
74:1
**sealed (1)**
55:14
**search (5)**
36:1,6,7;37:4,11
**searched (2)**
33:20;43:24
**second (9)**
18:4,5;32:19;
36:25;37:8;41:17;
51:12;71:10;73:21
**Section (2)**
26:9;27:22
**security (1)**
44:19
**seemingly (1)**
44:13
**sends (1)**
18:6
**Senior (2)**
14:17;70:1
**sense (1)**
37:14
**sent (5)**
16:15;17:10,24;
18:8;74:17
**sentiments (1)**
39:19
**separate (3)**
23:22;29:7;49:23
**separately (1)**
29:17
**serious (18)**
6:19;13:11;25:23;
26:2,7,9,13,14;27:10,
22;28:4,5;30:10,12;
31:3,6;33:7;47:19
**service (8)**
9:13;10:16;12:10;
14:9;24:8;32:13;
70:3;83:25
**services (3)**
6:21;13:13;37:16
**set (1)**
32:3
**setup (1)**

Min-U-Script®

ON THE RECORD 800-327-7274
ontherecord@roadrunner.com

(9) receive - setup

Exhibit A-98

UP_Dunger_000436

68:18
Seven (1)
64:24
several (2)
46:21;72:16
severe (1)
80:3
Sex (1)
81:3
sheet (1)
70:19
shift (3)
47:14;71:8,25
shifts (1)
30:15
shop (1)
9:12
short (10)
38:11,17;48:9,15;
49:8,10;55:7;63:3,
13;81:24
shot (1)
74:18
show (7)
48:2,18,18,19;
64:16;74:20;76:12
showed (1)
70:25
showing (4)
16:18;74:2,18;
80:11
shows (9)
16:19;17:1,2,5;
36:16,25;52:9;64:12;
74:8
sick (2)
43:18;54:12
side (1)
51:19
signature (1)
14:23
similar (2)
32:20,21
simply (1)
50:22
Sincerely (1)
81:12
site (1)
68:21
situation (4)
33:7,10;38:9;47:13
situations (3)
30:10;36:5;44:16
Six (5)
10:17;42:22,22,24,
25
six-page (1)
22:19
skip (1)
27:23
slightly (1)
17:12
snapshot (1)

36:2
snuck (1)
51:22
social (2)
44:12;52:22
somebody (6)
44:8,13,17;45:8,9;
46:7
someone (2)
36:25;46:1
someplace (1)
60:5
somewhere (2)
45:5;60:6
soon (1)
31:23
sorry (4)
11:12;71:18;73:14;
79:17
sort (2)
47:19;64:15
Sounds (1)
68:7
South (1)
9:5
Southern (1)
9:18
speaker (2)
57:25;73:15
speaking (1)
80:5
spell (3)
9:4;10:4;11:3
spelled (1)
9:24
spelling (6)
8:24;9:23;10:24;
11:15;12:2;69:21
spouse (1)
25:23
stamp (6)
18:8,9;65:8;74:2,7;
78:1
stands (1)
66:25
start (6)
24:9;27:1,4;36:15;
38:24;69:20
state (8)
8:23;9:23;10:24;
11:14;12:1;31:25;
75:24;78:17
stated (2)
7:24;30:24
STATEMENT (4)
5:17;62:1;82:21;
83:11
statements (3)
8:18;18:19;67:20
states (1)
72:19
status (3)
13:19;20:17;36:17

stay (2)
75:6;80:6
Steffel (31)
14:16;15:3,9,23,
24;50:6;52:1,3;
60:25;61:15;62:5,5,
14;65:22;69:6,7,8,11,
14,22;73:1,5,11;74:7,
13,15,17,25;75:2,6,
10
S-T-E-F-F-E-L (1)
69:22
Steffel's (1)
69:3
Steffle (1)
67:23
step (1)
28:16
step-by-step (1)
64:7
stick (1)
49:22
still (4)
45:18;50:3;51:24;
68:21
stop (5)
7:4,5,16;53:13;
59:3
stopped (4)
54:18;56:14;57:15;
58:24
stopping (1)
7:16
storage (1)
48:2
store (1)
36:4
stream (1)
50:4
street's (3)
9:4;10:5;11:3
sub-document (1)
67:4
Subject (9)
13:2;24:2,19;32:2;
59:23,25;60:1;68:15;
78:8
submit (5)
39:1;40:8;46:22;
68:3;79:21
submitted (7)
14:3;32:17;67:2,3;
70:21,22;80:19
subsequent (1)
26:22
subsequently (2)
30:17;33:16
substantiate (1)
23:8
substantiating (1)
33:25
substitute (1)
24:18

Success (1)
67:1
sued (1)
30:21
summarize (2)
47:6;61:8
summarizes (1)
33:8
supervise (1)
20:4
supervision (2)
27:6,18
Supervisor (3)
12:8;61:1;76:3
supply (1)
83:22
support (2)
6:9;35:13
supposed (2)
65:14,14;83:5
sure (4)
17:25;21:21;40:2;
69:15
sworn (1)
62:18
Sycamore (1)
9:5
S-Y-C-A-M-O-R-E (1)
9:6
System (14)
14:17;17:22;18:8;
36:3,3;40:9;42:3;
43:17,24;45:11,17;
46:14;47:9;50:16

T

talk (5)
27:7;36:15;69:13,
15;75:4
talking (4)
28:17;53:8;59:18,
21
talks (2)
26:6;27:24
ten (1)
12:11
terminated (2)
30:19;34:1
termination (2)
31:18;35:1
terms (1)
24:19
testify (1)
74:11
testimony (5)
19:18;63:20;68:16;
78:9;82:14
theft (1)
67:21
therefore (5)
8:6;14:4;17:23;
20:14;24:24

third (2)
52:24;71:25
Thomas (14)
5:10;6:13;9:24;
12:25;13:3;17:6;
72:3,5,11,20;73:22;
77:10;78:19;81:2
three (7)
26:21;37:2;49:22,
23,25;51:5;52:7
throughout (1)
82:11
timekeeping (1)
40:9
timeline (5)
38:24;70:16,19,21,
22
timely (1)
32:1
times (6)
26:25;33:24;37:2;
44:1;68:20;72:16
title (4)
9:10;12:7;69:25;
76:2
today (11)
7:6;10:19;15:7;
20:7;39:11,14;46:3;
50:25;69:10;81:9;
83:12
Today's (1)
81:6
together (1)
70:17
told (1)
52:7
tolerated (2)
8:19;22:3
Tom (1)
16:15
Tom's (1)
46:2
tone (1)
43:17
took (10)
30:16;64:16;71:1,
5,8;72:5,7;74:1,21;
83:4
touch (2)
33:2;43:17
towards (1)
72:21
tracking (4)
16:14,20;17:1,4
transaction (1)
74:8
transcribe (1)
53:17
transcribed (1)
84:6
transcript (3)
7:17;8:1,15
treatment (1)

Min-U-Script®

ON THE RECORD 800-327-7274
ontherecord@roadrunner.com
Exhibit A-99

(10) Seven - treatment

UP_Dunger_000437

26:19,22,25;27:3,5,
9,11,16,19;28:22
**treatments (1)**
27:21
**tried (1)**
38:6
**trip (1)**
81:17
**try (9)**
22:13;39:24;48:9,
9;50:10,10;53:10;
57:24;63:6
**trying (1)**
46:1
**turn (5)**
53:4,11,11,19,19
**turned (1)**
53:15
**twice (2)**
27:11;53:1
**two (18)**
16:19;26:25;29:7,
7,13;30:15,17;37:2;
38:11;41:18;42:11;
44:12;50:23;51:5,24;
55:2;80:8;81:9
**two-page (1)**
35:17
**type (5)**
28:17;43:17,18,19;
46:3
**Types (1)**
25:9
**typically (1)**
44:11

**U**

**Uh (1)**
10:6
**unable (3)**
25:25;31:3;33:25
**uncertain (1)**
32:12
**under (12)**
9:20;13:18;23:12,
15,25;25:9,11;27:5,
18;28:12;31:11;
34:20
**UNIDENTIFIED (66)**
54:1,2,3,4,5,6,8,9,
10,11,12,13,14,15,16;
55:20,21,22,23,24,
25;56:1,3,4,5,6,7,8,9,
10,11,12,21,22,23,24,
25;57:1,2,4,5,6,7,8,9,
10,11,12,13;58:5,6,7,
8,9,10,11,13,14,15,
16,17,18,19,20,21,22
**Union (18)**
6:10;9:16,17;
10:15;12:11;14:21;
18:7,10;24:2,21;

25:6;31:13,20;33:8;
70:4;71:25;78:21;
83:3
**unless (4)**
31:21;45:9;68:23;
77:25
**unpaid (7)**
23:18,19;24:18,24;
25:15;31:8;34:17
**unrelated (1)**
34:20
**unusual (1)**
31:21
**UP (34)**
16:20;19:5;22:12,
15;31:8;32:4,11;
34:17;35:6;36:3;
37:5;38:24;39:9;
41:25;45:7;47:16;
53:15;54:2,15,24;
56:7,10;57:8,11;
58:17,20;61:17,18;
64:6,18;67:24;72:11;
72:21;80:3;83:8
**update (1)**
22:4
**upon (4)**
8:16;13:19;25:19,
20
**UPRR (3)**
6:21;13:13;22:5
**UP's (2)**
32:3,10
**urgent (3)**
79:24;80:3;83:5
**URPP (1)**
21:16
**usage (1)**
46:21
**use (20)**
7:7,8;23:7;24:25;
25:4,5;30:4,22,23,24;
31:2,7;32:5;33:13;
34:16;40:20;41:9;
45:6;46:13;48:8
**used (12)**
6:18;13:10;26:9;
31:16;33:16,16;
34:24;43:10;45:11,
15;46:14,14
**user (1)**
44:12
**uses (1)**
43:16
**using (7)**
17:21;30:23;31:15;
33:21;34:23;41:15;
47:8
**USPS (1)**
16:20

**V**

**vacation (23)**
6:18,23;13:10;
15:10;24:16;30:14;
40:12,16,19,20;41:5,
9,13,18;43:21;47:11;
71:7,9,10;72:6,12,13;
73:23
**validate (1)**
83:6
**value (1)**
32:11
**Vargas (4)**
5:11;59:15;71:25;
77:1
**version (2)**
17:9;29:3
**Vic (2)**
70:25;74:10
**video (84)**
47:22;48:1;50:3,
13,19;52:11;53:2,6,
24;54:18,20;55:15,
18;56:14,19;57:15;
58:3,24;59:4,7,21;
60:10,10,12,13,16,19,
25;61:15;62:4,8,10,
20;64:6,8,9,12,14,16;
65:3,4,8,12,15,20,20,
24;70:15,16;71:1,3,5,
7,16,19,22,23,24;
72:4,7,17,19,21;
73:13,16,17,24;74:6,
9,10,13,18,21;76:12,
13,13,14,15,18;
77:20,23,24,25;79:8
**view (1)**
7:2
**violation (6)**
6:24;13:15,18,20;
20:19;38:25
**violations (2)**
23:11;32:10
**visits (1)**
27:11
**voice (7)**
64:19,20;65:2;
72:17,18;77:7,9
**volume (1)**
53:15

**W**

**wages (1)**
83:25
**wait (1)**
51:13
**Washington (1)**
13:4
**watch (1)**
53:14
**water (1)**
38:11
**way (4)**

46:10,14;48:5;83:5
**website (2)**
35:5,10
**Wednesday (2)**
70:19,23
**week (4)**
24:12,12,12;80:6
**weekends (1)**
32:8
**weeks (3)**
24:15;25:17;31:9
**what's (16)**
12:4;40:13;49:17;
54:2,15;56:5,7,10;
57:6,8,11;58:15,17,
20;60:15;75:12
**whenever (1)**
30:25
**Where's (1)**
57:25
**Whereupon (2)**
69:3;82:1
**whole (2)**
22:12;67:17
**who's (2)**
72:2;77:9
**whose (1)**
65:8
**willful (1)**
21:24
**window (5)**
53:22;54:21,24;
55:4,8
**withhold (2)**
8:6,12
**within (2)**
27:1,4
**without (3)**
23:16;53:14;55:16
**witness (4)**
8:21;60:9;62:6,6
**witnesses (5)**
8:18;14:1;19:12;
74:8;83:22
**Work (28)**
5:13;14:9;25:16;
28:7,7,8;30:18,20;
31:6,9,10,11;34:19;
40:7;43:17;48:10;
60:20;64:21,22;
68:22;74:4,5;76:6;
80:6,7;81:1,9,10
**worked (1)**
40:7
**workweeks (1)**
34:18
**worry (1)**
75:8
**writing (2)**
14:3;51:15
**written (1)**
14:4
**wrong (1)**

30:25

**Y**

**year (2)**
25:17;27:11
**years (8)**
9:15;10:17;12:11;
46:21;64:24;65:1;
70:4;81:3

**Z**

**Zachary (1)**
6:6;12:3;76:1
**Zack (1)**
62:18

**0**

**0000186 (1)**
69:24
**0231018 (1)**
9:2
**0437546 (1)**
12:6
**0444911 (3)**
10:2;12:25;78:19
**0800 (1)**
13:5

**1**

**1 (9)**
12:16,18;16:19;
21:18;29:17,17,19;
43:18;52:13
**1,250 (1)**
24:8
**1.1 (1)**
24:5
**1.6 (3)**
6:25;13:17;21:17
**10 (3)**
36:17,19;37:11
**10- (1)**
17:24
**10/19 (1)**
47:8
**10/19/2017 (2)**
81:6,8
**10/20 (1)**
47:10
**10/20/2017 (2)**
6:23;13:14
**10/21 (1)**
52:2
**10/21/2017 (4)**
6:16,23;13:8,15
**10/22/2017 (1)**
81:10
**10/25 (1)**
52:4

Case 2:18-cv-06374-PA-SS Document 35 Filed 04/22/19 Page 102 of 136 Page ID #:612
In re Investigation & Hearing of
THOMAS DUNGER
TRANSCRIPT OF PROCEEDINGS
November 17, 2017

**10:00 (1)**
63:3
**10:01 (1)**
63:13
**10:08 (1)**
63:18
**10:43 (1)**
81:25
**10:58 (1)**
82:4
**10363 (1)**
11:4
**11 (3)**
5:5;40:23;41:1
**11/10 (1)**
17:24
**11/17/2017 (1)**
13:5
**11/23/1988 (1)**
81:4
**11/9/2017 (2)**
12:24;14:22
**11:00 (2)**
84:9,13
**11:30 (1)**
14:22
**12 (9)**
5:6;24:7,10,15;
25:16;31:8;34:17;
43:3,5
**129 (3)**
10:7;12:25;17:6
**12-month (4)**
24:9,15;31:9;34:18
**13 (2)**
5:7;17:3
**14 (1)**
5:8
**14.1 (2)**
46:24;47:1
**14.2 (2)**
46:25;47:1
**14th (1)**
39:3
**15 (8)**
5:9;48:22,24;49:7,
18;80:9,9;84:4
**15.1 (3)**
51:7,9;80:9
**15.4 (3)**
51:7,9;80:10
**16 (1)**
5:10
**16.1 (2)**
80:12,14
**16.4 (2)**
80:12,14
**17 (6)**
5:13;6:1,8;80:19,
21;84:9
**18th (1)**
79:25
**19 (1)**

70:4
**19th (10)**
39:5;40:8;41:12;
42:9,9;62:10;65:16;
79:7,24;80:1
**1st (1)**
65:17

**2**

**2 (5)**
16:19;21:18;25:9;
26:9;29:19
**2.1 (5)**
16:21,23;17:2,4;
25:11
**2.3 (3)**
16:21,23;17:5
**2:00 (10)**
51:25;52:3,3,12,
20;60:11;65:9,15;
71:8;73:24
**20:38 (2)**
6:17;47:12
**2001 (1)**
9:5
**2010 (1)**
22:4
**2016 (1)**
30:2
**2017 (5)**
6:1,8;17:3;32:20;
84:9
**2038 (1)**
13:9
**2042 (1)**
47:9
**2056 (1)**
47:10
**20th (11)**
40:8;41:13;42:4,6,
9,23;62:10;65:16;
73:23;79:6,7
**21 (1)**
42:22
**2186 (1)**
17:2
**21st (25)**
32:20;40:8;41:13;
42:7,10,11,22;47:11;
51:25;52:15;60:20,
23;62:10;65:5,7,10,
11,13,16,25;66:2;
73:23,25;79:6,7
**22 (1)**
9:15
**2215332 (1)**
81:2
**22nd (1)**
80:7
**25th (4)**
52:1;61:1,15,16
**275-8747 (1)**

32:13
**28 (1)**
81:3
**28th (1)**
30:14
**2nd (2)**
30:16;61:17

**3**

**3 (5)**
17:15,17;21:19;
26:6;27:22
**3.1 (1)**
26:13
**30 (1)**
27:1
**323475-3831 (1)**
14:6
**3rd (2)**
30:17;31:5

**4**

**4 (7)**
21:9,11,18,23;
27:24;67:7,8
**4.1 (2)**
27:25;67:8
**4.2 (2)**
67:9,11
**40 (1)**
5:5
**42 (1)**
5:6
**4316196 (1)**
81:3
**4341 (1)**
13:4
**46 (1)**
5:8
**48 (1)**
5:9
**4th (3)**
30:13,18;31:5

**5**

**5 (3)**
21:19;23:2;28:11
**5.1 (2)**
22:20,23
**5.4 (2)**
28:16,18
**5.6 (2)**
22:20,23
**5:00 (1)**
32:14
**52 (1)**
24:15
**562 (1)**
67:24

**6**

**6 (3)**
21:19;29:18,21
**631-1993 (1)**
67:24

**7**

**7 (5)**
21:19;22:4;27:4;
29:19,21
**7th (1)**
61:21

**8**

**8 (4)**
37:15;67:5;74:3,4
**8.1 (4)**
35:20,22;37:25;
67:5
**8.2 (3)**
35:20,22;37:25
**8:11 (2)**
6:2,8
**8:57 (1)**
38:16
**80 (2)**
5:10,13
**800 (1)**
32:12
**82 (1)**
5:18
**83 (1)**
5:19
**877 (1)**
32:13

**9**

**9 (4)**
16:17;36:8,10;
37:11
**9:00 (1)**
32:14
**9:08 (1)**
38:21
**9:25 (1)**
49:10
**9:38 (1)**
49:15
**9:47 (1)**
55:7
**9:50 (1)**
55:13
**909 (1)**
81:14
**91345 (1)**
11:5
**92316 (1)**
9:6

**92325 (3)**
10:7;13:1;17:6
**948-8100 (1)**
81:14
**998-2000 (1)**
32:12
**9th (3)**
17:25;18:2;61:22

Min-U-Script®

ON THE RECORD 800-327-7274
ontherecord@roadrunner.com
Exhibit A-101

(12) 10:00 - 9th

UP_Dunger_000439



11/09/2017

Thomas Dunger
Employee ID: 0444911
P.O. Box 129
Crestline, CA 92325

Subject: NOTICE OF INVESTIGATION

Dear Thomas Dunger:

Please report to Commerce Diesel Facility, 4341 E Washington Blvd Commerce, CA at 08:00 hours on 11/17/2017 for the hearing to develop the facts and determine your responsibility, if any, in connection with the below charge.

On 10/21/2017, at the location of Commerce Diesel Facility, at approximately 20:38 hours, while employed as a Machinist, you allegedly used FMLA-Vacation in a manner that was not consistent with the serious medical condition for which you received an FMLA entitlement from UPRR Health Services. You were allegedly dishonest when you requested FMLA-Vacation time for 10/20/2017 and / or 10/21/2017. This is a possible violation of the following rule(s) and/or policy:
    1.6: Conduct - Dishonest

Under the MAPS Policy, this violation is a Dismissal event. Based upon your current status, if you are found to be in violation of this alleged charge, Dismissal may result.

The investigation will be conducted in accordance with applicable provisions of the collective bargaining agreement between the Company and the organization representing your craft or class. You are entitled to representation and to present witnesses at your own expense in accordance with the agreement. Any request for postponement must be submitted in writing, including reason therefore. A copy of your written request for postponement must be given to me. I can be reached at phone number 323-475-3831.

The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an Hours of Service (HOS) covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected not to attend the hearing.

Respectfully,

Brad Steffel
Sr Mgr Sys Loco Facil

cc: Derrick D Battle, derrick.battle@districtlodge19.com - E-Mail
Juan N Estrada, jnestrad@up.com - E-Mail

DELIVERED TO MACHINIST UNION REP JOHN LEMUS
ON 11/09/2017 @ 11:30 PM PT.

Exhibit A-102

UP_Dunger_000440

USPS.com® - USPS Tracking® Results                                      Page 1 of 4



# USPS Tracking®

FAQs > (http://faq.usps.com/?articleId=220900)

## Track Another Package  +

**Tracking Number:** 70160340000072982186                    Remove ✕

Your item was delivered at 2:28 pm on November 13, 2017 in CRESTLINE, CA 92325.

## ⊘ Delivered

November 13, 2017 at 2:28 pm
DELIVERED
CRESTLINE, CA 92325

Get Updates ∨

---

| Text & Email Updates | ∨ |
|---|---|

| Tracking History | ∧ |
|---|---|

**November 13, 2017, 2:28 pm**
Delivered
CRESTLINE, CA 92325
Your item was delivered at 2:28 pm on November 13, 2017 in CRESTLINE, CA 92325.

**November 13, 2017, 11:31 am**
Available for Pickup
CRESTLINE, CA 92325

November 13, 2017, 11:29 am
Arrived at Unit
CRESTLINE, CA 92325



November 13, 2017, 9:12 am
In Transit to Destination
On its way to CRESTLINE, CA 92325

November 12, 2017, 10:12 pm
Departed USPS Regional Facility
SAN BERNARDINO CA DISTRIBUTION CENTER

November 12, 2017, 9:23 am
In Transit to Destination
On its way to CRESTLINE, CA 92325

November 11, 2017, 11:58 am
Arrived at USPS Regional Facility
SAN BERNARDINO CA DISTRIBUTION CENTER

November 11, 2017, 9:07 am
In Transit to Destination
On its way to CRESTLINE, CA 92325

November 10, 2017, 7:07 pm
Arrived at USPS Regional Facility
SANTA ANA CA DISTRIBUTION CENTER

## Product Information                                      ∧

Postal Product:                     Features:
                                    Certified Mail™



SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Thomas Dunger
P.O. Box 124
Crestline, CA 92325

9590 9403 0591 5183 5022 77

2. Article Number (Transfer from service label)

7016 0340 0000 7298 2186

PS Form 3811, April 2015 PSN 7530-02-000-9053

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

UP_Dunger_000443

Exhibit A-105

 **BUILDING AMERICA®**



11/10/2017

Thomas Dunger
Employee ID: 0444911
P.O. Box 129
Crestline, CA 92325

Subject: NOTICE OF INVESTIGATION

Dear Thomas Dunger:

Please report to Commerce Diesel Facility, 4341 E Washington Blvd Commerce, CA at 08:00 hours on 11/17/2017 for the hearing to develop the facts and determine your responsibility, if any, in connection with the below charge.

On 10/21/2017, at the location of Commerce Diesel Facility, at approximately 20:38 hours, while employed as a Machinist, you allegedly used FMLA-Vacation in a manner that was not consistent with the serious medical condition for which you received an FMLA entitlement from UPRR Health Services. You were allegedly dishonest when you requested FMLA Vacation time for 10/20/2017 and / or 10/21/2017. This is a possible violation of the following rule(s) and/or policy:
    1.6: Conduct - Dishonest

Under the MAPS Policy, this violation is a Dismissal event. Based upon your current status, if you are found to be in violation of this alleged charge, Dismissal may result.

The investigation will be conducted in accordance with applicable provisions of the collective bargaining agreement between the Company and the organization representing your craft or class. You are entitled to representation and to present witnesses at your own expense in accordance with the agreement. Any request for postponement must be submitted in writing, including reason therefore. A copy of your written request for postponement must be given to me. I can be reached at phone number 323-475-3831.

The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an Hours of Service (HOS) covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected not to attend the hearing.

Respectfully,

Brad Steffel
Sr Mgr Sys Loco Facil

cc: Derrick D Battle, derrick.battle@districtlodge19.com - E-Mail
Juan N Estrada, jnestrad@up.com - E-Mail



**Current User:** omnp293
**Logout**

## Rule Details

**UPRR – General Code of Operating Rules**

**1.6:Conduct**

Employees must not be:

1. Careless of the safety of themselves or others
2. Negligent
3. Insubordinate
4. Dishonest
5. Immoral
6. Quarrelsome
   or
7. Discourteous

Any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported. Indifference to duty or to the performance of duty will not be tolerated.

**Rule Updated Date**

April 7, 2010

Rule Link

http://home.www.uprr.com/ert/secure/jas/viewBook/view/rule/

Exhibit A-107



# APPENDIX C: GLOSSARY

**TRIGGERING EVENT:**  Any rule or policy violation resulting in dismissal or remedial training under the MAPS progression.  Employees who violate Rule 1.5, Drugs and Alcohol, in conjunction with a triggering event violation will not be eligible for a one time return to service opportunity through EAP and will be terminated from service.

**The following definitions, while not all inclusive or absolute, are intended to guide the determination of whether various acts by employees meet necessary criteria to be considered a violation of applicable Dismissal Rules:**

**ALTERCATION:**  When an employee's actions cause or result in a quarrel characterized by physical activity such as pushing, shoving or fighting.

**CARELESS OF SAFETY:**  When an employee's actions or failure to take action demonstrate an inability or an unwillingness to comply with safety rules as evidenced by repeated safety rules infractions.  When an employee commits a specific rule(s) infraction that demonstrates a willful, flagrant, or reckless disregard for the safety of themselves, other employees, or the public.

**DISHONEST:**  When an employee's actions or statements constitute lying, cheating, theft or deception.

**FELONY CONVICTION:**  The conduct of an employee leading to the conviction of a felony in state or federal court is prohibited.   Guilty pleas, diversion programs, deferred decisions or adjudication, and other alternative sentencing or adjudication procedures, regardless of local nomenclature, are considered convictions under this policy.

**FRAUD:**  When an employee's actions or statements are intentional misrepresentations of fact for the purpose of deceiving others so as to secure unfair or unlawful gain.

**IMMORAL:**  When an employee's actions are contrary to commonly accepted moral principles.

**INSUBORDINATION:**  When an employee's actions or statements indicate a refusal (as opposed to a failure for cause) to carry out the instructions of a supervisor which are work, safety or policy related and which conform to accepted Company and industry practice, or when an employee demonstrates gross disrespect towards a supervisor.  **NOTE:**  Any failure to comply with Union Pacific's Drug and Alcohol Policy will be considered insubordination.

**NEGLIGENT:**  An employee demonstrates negligence when his or her actions or failure to take  action causes, or contributes to, the harm or risk of harm to the employee, other employees, the  general public or company property.

**QUARRELSOME:**  When an employee's continued behavior is inclined or disposed toward an angry verbal confrontation with others in the workplace.

**THEFT:**  When an employee's action is intended to and/or results in the taking and/or removing of property or other items of value from the Company, its customers, or other employees without proper authority.

UP_Dunger_000446

Exhibit A-108

 BUILDING AMERICA®



# Family & Medical Leave Policy, including Active Duty Family Military Leave & Military Caregiver Leave, for Employees Subject to Collective Bargaining Agreements

### (Revised August 5, 2015)

## Purpose

✓ This policy outlines conditions and procedures under which eligible employees may take limited periods of time off without pay for certain qualifying medical, family-related, and family-military related reasons. This policy is intended to cover eligibility for unpaid leave, including unpaid leave authorized in the Family and Medical Leave Act and the Family Military Leave Act, including Military Caregiver Leave.

This policy is separate and apart from the Military Leave Policy, which applies to an employee's own active or reserve military service leave.

## I. Scope & Eligibility

✓ The provisions of this policy apply to all eligible Union Pacific Railroad employees subject to collective bargaining agreements and to all absences designated as FMLA-related.

✓ 1.1. An employee is eligible for FMLA leave if he or she:

✓ (a) Has been employed for at least 12 months; and

✓ (b) Has at least 1,250 hours of service during the 12-month period immediately preceding the start of leave.

✓ The 12 months of employment do not need to be consecutive. If an employee is maintained on the payroll for any part of a week, the week will count as a week of employment. For purposes of determining whether intermittent employment qualifies for meeting the 12-month period, 52 weeks is deemed equal to 12 months.

1.2. If an employee has accrued vacation or personal leave, he or she may elect, but will not be required, to substitute such paid time for all or any part of unpaid FMLA leave subject to terms of any applicable collective bargaining agreement. Accordingly, the employee will receive pay pursuant to Union Pacific's applicable paid leave policies and any governing collective bargaining agreement provisions during the period of otherwise unpaid FMLA leave. Therefore, any conditions or procedural requirements governing use of that accrued paid leave must be met in order for an employee to receive pay for FMLA leave.

1.3. An employee may choose (or may be required, depending on the employee's craft) to use paid leave concurrent with FMLA leave. In order to use paid leave for FMLA leave, employees must comply with Union Pacific's normal paid leave policies and follow your department's procedures for requesting such paid leave.

## II. Types of FMLA Leave & Duration

Various forms of FMLA leave are identified as follows:

2.1. Basic and Active Duty Family Military Leave.

FMLA leave of absence taken for family and/or medical reasons, including a qualifying family military event, is defined as an approved unpaid absence available to eligible employees not to exceed 12 work weeks in a rolling calendar year. Leave may be taken for the following reasons:

* Upon the birth of the employee's child;
* Upon the placement of a child with the employee for adoption or foster care;

- When the employee is needed to care for his or her child, spouse, or parent who has a serious health condition;
- When the employee is unable to perform the essential functions of his or her position because of a serious health condition; or
- Because of any qualifying exigency arising out of the fact that the employee's spouse, son, daughter or parent is either (1) a member of the National Guard and/or Reserves and is on active duty (or has been notified of an impending call or order to active duty) in support of a national emergency, or a military action or operation outside the U.S. or (2) is a member of the regular Armed Forces who is or has been deployed to an assignment outside the U.S.

**2.2. Military Caregiver Leave;**

An FMLA leave of absence taken as Military Caregiver Leave is defined as an approved, unpaid absence that may be taken to care for a spouse, son, daughter, parent, or next of kin who is either (1) a current member of the Armed Forces, including the National Guard or Reserves, who is undergoing medical treatment, recuperation, or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury or illness incurred in the line of duty while on active duty or (2) a veteran who has left military service sometime within the previous five years, and who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness that the veteran incurred in the line of duty while on active duty, and that manifested itself before or after the service member became a veteran. Serious injury or illness is one that was incurred in the line of duty on active duty that may render him or her medically unfit to perform the duties of his or her office, grade, rank or rating.

Employees who are eligible for Military Caregiver Leave are entitled to a total of 26 work weeks of unpaid Military Caregiver Leave during a single 12-month period. This single 12-month period begins on the first day an eligible employee takes Military Caregiver Leave and ends 12 months after that date.

The leave described in Section 2.2 applies on a per-covered service member, per-injury basis. However, no more than 26 work weeks of leave may be taken within a single 12-month period by any employee. Even in circumstances where an employee takes other leave covered by the federal FMLA, including Active Duty Family Leave described in Section 2.1, the aggregate leave under this policy shall not exceed 26 work weeks during that 12-month period.

## III. Definitions of "Serious Health Condition" & "Qualifying Exigency"

As used above in Section II, "serious health condition," which relates to basic FMLA leave, and "qualifying exigency," which relates to Active Duty Family Military Leave, are defined as:

**3.1. Serious Health Condition.**

A "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves:

(a) Inpatient care in a hospital, hospice, or residential care facility; or

(b) Continuing treatment by a healthcare provider involving:

i) A period of incapacity of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition that also involves;

- Treatment two or more times by a healthcare provider within 30 days of the start of the incapacity; or
- Treatment by a healthcare provider on at least one occasion within 7 days of the start of the incapacity that results in a regimen of continuing treatment under the supervision of a health care provider;

ii) Any period of incapacity due to pregnancy or for prenatal care;

iii) Any period of incapacity or treatment due to a chronic serious health condition that requires periodic visits of at least twice per year for treatment by a healthcare provider (this includes conditions that may cause episodic rather than a continuing period of incapacity);

iv) A period of incapacity that is permanent or long term due to a condition for which treatment may not be effective during which time the employee must be under the continuing supervision of, but need not be receiving active treatment by, a healthcare provider; and

v) Any period of absence to receive multiple treatments by a healthcare provider.



### 3.2. Qualifying Exigency.

A "qualifying exigency" as used in connection with Active Duty Family Military Leave only refers to the following circumstances:

(a) **Short-notice deployment:** To address issues arising when the notification of a call or order to active duty is seven (7) days or less;

(b) **Military events and related activities:** To attend official military events or family assistance programs or briefings;

(c) **Childcare and school activities:** For qualifying childcare and school-related reasons for a child, legal ward, or stepchild of a covered military member;

(d) **Financial and legal arrangements:** To make or update financial or legal affairs to address the absence of a covered military member;

(e) **Counseling:** To attend counseling provided by someone other than a healthcare provider for oneself, for the covered military member, or child, legal ward, or stepchild of the covered military member;

(f) **Rest and recuperation:** To spend up to five (5) days for each period in which a covered military member is on a short-term rest leave during a period of deployment; and

(g) **Post-deployment activities:** To attend official ceremonies or programs sponsored by the military for up to 90 days after a covered military member's active duty terminates or to address issues arising from the death of a covered military member while on active duty.

## IV. Other Considerations

4.1. Leave may be taken intermittently or on a reduced leave schedule when it is medically necessary and the employee is required to care for a family member with a serious health condition or the employee is taking FMLA leave for his or her own serious health condition. When it is physically impossible for an employee to return to work during a work assignment after the taking of intermittent FMLA leave, the entire amount of work missed will be counted against the employee's FMLA leave entitlement.

4.2. Leave may be taken for the birth or placement of a child; leave cannot be taken on a reduced leave schedule or intermittent basis. Under such circumstances, leave must be taken in a single block of time and within one year of the qualifying event.

4.3. A husband and wife who are both employed by the Company are each entitled to 12 work weeks of FMLA leave for basic and family military leave.

4.4. A husband and wife who are both employed by the Company are entitled to a combined 26 work weeks of Military Caregiver Leave.

## V. FMLA Notice Requirements

Employees should provide maximum advance notice of their intentions to take FMLA leave to allow for the time necessary to reassign duties or otherwise fill the assignment.

As of Jan. 1, 2014 all requests for FMLA should be made through the eHealthSafe system. Applicable forms are made available through eHealthSafe during the request process. Review this FMLA Quick Reference Guide (QRG) for step-by-step instructions on how to formally request FMLA.

5.1. Employees must give 30-days advance notice of the need for FMLA leave when it is foreseeable for the birth or placement of a child, for planned medical treatment, or when leave is due to active duty of an immediate family member. All employees are required to comply with their department's or work group's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances.

5.2. When 30-days advance notice is not possible, notice is required as soon as practicable.



5.3. When planning or scheduling medical treatment, an employee should consult with his or her supervisor and make reasonable efforts to schedule the leave so as not to unduly disrupt operations.

5.4. In the case of an intermittent or reduced leave schedule, the employee must provide the reasons why the taking of intermittent or reduced schedule leave is necessary and provide the schedule for treatment to allow an opportunity to reassign duties or otherwise fill the assignment.

5.5. When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to Union Pacific as soon as practicable under the facts and circumstances of the particular case. It generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employee's department's or work group's usual and customary notice requirements applicable to such leave. Notice should be given either in person or by telephone when medical emergencies are involved and may be given by the employee's spouse or other family member if the employee is medically unable to provide notice.

5.6. If an employee fails to give 30-days notice for foreseeable leave and has no reasonable excuse for the delay, FMLA may be denied until adequate notice of the need is provided, and the leave may be delayed as a result of the inadequate or delayed notice.

5.7. Nothing herein changes the normal call-in procedures or requirements for requesting leave that have been established by the employee's department or workgroup absent unusual circumstances. Where an employee does not comply with the usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied.

## VI. Conditions of Leave & Certification of Medical Need

6.1. The reason for the leave must be covered under FMLA and the employee must provide the appropriate, completed FMLA Certification of Health Care Provider Form, which is made available during the eHealthSafe FMLA request process, supporting the need for the leave. A request for reasonable documentation of family relationship verifying the legitimacy of a FMLA Leave may also be required.

6.2. An employee will have fifteen (15) days in which to return a completed Certification Form. If the employee fails to provide timely certification after being required to do so, the employee may be denied the taking of the leave under FMLA. If the Certification Form is incomplete or insufficient, an employee will be given written notification of the information needed and will have seven (7) days after receiving such written notice to provide the necessary information.

6.3. If there is reason to doubt the validity of the medical certification, a second opinion, at the expense of the Company, related to the health condition may be required. If the original certification and the second opinion differ, a third opinion, at the expense of the Company, may be required. The opinion of the third healthcare provider, which the Company and the employee jointly select, will be the final and binding decision.

6.4. When the Company identifies information, such as a weekend pattern of FMLA usage, that casts doubt upon the employee's stated reason for the absences and there is no apparent medical reason for the timing of those absences along the pattern, and when the Company identifies an employee whose FMLA use is greater than the estimated frequency and duration certified by the employee's Health Care Provider, the Company may request recertification.

6.5. A request for Active Duty Leave must be supported by the Certification of Qualifying Exigency for Military Family Leave Form, as well as appropriate documentation, including the covered military member's active duty orders.

6.6. A request for Military Caregiver Leave must be supported by the Certification for Serious Injury or Illness of Covered Service Member Form, as well as any necessary supporting documentation.

6.7. As of Jan. 1, 2014 all requests for FMLA should be made through the eHealthSafe system. Applicable forms are made available through eHealthSafe during the request process. Review this FMLA Quick Reference Guide (QRG) for step-by-step instructions on how to formally request FMLA.

## VII. Maintenance of Benefits

An employee's healthcare coverage will be maintained by the Company during FMLA absences to the same extent that coverage was provided prior to the leave.

EXHIBIT
S 4

UP_D_nger_000459
11/15/2017

7.1. Any portion of the health plan premiums that had been paid by the employee prior to FMLA leave must continue to be paid by the employee during the FMLA leave period and handled in the same manner as for other periods of unpaid leave.

7.2. When, at an employee's request, accrued vacation, personal days, or sick leave is taken concurrently with FMLA leave, the employee's share of healthcare premiums will be paid in the normal manner through payroll deductions.

7.3. Medical and dental benefits may be continued during an FMLA leave of absence by the employee making his/her applicable monthly contributions to UPRR to cover the cost of participation in the plan. If an employee's health insurance premium is more than 30 days late, UPRR will mail a written notice advising such employee that the payment has not been received. Fifteen days after the notice has been mailed, UPRR will discontinue the employee's health insurance benefits while on FMLA leave. Upon returning from leave, the employee will be reinstated on the same terms and conditions as prior to taking leave without having to fulfill any qualifying period or physical examination.

7.4. Except as required by the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1986, the Company's obligation to maintain health benefits under FMLA ceases if and when the employee (1) informs the Company of his or her intent not to return from leave; (2) fails to return from leave and thereby terminates employment; or (3) the employee exhausts his or her FMLA leave entitlement.

7.5. The Company may recover healthcare premiums from an employee who does not return to work after FMLA leave, unless the employee can show that the failure to return is due to the continuation, recurrence, or onset of an FMLA qualifying serious health condition or due to circumstances beyond the employee's control.

## VIII. Reinstatement Rights

8.1. Employees will return to service as provided for under applicable collective bargaining agreements.

8.2. An employee returning to service after FMLA leave has no greater right to reinstatement or to other benefits and conditions of employment than if he or she had been continuously employed during the FMLA leave.

8.3. Upon return from FMLA leave, an employee's benefits will be at the same level as before the leave began subject to any changes in benefit levels that may have taken place during the period of leave.

## IX. Fraudulent FMLA Leave

An employee who fraudulently obtains FMLA leave is not protected by the FMLA's job restoration or maintenance of healthcare benefits provisions.

## X. Failure to Return from Leave

The failure of an employee to return to work upon expiration of FMLA leave will subject the employee to termination in accordance with the applicable collective bargaining agreement.

## XI. State & Local Laws

FMLA provisions do not supersede provisions of state or local law that provide greater family or medical leave rights.

## XII. Changes in Policy

The Company reserves the right to modify the terms of this policy where benefits extended exceed FMLA requirements.

## XIII. Miscellaneous

Nothing in this policy insulates an employee from the application of any applicable collective bargaining agreement and any other Company policies.

## XIV. Need Help?

Employees requiring FMLA-related absences should contact their supervisor. The Company has the authority and responsibility to administer this leave policy, including deciding which absences from work will be charged as FMLA leave time. Questions concerning the FMLA or Union Pacific Railroad's policy and procedures for implementing the Act should be referred to the HR Service Center at (877) 275-8747 (ASK-UPHR), option 4, from 9 a.m. to 5 p.m., Central Standard Time.



## XV. U.S. Department of Labor Contact Information

U.S. Department of Labor
200 Constitution Ave., NW
Washington, DC 20210
1-866-4-USA-DOL



 **BUILDING AMERICA®**



# Use Family Medical Leave Appropriately

The Family Medical Leave Act (FMLA) is designed to protect eligible employees' jobs so they can focus on qualifying personal or family serious medical situations, when necessary. Consider the following scenario. An employee had an approved FMLA case for a serious health condition. She had a planned Fourth of July holiday vacation beginning June 28, but had difficulty finding coverage for two scheduled shifts. The employee took a personal day July 2, but subsequently requested two days of FMLA leave for July 3 and 4 instead of returning to work. Employment was terminated for improperly taking FMLA leave to cover scheduled work days.

## Consequences

The employee sued her employer, contending the company interfered with her right to use FMLA and discriminated against her for using FMLA. The court stated the employee's assumption to use FMLA whenever she wanted due to an approved case was wrong. The employee "conveniently overlook[ed]" that her use of leave *on each occasion* had to be the result of a serious health condition rendering her unable to perform one or more essential job functions. The employee had no proof her July 3 and 4 FMLA leave were for serious health conditions.

## Policy

Employees should only use FMLA leave for its intended purpose. FMLA may provide up to 12 unpaid workweeks during a rolling 12-month period and is not a means to take additional time off from work not otherwise allowed under company policies or collective bargaining agreements. Please review Union Pacific's FMLA Policy.

Employees are reminded of their responsibilities when using FMLA leave:

· FMLA leave may only be used for its lawful purpose; intentional misuse and FMLA fraud are grounds for termination.

· An employee needing intermittent FMLA leave for a chronic condition must comply with Union Pacific's advance call-in procedures unless unusual circumstances prevent the employee from doing so (in which case the employee must provide notice as soon as he or she is able).

· Federal regulations clearly state that if an employee fails to provide timely notice, he or she may have the FMLA leave request delayed or denied and be subject to discipline as set forth in UP's attendance policy.

· FMLA regulations permit UP to request recertification if an employee's FMLA use is in excess of the frequency and duration identified by a health care provider, or if the employee has a pattern of taking leave in conjunction with rest days, weekends, or holidays.

## More Information

Employees should report violations of UP's Ethics and Business Conduct Policy to a manager or to the UP Values Line at 800-998-2000. Employees uncertain about FMLA policy or with questions can contact the HR Service Center at 877-275-8747 (ASK-UPHR) from 9 a.m. to 5 p.m. Central Standard Time.

Questions regarding collective bargaining, including labor contracts and negotiations, should be submitted to Ask LR.





## UNION PACIFIC NEWS ▬▬ UPDATED DAILY ▬▬▬▬▬

# UPOnline

**AROUND THE RAILROAD**

## Ethics Bulletin: Use Family Medical Leave Appropriately

April 21, 2017 | 09:10 a.m. CDT

The Family Medical Leave Act (FMLA) is designed to protect eligible employees' jobs to permit employees to focus on their own or a family member's qualifying, serious medical condition. The below situation summarizes a recent FMLA court case not related to Union Pacific.

**Situation**

An employee had an approved intermittent FMLA case for a recurring medical condition causing arthritis and painful flare ups, requiring bed rest. One day after legitimate FMLA use, the employee drove to a pub, became intoxicated and was arrested driving home. The employee was released from jail the next day but used FMLA to lay off. Subsequently, the employee used additional FMLA time on days corresponding with court days for the DUI case.

Eventually, the employee's manager was made aware of the arrest and conviction, searched court records, and concluded the employee was falsely using FMLA to cover absences connected to the arrest. The employee responded the absences were legitimate. The employee denied being in jail or court at the times of FMLA use but was unable to provide evidence substantiating the denial.

The employee was terminated based on the manager's good faith belief that the employee had falsely claimed FMLA leave to cover absences connected with the arrest for driving while intoxicated.

**Consequences**

In a subsequent lawsuit, the court found that the employer had not interfered with the employee's right to use FMLA and had not retaliated against the employee for using FMLA. The court ruled that the right to use FMLA extends only to cover absences cause by the medical reason for which the leave was certified. Furthermore, the court was not impressed with the employee's argument that the FMLA absences were coincidental with the court dates.

**Policy**

Employees should always use FMLA leave for its intended purpose. FMLA may provide up to 12 unpaid workweeks during a rolling 12-month period, but it is not a means to take additional time off from work for unrelated reasons not otherwise allowed under company policies or collective bargaining agreements. Please review UP's FMLA Policy.

Employees are reminded of their responsibilities when using FMLA leave:

* FMLA leave may only be used for its lawful purpose; intentional misuse and FMLA fraud are grounds for termination.
* An employee needing intermittent FMLA leave for a chronic condition must comply with UP's advance call-in procedures unless unusual circumstances prevent the employee from doing so (in which case the employee must provide notice as soon as he or she is able).
* Federal regulations clearly state that if an employee fails to provide timely notice, he or she may have the FMLA leave request delayed or denied and may be subject to discipline as set forth in UP's attendance policy.
* FMLA regulations permit UP to request recertification if an employee's FMLA use is in excess of the frequency and duration identified by a health care provider, or if the employee has a pattern of taking leave in conjunction with rest days, weekends, or holidays.

**More Information**

Employees should report violations of UP's Ethics and Business Conduct Policy to a manager or to the UP Values Line at 800-998-2000. Employees uncertain about FMLA policy or with questions can contact HR Services at 877-275-8747 (ASK-UPHR) from 9 a.m. to 5 p.m. Central Standard Time, Monday through Friday.

Questions regarding collective bargaining, including labor contracts and negotiations, should be submitted to Ask LR.

## Comments

UNION PACIFIC RAILROAD
1400 Douglas Street   Omaha, Nebraska  68179



October 06, 2017 FL035

Thomas E. Dunger
P.O. box 129
crestline, CA 92325

Family Medical or Military Leave
Employee ID: 00444911

Dear Thomas E. Dunger:

Health and Medical Services has recently become aware that you may have a qualifying need for leave under the Family Medical Leave Act (FMLA), which also includes Family Military Leave.

Our records indicate that you have requested and have met the initial eligibility requirements for the following leave:

*     Leave Type: FED FMLA
*     Category:   Self
*     Reason:     Self - Health Condition

Enclosed are forms 16873 Notice of Eligibility and Employee Rights and Responsibilities, and the appropriate Certification form to certify your request for leave. Form 16873 is yours to keep for your records; it explains your eligibility for FMLA and your Rights and Responsibilities under the act.

You are required to submit a complete Certification form or supporting documentation to verify if the reason for your need for leave would qualify under the Family & Medical Leave Act.

Your Certification form or other supporting documentation should be returned to Health & Medical Services within 15 days of the date of this letter. You may start to use FMLA during the certification process. However if the appropriate certification form or other supporting documentation is not provided or does not substantiate your eligibility for leave as defined by the FMLA, all FMLA absences attributable to this leave request will revert to unexcused absences. These unexcused absences, in turn, may result in a violation of the applicable attendance or discipline policy. In the event your use of FMLA leave was for reasons other than its intended purpose, you may also be subject to discipline, up to and including termination of employment.

PLEASE NOTE: The enclosed information includes only a portion of the company's FMLA

UP_Dunger_000455

UNION PACIFIC RAILROAD
1400 Douglas Street   Omaha, Nebraska 68179

policy. It is your responsibility to read and understand the entire policy when taking FMLA. For further information please go to http://home.www.uprr.com/emp/ec/policy/time_away/index.shtml

Information regarding the status of your FMLA request is available on the Employee tab in eHealthSafe. eHealthSafe is available on your MyUP page under the Employee menu.

If you have any questions, please contact Health & Medical Services at 877-275-8747 option 4.

Sincerely,

Health & Medical Services
Fax: 402-233-3305

cc:r



View Status and Chronology - Union Pacific



Exhibit A-119

UP_Dunger_000457

View Status and Chronology - Union Pacific



Exhibit A-120

UP_Dunger_000458

UP: EDCS: Calendar

EXHIBIT

Page 1 of 1

**EDCS Calendar**

Current User: omnp293
Logout »

Location:   COMMERCE LOCO  Change Location

### Filters

Employee: [DUNGER, THOMAS E ▼]    Employee ID:   0444911    [Next]

<< Previous          [October ▼] [2017 ▼] [Go]  Today                    Next >>

| | | | October 2017 | | MTD Hours Worked: 144:00 | |
|---|---|---|---|---|---|---|
| **Sunday** | **Monday** | **Tuesday** | **Wednesday** | **Thursday** | **Friday** | **Saturday** |
| | | * 3 *<br>08:00 | * 4 *<br>08:00 | * 5 *<br>08:00 | * 6 *<br>08:00 | * 7 *<br>08:00 |
| | | * 10 *<br>08:00 | * 11 *<br>08:00 | * 12 *<br>08:00 | * 13 *<br>08:00 | * 14 *<br>08:00 |
| | | * 17 *<br>08:00 | * 18 *<br>08:00 | * 19 *<br>08:00<br>FMLA NO PAY | * 20 *<br>08:00<br>FMLA VACATION PAID | * 21 *<br>08:00<br>FMLA VACATION PAID |
| | | * 24 *<br>08:00 | * 25 *<br>08:00 | * 26 *<br>08:00 | * 27 *<br>08:00 | * 28 *<br>08:00 |
| | | * 31 *<br>08:00 | | | | |

[Show Vacation]  [Done]

UP_Dunger_000459

Exhibit A-121

MVS   MVS Reports

Current User:comto202:
Logout »



**Error**  ×
• Please select the roster

Reports

Select Locations: CHRLO ∨   Select Report: MVS Available Vacation Days ∨   Select year: 2017 ∨
Select Roster(s): ALL ∨   Select Employee: ALL ∨
Calender View

MVS Assigned Vacation Days

KEY: AVAILABLE | FULL | SIC | NO DATA AVAILABLE
[DAY OF MONTH = DAYS TAKEN(MAX OFF)]

### January 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| 1-0.0(6) | 2-6.0(6) | 3-6.0(6) | 4-3.0(6) | 5-3.0(6) | 6-2.0(6) | 7-5.0(6) |
| 8-2.0(6) | 9-3.0(6) | 11 | 12-3.0(6) | 13-1.0(6) | 14-1.0(6) | 15-3.0(6) |
| 15-2.0(6) | 16-1.0(6) | 17-1.0(6) | 18-2.0(6) | 19-1.0(6) | 20-3.0(6) | 21-2.0(6) |
| 22-1.0(6) | 23 | 24-1.0(6) | 25-2.0(6) | 26-2.0(6) | 27-2.0(6) | 28-2.0(6) |
| 29-1.0(6) | 30-1.0(6) | 31 | | | | |

### February 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | 1 | 2-1.0(6) | 3-1.0(6) | 4-4.0(6) |
| 5-5.0(6) | 6-4.0(6) | 7-1.0(6) | 8-1.0(6) | 9-4.0(6) | 10-2.0(6) | 11-3.0(6) |
| 12-1.0(6) | 13-5.0(6) | 14-4.0(6) | 15-3.0(6) | 16-1.0(6) | 17-3.0(6) | 18-2.0(6) |
| | 20-2.0(6) | 21-2.0(6) | 22 | 23-1.0(6) | 24-1.0(6) | 25-2.0(6) |
| 26 | 27-2.0(6) | 28-1.0(6) | | | | |

### March 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5-1.0(6) | 6 | 7-1.0(6) | 8-2.0(6) | 9-3.0(6) | 10-3.0(6) | 11-1.0(6) |
| 12-1.0(6) | 13-2.0(6) | 14-2.0(6) | 15-4.0(6) | 16-5.0(6) | 17-0.0(6) | 18-4.0(6) |
| 19-2.0(6) | 20-3.0(6) | 21-2.0(6) | 22-2.0(6) | 23-1.0(6) | 24-2.0(6) | 25-1.0(6) |
| 26-2.0(6) | 27-4.0(6) | 28-4.0(6) | 29-3.0(6) | 30-5.0(6) | 31-3.0(6) | |

### April 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | | | 1-0.0(6) |
| 2-2.0(6) | 3-2.0(6) | 4-2.0(6) | 5-2.0(6) | 6-3.0(6) | 7-3.0(6) | 8-5.0(6) |
| | 10-2.0(6) | 11-2.0(6) | 12-2.0(6) | 13-2.0(6) | 14-4.0(6) | 15-5.0(6) |
| 16-6.0(6) | 17-4.0(6) | 18-2.0(6) | 19-1.0(6) | 20-1.0(6) | 21-3.0(6) | 22-6.0(6) |
| 23-3.0(6) | 24-3.0(6) | 25-3.0(6) | 26-3.0(6) | 27-1.0(6) | 28-4.0(6) | 29-5.0(6) |
| 30-2.0(6) | | | | | | |

### May 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | 1-2.0(6) | 2-1.0(6) | 3-1.0(6) | 4-3.0(6) | 5-5.0(6) | 6-6.0(6) |
| 7-6.0(6) | 8-4.0(6) | 9-2.0(6) | 10-2.0(6) | 11-6.0(6) | 12-6.0(6) | 13-5.0(6) |
| 14-3.0(6) | 15-3.0(6) | 16-2.0(6) | 17-2.0(6) | 18-4.0(6) | 19-5.0(6) | 20-6.0(6) |
| 21-6.0(6) | 22-5.0(6) | 23-6.0(6) | 24-5.0(6) | 25-2.0(6) | 26-3.0(6) | 27-6.0(6) |
| 28-6.0(6) | 29-2.0(6) | 30-3.0(6) | 31-2.0(6) | | | |

### June 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | 1-2.0(6) | 2-4.0(6) | 3-6.0(6) |
| 4-4.0(6) | 5-6.0(6) | 6-6.0(6) | 7-6.0(6) | 8-6.0(6) | 9-6.0(6) | 10-5.0(6) |
| 11-4.0(6) | 12-4.0(6) | 13-4.0(6) | 14-4.0(6) | 15-3.0(6) | 16-6.0(6) | 17-4.0(6) |
| 18-6.0(6) | 19-6.0(6) | 20-6.0(6) | 21-5.0(6) | 22-5.0(6) | 23-6.0(6) | 24-5.0(6) |
| 25-6.0(6) | 26-5.0(6) | 27-5.0(6) | 28-4.0(6) | 29-2.0(6) | 30-1.0(6) | |

### July 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | | | 1-5.0(6) |
| 2-5.0(6) | 3-6.0(6) | 4-5.0(6) | 5-6.0(6) | 6-6.0(6) | 7-6.0(6) | 8-5.0(6) |
| 9-6.0(6) | 10-5.0(6) | 11-2.0(6) | 12-5.0(6) | 13-4.0(6) | 14-5.0(6) | 15-6.0(6) |
| 16-5.0(6) | 17-5.0(6) | 18-6.0(6) | 19-6.0(6) | 20-4.0(6) | 21-4.0(6) | 22-6.0(6) |
| 23-6.0(6) | 24-6.0(6) | 25-6.0(6) | 26-6.0(6) | 27-3.0(6) | 28-6.0(6) | 29-6.0(6) |
| 30-5.0(6) | 31-4.0(6) | | | | | |

### August 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | 1-2.0(6) | 2-5.0(6) | 3-5.0(6) | 4-3.0(6) | 5-5.0(6) |
| 6-5.0(6) | 7-2.0(6) | 8-2.0(6) | 9-5.0(6) | 10-6.0(6) | 11-6.0(6) | 12-6.0(6) |
| 13-5.0(6) | 14-6.0(6) | 15-6.0(6) | 16-5.0(6) | 17-5.0(6) | 18-5.0(6) | 19-6.0(6) |
| 20-4.0(6) | 21-4.0(6) | 22-5.0(6) | 23-4.0(6) | 24-5.0(6) | 25-4.0(6) | 26-2.0(6) |
| 27-1.0(6) | 28-5.0(6) | 29-5.0(6) | 30-6.0(6) | 31-3.0(6) | | |

### September 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | | 1-6.0(6) | 2-6.0(6) |
| 3-6.0(6) | 4-2.0(6) | 5-6.0(6) | 6-6.0(6) | 7-6.0(6) | 8-1.0(6) | 9-4.0(6) |
| 10-6.0(6) | 11-4.0(6) | 12-5.0(6) | 13-5.0(6) | 14-5.0(6) | 15-5.0(6) | 16-5.0(6) |
| 17-5.0(6) | 18-5.0(6) | 19-6.0(6) | 20-6.0(6) | 21-5.0(6) | 22-4.0(6) | 23-5.0(6) |
| 24-1.0(6) | 25 | 26-3.0(6) | 27-6.0(6) | 28-5.0(6) | 29-5.0(6) | 30-4.0(6) |

### October 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| 1-1.0(6) | 2-1.0(6) | 3-5.0(6) | 4-5.0(6) | 5-5.0(6) | 6-6.0(6) | 7-6.0(6) |
| 8-4.0(6) | 9-6.0(6) | 10-4.0(6) | 11-5.0(6) | 12-6.0(6) | 13-3.0(6) | 14-5.0(6) |
| 15-5.0(6) | 16-4.0(6) | 17-5.0(6) | 18-5.0(6) | 19-5.0(6) | 20-4.0(6) | 21-6.0(6) |
| 22-5.0(6) | 23-3.0(6) | 24-5.0(6) | 25-6.0(6) | 26-6.0(6) | 27-5.0(6) | 28-6.0(6) |
| 29-3.0(6) | 30-5.0(6) | 31-6.0(6) | | | | |

### November 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | 1-6.0(6) | 2-3.0(6) | 3-3.0(6) | 4-6.0(6) |
| 5-4.0(6) | 6-5.0(6) | 7-6.0(6) | 8-5.0(6) | 9-3.0(6) | 10-3.0(6) | 11-6.0(6) |
| 12-2.0(6) | 13-3.0(6) | 14-5.0(6) | 15-5.0(6) | 16-5.0(6) | 17-6.0(6) | 18-6.0(6) |
| 19-4.0(6) | 20-6.0(6) | 21-6.0(6) | 22-6.0(6) | 23-4.0(6) | 24-4.0(6) | 25-6.0(6) |
| 26-6.0(6) | 27-5.0(6) | 28-4.0(6) | 29-6.0(6) | 30-6.0(6) | | |

### December 2017

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | | 1-4.0(6) | 2-6.0(6) |
| 3-6.0(6) | 4-6.0(6) | 5-6.0(6) | 6-6.0(6) | 7-6.0(6) | 8-5.0(6) | 9-6.0(6) |
| 10-4.0(6) | 11-5.0(6) | 12-6.0(6) | 13-5.0(6) | 14-6.0(6) | 15-6.0(6) | 16-6.0(6) |
| 17-4.0(6) | 18-5.0(6) | 19-6.0(6) | 20-6.0(6) | 21-5.0(6) | 22-3.0(6) | 23-1.0(6) |
| 24-2.0(6) | 25-6.0(6) | 26-6.0(6) | 27-6.0(6) | 28-6.0(6) | 29-5.0(6) | 30 |
| 31 | | | | | | |

| DCS Location | Shop Location | Employee Id | Employee Name | Confirmation | Call Date Time | Layoff Date | Shift | Time | Layoff Reason | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| RLO | COMMERCE LOCO | 0444911 | DUNGER, THOMAS E | 150163 | 10/19/2017 20:42:10 | 10/19/2017 | 3 | 22:00 - 06:00 | FMLA | |
| RLO | COMMERCE LOCO | 0444911 | DUNGER, THOMAS E | 150346 | 10/20/2017 20:56:35 | 10/20/2017 | 3 | 22:00 - 06:00 | FMLA PAID | |
| RLO | COMMERCE LOCO | 0444911 | DUNGER, THOMAS E | 150529 | 10/21/2017 20:38:18 | 10/21/2017 | 3 | 22:00 - 06:00 | FMLA PAID | |
| RLO | COMMERCE LOCO | 0444911 | DUNGER, THOMAS E | 153862 | 11/10/2017 22:04:47 | 11/10/2017 | 3 | 22:00 - 06:00 | FMLA | |
| RLO | COMMERCE LOCO | 0444911 | DUNGER, THOMAS E | 153689 | 11/09/2017 21:07:01 | 11/09/2017 | 3 | 22:00 - 06:00 | FMLA | |



EXHIBIT
13

Exhibit A-123

UP_Dunger_000461

 **FMLA 365 Rollover**   **FMLA Absence Detail**      

EXHIBIT

Current User: omnp293
Logout »

Exhibit A-124

UP_Dunger_000462

1-25 of 32 Records                                        « Previous  1  2  Next »

| Employee ID | Leave Type | Absence Type | FL Category | Date | Day Of Week | Usage Type | Portion Of Week Used | Holiday Usage | Weekend Usage | FL Status | nd | FL Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0444911 | FMLA | Intermittent | Family Member | 10/15/2014 | Wednesday | Normal | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 11/03/2014 | Monday | Normal | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 11/16/2014 | Sunday | Normal | 0.2 | N | Y | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 11/17/2014 | Monday | Normal | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 11/18/2014 | Tuesday | Normal | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 11/19/2014 | Wednesday | Normal | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 12/03/2014 | Wednesday | Normal | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 12/31/2014 | Wednesday | Normal | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/14/2016 | Saturday | Cancelled | 0.2 | N | Y | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/17/2016 | Tuesday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/18/2016 | Wednesday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/19/2016 | Thursday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/20/2016 | Friday | Cancelled | 0.2 | N | Y | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/21/2016 | Saturday | Cancelled | 0.2 | N | Y | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/24/2016 | Tuesday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/25/2016 | Wednesday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/26/2016 | Thursday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/27/2016 | Friday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/28/2016 | Saturday | Cancelled | 0.2 | N | Y | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 05/31/2016 | Tuesday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 06/01/2016 | Wednesday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 06/02/2016 | Thursday | Cancelled | 0.2 | N | N | | | CLOSED |
| 0444911 | Undefined | Intermittent | Undefined | 06/03/2016 | Friday | Cancelled | 0.2 | N | Y | | | CLOSED |



[redacted] [redacted] [redacted]

[redacted]

[redacted] [redacted] [redacted] [redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted] [redacted] [redacted]

[redacted] [redacted] [redacted]

# Employee Information   11/17/2017

Page Generated: 11/17/2017 06:14

Current User: OMNP293
Logout »

## Employee Information

| Employee: | _____ | Submit |
|---|---|---|

OR

| Location: | CMRLO ▼ |
|---|---|
| Employee: | DUNGER THOMAS E ▼ |
| Active Only: | ☐ |

| Select | PDF |
|---|---|

| Employee ID | Last Name | First Name | MI | Birth Date | Hire Date | SV |
|---|---|---|---|---|---|---|
| 0444911 | DUNGER | THOMAS | E | 11/23 | 03/14/2011 | 6 |

| Address | City | State | Zip Code |
|---|---|---|---|
| P.O. BOX 129 | CRESTLINE | CA | 92325 |

| Home Phone | Cell Phone | Alt Phone |
|---|---|---|
| (909) 781-4423 | ██████ | |

| Position ID | Occupation | EDCS Status Code and Description | Status Date |
|---|---|---|---|
| 00121203 | MACHINIST | 2H | 07/01/2012 |

| OT | Last PT Date | Last TimeCard | User ID | Days |
|---|---|---|---|---|
| Y | | 11/17/2017 | OMNQ831 | |

| PSoft Status Description | PSoft Stat Date |
|---|---|
| Agr Return from Leave of Abs | 09/22/2016 |

### PRS - Days as of the Last Closed Payroll

| | DUE | TAKEN | LEFT |
|---|---|---|---|
| VAC | 80 | 72 | 8 |
| PER LV | 0 | 0 | 0 |
| SICK | 0 | 0 | 0 |
| SFTY | 0 | 0 | 0 |

| Vac Qual Yrs | Days Worked |
|---|---|
| 7 | 202 |

Tabs: **Job** | Personal Record | Discipline | ETE | Seniority | Absent Time | Time Away | LOA and Status | 90

### Position

| Pos ID | Pos Stat | Qual | Rest Days | Sen Ros/Title Code | Paid Lunc |
|---|---|---|---|---|---|
| 00121203 | | 0 | SUN MON | 0000016953 | Y |

### Position Detail

| Sft | Start | End | Fram | Area | PPC | HOS | Mon | Tue | Wed | Thur | Fri |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 22:00 | 06:00 | 1333 | 3603 | 711 | N | 0 | 1 | 1 | 1 | 1 |

### Job History

| Effective Date | Action | Reason | Job Code | Job Title |
|---|---|---|---|---|
| 08/09/2017 | XFR | | A32711 | MACHINIST |
| 01/19/2017 | XFR | | A32704 | MACHINIST LEAD MEC |
| 09/22/2016 | XFR | | A32711 | MACHINIST |
| 09/22/2016 | RFL | | A32711 | MACHINIST |

EXHIBIT



## Employee Information   **11/17/2017**
Page Generated: 11/17/2017 06:14

Current User: OMNP293
Logout »

### Employee Information

| | |
|---|---|
| **Employee:** | [ ]   Submit |

**OR**

| | |
|---|---|
| **Location:** | CMRLO [v] |
| **Employee:** | VARGAS JASSIER C [v] |
| **Active Only:** | [ ] |

Select        PDF

| Employee ID | Last Name | First Name | MI | Birth Date | Hire Date | SV |
|---|---|---|---|---|---|---|
| 0452004 | VARGAS | JASSIER | C | 01/24 | 04/09/2012 | 5 |

**PRS - Days as of the Last Closed Payroll**

| | DUE | TAKEN | LEFT |
|---|---|---|---|
| **VAC** | 80 | 72 | 8 |
| **PER LV** | 0 | 0 | 0 |
| **SICK** | 0 | 0 | 0 |
| **SFTY** | 0 | 0 | 0 |

Vac Qual Yrs: 6   Days Worked: 209

| Address | | City | State | Zip Code |
|---|---|---|---|---|
| | | BALDWIN PARK | CA | 91706 |

| Home Phone | Cell Phone | Alt Phone |
|---|---|---|
| | | |

| Position ID | Occupation | PDES | Status Code and Description | Status Date |
|---|---|---|---|---|
| 00217621 | ELECTRICIAN | 2H | | 07/01/2012 |

| OT | Last OT Date | Last Time Card | User ID | Days |
|---|---|---|---|---|
| Y | | 11/17/2017 | OMNZ646 | |

| PSoft Status Description | PSoft Stat Date |
|---|---|
| Agr Return from Leave of Abs | 07/19/2013 |

---

**Job** | Personal Record | Discipline | ETE | Seniority | Absent Time | Time Away | LOA and Status | 90

**Position**

| Pos ID | Pos Stat | Qual | Rest Days | Sen Rost | Title Code | Paid Lunch |
|---|---|---|---|---|---|---|
| 00217621 | | 0 | SAT | SUN | 0000016975 | Y |

**Position Detail**

| Sft | Start | End | Frmn | Area | PFC | HOS | Mon | Tue | Wed | Thur | Fri |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 22:00 | 06:00 | 1333 | 2003 | 858 | | 0 | 0 | 0 | 0 | 1 |
| 3 | 22:00 | 06:00 | 1339 | 3803 | 858 | | 1 | 1 | 1 | 1 | 0 |

**Job History**

| Effective Date | Action | Reason | Job Code | Job Title |
|---|---|---|---|---|
| 08/17/2017 | XFR | | A32858 | ELECTRICIAN |
| 08/17/2017 | XFR | | A32858 | ELECTRICIAN |
| 03/23/2017 | XFR | | A32858 | ELECTRICIAN |

EXHIBIT
2
1C



**Employee Information** **11/17/2017**
Page Generated: 11/17/2017 06:14

Current User: OMNP293
Logout »

## Employee Information

| | |
|---|---|
| **Employee:** | [ ] Submit |

OR

| | |
|---|---|
| **Location:** | CMRLO [v] |
| **Employee:** | SCHARF HARRISON T [v] |
| **Active Only:** | [ ] |

Select    PDF

| Employee ID | Last Name | First Name | MI | Birth Date | Hire Date | SV |
|---|---|---|---|---|---|---|
| 0447462 | SCHARF | HARRISON | T | 07/22 | 06/20/2011 | 6 |

| Address | City | State | Zip Code |
|---|---|---|---|
| ▓▓▓▓▓ | SAN JUAN CAPISTRA | CA | 92675 |

| Home Phone | Cell Phone | Alt Phone |
|---|---|---|
| ▓▓▓▓▓ | | |

| Position ID | Occupation | EDC5 | Status Code and Description | Status Date |
|---|---|---|---|---|
| 00210288 | ELECTRICIAN | 2H | | 07/01/2012 |

| | PRS - Days as of the Last Closed Payroll | | |
|---|---|---|---|
| | DUE | TAKEN | LEFT |
| VAC | 80 | 64 | 16 |
| PER LV | 0 | 0 | 0 |
| SICK | 0 | 0 | 0 |
| SFTY | 0 | 0 | 0 |
| Vac Qual Yrs | 7 | Days Worked | 220 |

| On | Last PD Date | Last Time Card | User ID | Days |
|---|---|---|---|---|
| Y | | 11/17/2017 | OMNQ785 | |

| PSoft Status Description | PSoft Stat Date |
|---|---|
| Agr Set up to Journeyman | 07/29/2015 |

Job | Personal Record | Discipline | ETE | Seniority | Absent Time | Time Away | LOA and Status | 90

| | | | | Position | | | |
|---|---|---|---|---|---|---|---|
| Pos ID | Pos Stat | Qual | Rest Days | Sen Rost/Title Code | Paid Lunch | |
| 00210288 | | 0 | FRI  SAT | 0000016975 | Y | E |

| | | | | Position Detail | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Str | Start | End | Frmn | Area | PRC | HOS | Mon | Tue | Wed | Thu | Fri |
| 3 | 22:00 | 06:00 | 1339 | 3803 | 858 | N | 1 | 1 | 1 | 1 | 0 |

| | | Job History | | |
|---|---|---|---|---|
| Effective Date | Action | Reason | Job Code | Job Title |
| 03/23/2017 | XFR | | A32858 | ELECTRICIAN |
| 03/23/2017 | XFR | | A32858 | ELECTRICIAN |
| 03/01/2017 | XFR | | A32858 | ELECTRICIAN |
| 10/20/2016 | XFR | | A32858 | ELECTRICIAN |

EXHIBIT

**Exhibit A-128**



**Employee Information**   **11/17/2017**

Page Generated: 11/17/2017 06:14

Current User: OMNP293

Logout »

## Employee Information

| Employee: | [ ]  Submit |
|---|---|

OR

| Location: | CMRLO ▾ |
|---|---|
| Employee: | LEMUS JOHN M ▾ |
| Active Only: | ☐ |

| Select | PDF |
|---|---|

| Employee ID | Last Name | First Name | MI | Birth Date | Hire Date | SV |
|---|---|---|---|---|---|---|
| 0352670 | LEMUS | JOHN | M | 04/28 | 01/29/2001 | 16 |

| | Address | | City | State | Zip Code |
|---|---|---|---|---|---|
| | | | RIALTO | CA | 92377 |

| Home Phone | Cell Phone | Alt Phone |
|---|---|---|

| Position ID | Occupation | EDCS Status Code and Description | Status Date |
|---|---|---|---|
| 00210234 | MACHINIST | 2H | 07/01/2012 |

| OT | Last OT Date | Last TimeCard | User ID | Days |
|---|---|---|---|---|
| Y | | 11/17/2017 | OMNI952 | |

| PSoft Status Description | PSoft Stat Date |
|---|---|
| Agr Return from Leave of Abs | 09/09/2010 |

| PRS - Days as of the Last Closed Payroll | | | |
|---|---|---|---|
| | DUE | TAKEN | LEFT |
| VAC | 120 | 64 | 56 |
| PER LV | 8 | 0 | 8 |
| SICK | 0 | 0 | 0 |
| SFTY | 0 | 0 | 0 |
| Vac Qual Yrs | | Days Worked | |
| 17 | | 218 | |

---

| Job | Personal Record | Discipline | ETE | Seniority | Absent Time | Time Away | LOA and Status | 90 |
|---|---|---|---|---|---|---|---|---|

| | | | | | Position | | |
|---|---|---|---|---|---|---|---|
| Pos ID | Pos Stat | Qual | Rest Days | | Sen Rost | Trig Code | Paid Lunch |
| 00210234 | | 0 | FRI | SAT | 0000016953 | | Y |

| | | | | | Position Detail | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Str | Start | End | Termn | Area | PRC | HOS | Mon | Tue | Wed | Thur | Fri |
| 3 | 22:00 | 06:00 | 1339 | 3803 | 711 | N | 1 | 1 | 1 | 1 | 0 |

| | | | Job History | | |
|---|---|---|---|---|---|
| Effective Date | Action | Reason | Job Code | Job Title | |
| 08/09/2017 | XFR | | A32711 | MACHINIST | |
| 05/25/2017 | XFR | | A32711 | MACHINIST | |
| 05/25/2017 | XFR | | A32711 | MACHINIST | |
| 10/06/2016 | XFR | | A32711 | MACHINIST | |

EXHIBIT 4 IC

Work/School Note                                                    DUNGER, THOMAS - 2215332



**Work or School Excuse \***

Patient:  **DUNGER, THOMAS**      **MRN: 2215332**      **FIN: 4316196**
Age:  **28 years**   Sex:  **Male**   DOB:  **11/23/1988**
Associated Diagnoses:  **None**
Author:  **McNutt , Carrolyn**

Today's date:   10/19/2017.

To whom it may concern:
   This patient was seen in my office on 10/19/2017.     Please excuse him/ her from work, today, for the next 2 days. He/ she may return
to work, on  10/22/2017.  Please contact me if you have any questions or concerns.

Sincerely,
Lizotte, Scott, FNP
909-948-8100



Charted Date:            October 19, 2017 11:00 AM PDT
Subject / Title:          Work or School Excuse *
Performed By:           McNutt , Carrolyn on October 19, 2017 11:00 AM PDT
Electronically Signed By: McNutt , Carrolyn on October 19, 2017 11:00 AM PDT
Visit Information:          4316196, Rancho San Antonio Urgent Care, Outpatient, 10/19/2017 -

SAN ANTONIO URGENT CARE
7777 MILLIKEN AVE
RANCHO CUCAMONGA, CA 91730
(909)948-8100

Printed by:  .   McNutt , Carrolyn                                    Page 1 of 1
Printed on:      10/19/2017 11:00 AM PDT                          (End of Report)

Exhibit A-130

UP_Dunger_000468

# Cover Page – Exhibit B

 **BUILDING AMERICA®**

11/27/2017

Thomas Dunger
Employee ID: 0444911
P.O. Box 129
Crestline, CA 92325

**Subject: NOTIFICATION OF DISCIPLINE ASSESSED**

Dear Thomas Dunger:

This correspondence is regarding the hearing held on 11/17/2017 in Commerce, CA as originally outlined in the Notice of Investigation dated 11/10/2017.

After carefully considering the evidence adduced at the hearing, I find that the evidence more than substantially supports the charges against you. The following charge has been sustained:

> On 10/21/2017, while employed as a Machinist, you used FMLA-Vacation in a manner that was not consistent with the serious medical condition for which you received an FMLA entitlement from UPRR Health Services. You were allegedly dishonest when you requested FMLA Vacation time for 10/20/2017 and / or 10/21/2017. This is a violation of the following rule(s) and/or policy:
> 1.6: Conduct - Dishonest

Additionally, **Rule 1.6: Conduct** stipulates that any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported. Indifference to duty or to the performance of duty will not be tolerated.

Based on your current record, you are hereby dismissed from all service with the Union Pacific Railroad. Immediately arrange to deliver all Company property in your possession to Daniel Glenn.

Respectfully,

Andreas Mader
Lead Mech Support

cc: Derrick D Battle, derrick.battle@districtlodge19.com - E-Mail
Juan N Estrada, jnestrad@up.com - E-Mail

**Exhibit B-131**

# Cover Page – Exhibit C

 **BUILDING AMERICA®**

January 15, 2018

From:   Andreas J Mader
To:       Kali Landmark, Labor Relations

Subj:   Thomas Dunger EID 0444911 Investigation and Decision

Kali,

I was the hearing and reviewing officer for the investigation of Thomas Dunger. The investigation was held on Nov 17th 2017 and I received the transcript at the end of the day on Nov 22nd (1536 CST). I rendered my decision on the 26th of Nov after reviewing the transcript and evidence presented at the investigation. At no time during the investigation was an objection made to timeliness of the charges. Had an objection been made I would have inquired from the charging officer and witnesses as to when they became aware of the alleged violation.

Respectfully,



Andreas Mader

Union Pacific Railroad
1400 Douglas Street STOP 1060
Omaha Nebraska 68179

**Exhibit C-132**                    UP_Dunger_000076

# CERTIFICATE OF SERVICE

I, the undersigned, am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action; am employed with the law offices of Fisher & Phillips LLP and my business address is 4747 Executive Drive, Suite 1000, San Diego, California, 92121.

On April 22, 2019 I served the foregoing document entitled **DECLARATION OF ANDREAS MADER IN SUPPORT OF DEFENDANT UNION PACIFIC RAILROAD COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** on all the appearing and/or interested parties in this action by placing ☐ *the original* ☒ *a true copy* thereof enclosed in sealed envelope(s) addressed as follows:

Joseph Y. Avrahamy (SBN 150885)       Telephone: (818)990-1757
LAW OFFICES OF JOSEPH Y.              Facsimile: (818)990-1955
AVRAHAMY                              E-Mail: javrahamy@jyalaw.com
16530 Ventura Boulevard, Suite 208    Co-Counsel for Thomas Dunger
Encino, California 91436

Marla A. Brown (SBN 140158)          Telephone: (310)779-4354
2324 South Beverly Glen Boulevard,   Facsimile: (818)990-1955
Suite 205                            E-Mail: socalmab@sbcglobal.net
Los Angeles, California 90064        Co-Counsel for Thomas Dunger

☒      **[by ELECTRONIC SUBMISSION]** - I served the above listed document(s) described via the United States District Court's Electronic Filing Program on the designated recipients via electronic transmission through the CM/ECF system on the Court's website. The Court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document(s). Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed April 22, 2019 at San Diego, California.

| Susan E. Valle | By: *Susan E. Valle* |
|---|---|
| Print Name | Signature |